

1  Theodore A. Griffinger, Jr. (SBN 66028)
   Catherine A. Jackson (SBN 191599)
2  STEIN & LUBIN LLP
   Transamerica Pyramid
3  600 Montgomery Street, 14th Floor
   San Francisco, CA 94111
4  Telephone:    (415) 981-0550
   Facsimile:    (415) 981-4343
5  tgriffinger@steinlubin.com
   cjackson@steinlubin.com
6
   Attorneys for Plaintiffs
7  INTERNATIONAL SETTLEMENT HOLDING
   CORPORATION and GARY GAVELLO
8

ORIGINAL
FILED

JUL 3 0 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**MHP**

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

12

13  INTERNATIONAL SETTLEMENT          **CV 08       3647**
    HOLDING CORPORATION, a California    Case No.
14  corporation; and GARY GAVELLO, an
    individual,
15
                    Plaintiffs,          **COMPLAINT FOR DECLARATORY**
16                                       **RELIEF AND BREACH OF CONTRACT**
    v.
17
    OFFICEMAX NORTH AMERICA, INC.,
18  an Ohio corporation; DOES 1 through 100,

19                  Defendants.

20

21          Plaintiffs INTERNATIONAL SETTLEMENT HOLDING CORPORATION, a

22  California corporation, and GARY GAVELLO, an individual (collectively, "Plaintiffs") allege:

23                          **JURISDICTION**

24          1.      This Court has jurisdiction over the claims asserted by Plaintiffs under 28

25  U.S.C. Section 1332(a) because complete diversity exists between Plaintiffs and Defendant and

26  the amount in controversy exceeds $75,000 in value, exclusive of interest and costs.

27                      **INTRADISTRICT ASSIGNMENT**

28          2.      Venue is proper in the San Francisco or Oakland Division of the United

70450002/370265v1                           1                          Case No.

States District Court for the Northern District of California under 28 U.S.C. Section 1391(a) and Civil Local Rule 3-2 because (a) the lease that is the subject of this action was entered into in this judicial district and applies to real property located in this judicial district; (b) Plaintiffs' injuries and losses have and continue to occur within this judicial district; (c) Defendant is subject to personal jurisdiction within this judicial district; and (d) a substantial part of the events giving rise to Plaintiffs' claims for relief occurred in this judicial district.

<u>**PARTIES**</u>

3.      Plaintiff INTERNATIONAL SETTLEMENT HOLDING CORPORATION is a corporation organized under the laws of the State of California and doing business in the County of San Mateo, California.

4.      Plaintiff GARY GAVELLO is an individual and a resident of the County of San Mateo, State of California.

5.      Plaintiffs are informed and believe and, based on that information and belief, allege that Defendant OFFICEMAX NORTH AMERICA, INC. is a corporation organized under the laws of the State of Ohio with its principal place of business in Naperville, Illinois and which does business in the Northern District of California ("Defendant").

6.      Plaintiffs are ignorant of the true names and capacities of the remaining Defendants sued herein as Does 1 through 100 (the "Doe Defendants"), and therefore sue those Doe Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained.

<u>**GENERAL ALLEGATIONS**</u>

7.      Plaintiffs are the owners of improved real property located at 785 Serramonte Boulevard in the City of Colma, County of San Mateo, State of California (the "Property").

8.      On or about December 20, 2006, Plaintiffs and Defendant entered into a written lease for the Property for a ten (10) year term (the "Lease"). The Lease specified annual minimum rent due, during the ten (10) year lease term, was $486,000.00 for years one through five and $534,600.00 for years six through ten. In addition to the annual minimum rent, the Lease

COMPLAINT FOR DECLARATORY RELIEF AND BREACH OF CONTRACT

1    required Defendant to pay the Property's taxes and assessments, insurance and common area

2    costs as defined in the Lease. A true and correct copy of the Lease is attached hereto as Exhibit

3    A and incorporated herein by reference.

4           9.    As expressly set forth in Article 6 of the Lease, Plaintiffs agreed to deliver

5    and Defendant agreed to accept the Property in "as-is" condition except that Plaintiffs agreed that,

6    at the time of delivery by Plaintiffs to Defendant (a) the Property was to be in "broom-clean"

7    condition; (b) the Property's mechanical heating and air conditioning systems were to be in "good

8    working condition;" (c) the Property would provide electrical service according to certain

9    specifications; and (d) the Property's roof would be "water tight."

10           10.    The Lease further provided Defendant, at Article 7, the right to do

11    improvements and work to the Property as specified in the Lease's Exhibit C ("Defendant's

12    Improvements"). The first page of the Lease's Exhibit C specifically provided:

13    **EXHIBIT C**

14    **Tenant's Outline Specifications**

15    TENANT IS TAKING THIS PROPERTY "AS IS." THE
16    ATTACHED OUTLINE SPECIFICATIONS ARE INCLUDED
     SOLELY TO OUTLINE THE POSSIBLE SCOPE OF WORK TO
     BE PERFORMED BY TENANT AT TENANT'S EXPENSE.
17    ANY REFERENCE TO LANDLORD RESPONSIBILITY OR
     LANDLORD WORK IN THE ATTACHED OUTLINE
18    SPECIFICATIONS ARE INAPPLICABLE AND VOID IN THEIR
     ENTIRETY.

19

20           11.    Article 7 of the Lease required Defendant "to procure all building and other

21    permits and approvals necessary" to perform Defendant's Improvements within sixty days of the

22    Lease's December 20, 2006 execution and to "complete such construction in a good and

23    workmanlike manner and, in compliance with all applicable laws, ordinances, and regulations,

24    including building codes."

25           12.    Under the Lease's Article 2, the Initial Term of the Lease term began, and

26    Defendant's first monthly rental payment was due, one hundred and eighty days after Plaintiffs'

27    delivery of the Property to Defendant as set forth in paragraph 9, above. The purpose for the one

28    hundred eighty day period was to allow Defendant to complete whatever alterations and

1    improvements it chose under the Lease's Article 7 and Exhibit C.

2    13.    By letter dated January 2, 2007, Plaintiffs delivered possession of the

3    Property to Defendant via written notice delivered to Defendant by overnight courier (the

4    "Delivery Notice").

5    14.    After delivery of the Property by Plaintiffs to Defendant, Defendant began

6    to work on the Property by, among other demolition projects, removing substantially all existing

7    landscaping, dismantling the Property's irrigation sprinkler system, gutting the interior of the

8    building on the Property, removing and boarding up certain then existing access and loading dock

9    doors, sawcutting and making trenches in the existing parking lot asphalt, cutting new entrance

10    and exit door openings in new locations on the building's exterior walls, disconnecting and

11    disabling the building's fire sprinkler system, and initiating significant alterations, among other

12    things, to the building's interior electrical main panel and wiring, bathrooms and plumbing,

13    HVAC system and ducting, and exterior roof parapet.  In the middle of these demolition and

14    construction projects, Defendant stopped work and abandoned the Property in a substantially

15    debilitated condition.

16    15.    Under Article 2 of the Lease, Defendant's Lease's ten-year term and first

17    rent became due one hundred and eighty days from January 3, 2007.  Defendant has paid no rent

18    to Plaintiffs.

19    16.    Defendant has further consistently failed to perform its obligations under

20    the Lease but instead put forth a series of meritless positions culminating in Defendant's

21    abandoning the Property in a substantially debilitated condition.

22    17.    By letter dated July 2, 2007, Defendant's Associate General Counsel

23    Christopher Lentz advised Plaintiff that Mr. Lentz had been "… unable to locate any information

24    concerning … delivery of the Demised Premises in accordance with … the lease."  In response,

25    Plaintiffs sent Defendant a copy of the Delivery Notice along with three receipts from Federal

26    Express showing the Delivery Notice had been delivered to Defendant on January 3, 2007.

27    18.    That gambit having failed, Defendant's Mr. Lentz notified Plaintiffs that

28    the Town of Colma (where the Property is located) had imposed "certain requirements" on

COMPLAINT FOR DECLARATORY RELIEF AND BREACH OF CONTRACT

1    Defendant before Defendant would receive a permit for Defendant's Improvements and that these

2    requirements were allegedly Plaintiffs' responsibility, citing the Lease's Article 14(d).

3        19.    Article 14(d) is the "Repairs and Maintenance" provision of the Lease and

4    provides that "throughout the term" of the Lease, Plaintiffs would maintain and make repairs

5    which are "[r]equired for reasons unrelated to [Defendant's] use of [the Property] in order to

6    comply with any law, order, ordinance, rule, regulation or requirement." The Lease's Article 2

7    provides the Initial Term of the Lease commenced one hundred and eighty days after delivery of

8    the Property by Plaintiffs to Defendants. That one hundred and eighty days was the time period

9    Defendant estimated would be necessary to effect Defendant's Improvements. In other words,

10   the Lease term, and therefore Plaintiffs' repair and maintenance obligation, did not commence

11   until after Defendant was to have completed Defendant's Improvements.

12       20.    As such, Plaintiffs responded that the Lease provides that, whatever

13   alterations or improvements the Town of Colma, or Defendant, might require to effect

14   Defendant's Improvements were Defendant's sole responsibility as the Property had been

15   delivered to Defendant "as-is" and that the Lease's Article 14 delineates Plaintiffs' responsibility

16   to repair and maintain the Property after Defendant's Improvements had been completed and the

17   Lease term commenced.

18       21.    By letter to Plaintiffs dated September 19, 2007 from Defendant's outside

19   counsel, Katherine Graham Sarlson of Baker & Hosteler LLP of Cleveland, Ohio, Defendant

20   relented from Mr. Lentz's position and agreed to "do whatever is reasonably necessary to assuage

21   the City of Colma's concerns, to obtain permitting, and to proceed to open at this location" while

22   Defendant stated it was "amenable to working with you (Plaintiffs) to an equitable division of

23   costs associated with this matter, including proration of rent."

24       22.    Approximately four months later, Defendant's Mr. Lentz again became

25   involved – this time to notify Plaintiffs that Defendant had changed its position. By letter to

26   Plaintiffs dated January 4, 2008, Defendant's Mr. Lentz listed a series of improvements to the

27   Property that Defendant's structural engineer wanted done in connection with Defendant's

28   Improvements and which Defendant's Mr. Lentz maintained Plaintiff "… will be required to

complete ..." By January 2008, Defendant had been performing demolition and construction work for approximately five (5) months and the Property was in the debilitated state described in paragraph 14 above.

23.    Plaintiffs responded by e-mail dated January 17, 2008, repeating the Lease's express provision that the Property had been delivered to Defendant "as-is" and that Lease Article 7 obligated Defendant, "at [Defendant's] expense," to complete Defendant's Improvements "... in a good and workmanlike manner, and in compliance with all applicable laws, ordinances, and regulations, including building codes ..." and "... to procure all building and other permits and approvals necessary for performing ..." Defendant's Improvements.

24.    Thereupon, by letter from Defendant's Mr. Lentz to Plaintiffs, dated February 5, 2008, Defendant purported to terminate the Lease based upon Defendant's position that Plaintiffs had breached the Lease's Article 14, the "Repairs and Maintenance" paragraph discussed *supra*, and Article 25 by which Plaintiffs "to the best of [their] knowledge" represented that "except as to the extent the obligations are those of [Defendant]" under the Lease, the Property complied with all code requirements.

25.    Defendant thereupon abandoned the Property in a derelict condition, a condition caused entirely by Defendant. The Town of Colma has declared that the Property's condition has continued to deteriorate since Defendant's abandonment, that the Property "...is considered a significant public blight, a public nuisance and a health and safety hazard" and has issued a Final Notice-Compliance Order to that effect. Plaintiff is informed and believes and, based on this information and belief, alleges that Defendant has done nothing to remediate the derelict conditions it created on the Property.

## FIRST CLAIM FOR RELIEF
(Declaratory Relief)

26.    Plaintiffs reallege and incorporate herein by reference as though set forth in full the allegations contained in Paragraphs 1 through 25 of this Complaint.

27.    An actual controversy has arisen and now exists between Plaintiffs, on the one hand, and Defendant, on the other hand, concerning their respective rights and interests in the

COMPLAINT FOR DECLARATORY RELIEF AND BREACH OF CONTRACT

1  Lease.

2          28.    Plaintiff contends (i) that the Property was delivered to Defendant by

3  Plaintiffs under the Lease on or about January 3, 2007; (ii) that Defendant expressly agreed in the

4  Lease to lease the Property in "as-is" condition; (iii) that each and every condition of the Property

5  complained of by Defendant is Defendant's responsibility; and (iv) that Defendant's purported

6  termination of the Lease and abandonment of the Property is in breach of the Lease.

7          29.    Plaintiffs are informed and believe and, on that basis, allege that Defendant

8  disputes Plaintiffs' contentions.

9          30.    Plaintiffs desire a judicial determination of their rights and interests in the

10 Lease and, specifically, for a judicial determination that (i) that the Property was delivered to

11 Defendant by Plaintiffs under the Lease; (ii) that Defendant expressly agreed in the Lease to lease

12 the Property in "as-is" condition; (iii) that each and every condition of the Property complained of

13 by Defendant is Defendant's responsibility; and (iv) that Defendant's purported termination of the

14 Lease and abandonment of the Property is in breach of the Lease.

15         31.    A judicial determination is necessary at this time so that the parties may

16 ascertain their rights and interests in the Lease.

17         WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth below.

18                          **SECOND CLAIM FOR RELIEF**
19                              (Breach of Contract)

20         32.    Plaintiffs realleges and incorporate herein by reference as if set forth in full

21 the allegations contained in Paragraphs 1 through 25 of this Complaint.

22         33.    Plaintiffs have performed each and every obligation required of them by

23 the Lease.

24         34.    Defendants have breached the Lease by failing and refusing to pay the rent

25 due Plaintiffs under the Lease, by wrongfully terminating the Lease and abandoning, after having

26 substantially damaged, the Property.

27         35.    As a direct and proximate result of the Defendant's conduct, Plaintiffs have

28 been damaged in an amount which is not fully ascertainable.   Plaintiffs will seek leave of this

1   Court to amend this Complaint with the precise amount of damages at such time as those

2   damages become fully ascertainable or according to proof at trial.  The minimum damages

3   sustained by Plaintiffs exceed the jurisdictional minimum of this Court.

4          36.    Plaintiffs are entitled to receive from Defendant all of their costs and

5   reasonable attorneys fees in this action.

6          WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

7                      **On the First Claim for Relief**:

8          1.    For a judicial determination of the parties' rights and interests in the Lease

9   and, specifically, for a judicial determination (i) of the date that the Property was delivered to

10  Defendant by Plaintiffs under the Lease; (ii) that Defendant expressly agreed in the Lease to lease

11  the Property in "as-is" condition; (iii) that each and every condition of the Property complained of

12  by Defendant is Defendant's responsibility; and (iv) that Defendant's purported termination of the

13  Lease and abandonment of the Property is in breach of the Lease.

14                     **On the Second Claim for Relief**:

15         1.    For compensatory damages according to proof.

16                     **On All Claims for Relief**:

17         1.    For Plaintiffs' attorneys fees and costs of suit; and

18         2.    For such other relief as the Court deems just.

19                          **Jury Demand**

20         Plaintiffs hereby demand a trial by jury of those issues in this Complaint which

21  are so triable pursuant to Federal Rule of Civil Procedure 38(b).

22  Dated: July 30, 2008              STEIN & LUBIN LLP

23

24                          By:  _____

25                                   Theodore A. Griffinger, Jr.
                                     Attorneys for Plaintiffs
26                                   INTERNATIONAL SETTLEMENT HOLDING
                                     CORPORATION and GARY GAVELLO
27

28

COMPLAINT FOR DECLARATORY RELIEF AND BREACH OF CONTRACT

# EXHIBIT A

OfficeMax Store
No. 1413

# ORIGINAL

COLMA, CALIFORNIA

LEASE

BY AND BETWEEN

**GARY GAVELLO,**
an individual

and

**INTERNATIONAL SETTLEMENT HOLDING CORPORATION,**
a California corporation

**"LANDLORD"**

and

**OFFICEMAX NORTH AMERICA, INC.,**
an Ohio corporation (formerly OfficeMax, Inc.)

**"TENANT"**

# ORIGINAL

COLMA, CALIFORNIA

### INDEX TO LEASE

**SECTION**                                                                                          **PAGE**

Parties.................................................................................................................................. 1

Demised Premises............................................................................................................... 1

Term.................................................................................................................................... 1

Annual Minimum Rent........................................................................................................ 2

Additional Rent................................................................................................................... 2

Real Estate Taxes................................................................................................................ 2

Delivery by Landlord and Landlord's Work...................................................................... 4

Tenant's Work..................................................................................................................... 4

Guarantee of Materials........................................................................................................ 5

Turnover Notices................................................................................................................. 5

Parking and Other Common Areas and Shopping.............................................................. 5

Store Opening...................................................................................................................... 6

Landlord's Representations and Warranties........................................................................ 6

Options to Extend Lease...................................................................................................... 7

Repairs and Maintenance.................................................................................................... 7

Alterations and Additional Construction............................................................................ 10

Utilities................................................................................................................................ 10

Governmental Regulations.................................................................................................. 10

Exculpation.......................................................................................................................... 11

Damage to Demised Premises............................................................................................. 11

Eminent Domain.................................................................................................................. 13

Use, Assignment, Subletting, and Other Restrictions........................................................ 15

Signs.................................................................................................................................... 16

**SECTION**  **PAGE**

Landlord's Remedies ............................................................................................................ 17

Bankruptcy ............................................................................................................................ 19

Covenant of Title and Assurances ........................................................................................ 19

Cotenancy .............................................................................................................................. 21

Mortgage Subordination ....................................................................................................... 21

Indemnity ............................................................................................................................... 22

Tenant's Right to Cure Landlord's Defaults ......................................................................... 22

Condition of Premises at Termination .................................................................................. 22

Hazardous Waste ................................................................................................................... 23

Holding Over ......................................................................................................................... 24

Investment Tax Credit ........................................................................................................... 24

Notices ................................................................................................................................... 24

Captions and Definitions ....................................................................................................... 24

Partial Invalidity .................................................................................................................... 24

Entire Agreement; Construction ........................................................................................... 24

Successors and Assigns ......................................................................................................... 25

Memorandum of Lease .......................................................................................................... 25

Attorneys' Fees ...................................................................................................................... 25

Brokerage ............................................................................................................................... 25

Condition ............................................................................................................................... 25

Right of First Refusal ............................................................................................................ 25

Satellite Dish ......................................................................................................................... 25

Estoppel Certificates ............................................................................................................. 26

Gross Sales Defined .............................................................................................................. 26

Counterparts .......................................................................................................................... 26

**SECTION**                                                                                    **PAGE**

Late Charge .................................................................................................................. 26

Tenant's Insurance ....................................................................................................... 27

# EXHIBITS

Exhibit A          Legal Description of Property

Exhibit B          Site Plan

Exhibit C          Tenant's Outline Specifications

Exhibit C-1        Landlord's Construction Schedule

Exhibit C-2        Building Elevation(s)

Exhibit C-3        Pylon Sign(s)

Exhibit D          Permitted Title Exceptions

Exhibit E          SNDA

Exhibit F          Rent Commencement Date Letter

Exhibit G          Prohibited Uses

Exhibit H          Electrical Service to Premises

Exhibit I          Tenant Estoppel Certificate Form

Preparer:  KGS

# L E A S E

**Parties**

      THIS LEASE, made and entered into as of this 2oᵗʰ day of December, 2006, between **GARY GAVELLO**, an individual and **INTERNATIONAL SETTLEMENT HOLDING CORPORATION**, a California corporation having their principal office at 72 Barry Lane, Atherton, CA 94027 (collectively, "Landlord"), and **OFFICEMAX NORTH AMERICA, INC.**, an Ohio corporation (formerly OfficeMax, Inc.) having its principal office at 263 Shuman Blvd., Naperville, Illinois 60563 ("Tenant").

      **WITNESSETH:** That in consideration of the rents, covenants and conditions herein set forth, Landlord and Tenant do hereby covenant, promise and agree as follows:

**Demised Premises**

      1.      Landlord, in consideration of the rents to be paid and the covenants and agreements to be performed and observed by Tenant, does hereby lease unto Tenant, and Tenant does hereby lease and take from Landlord, the building (including the loading dock notch area at the rear of the building) of approximately eighteen thousand (18,000) square feet of floor area (the "Building"), located on that certain parcel of land consisting of approximately ninety thousand (90,000) square feet and further described on **EXHIBIT "A"**, attached hereto, located at 785 Serramonte Boulevard in Colma, California (the "Property" or the "Demised Premises"), (b) an exclusive easement and right to use all facilities erected or serving the Property, including, but not limited to, all entrances, exits, driveways, service drives and parking areas, and (c) the exclusive right to use those portions of the truck dock(s), truck ramp(s) and related facilities located outside of but adjacent to the premises. The Demised Premises, including the Building area, as delineated on the site plan attached hereto as **EXHIBIT "B"**.

      Prior to the Date of Occupancy (as defined in Article 11), Tenant shall measure the leasable space in the Demised Premises and deliver to Landlord a written certificate certifying the correct dimension of the Demised Premises. The measurement shall be to the outside face of all exterior walls. If such certificate reveals a floor area that is different from the floor area provided for in this Article 1 above, either (a) Landlord and Tenant shall mutually agree on the floor area of the Demised Premises, or (b) Landlord and Tenant shall agree to have the space measured by an independent architect mutually acceptable to Landlord and Tenant, at Landlord's expense, in which event Landlord and Tenant agree to abide by such measurement. Upon the determination of the actual floor area of the Demised Premises, the minimum rent and all other charges payable by Tenant hereunder shall be adjusted to reflect the floor area of the Demised Premises, but in no event shall the floor area be deemed to be larger than eighteen thousand one hundred (18,100) square feet for the purpose of calculating minimum rent and other charges under this lease.

      Landlord shall not place any signs on the exterior of the Building, construct any additional floors above the Demised Premises, remodel the exterior of the Building or locate any equipment on the roof without Tenant's prior written consent, and in no event shall Landlord's use of the exterior walls of the Building, the area beneath the Demised Premises, or the roof of the Building adversely affect Tenant's access to or use of the Demised Premises.

**Term**

      2.      The initial term of this lease (the "Initial Term") shall commence (the "Commencement Date") upon the earlier of (a) one hundred eighty (180) days after the Date of Delivery (as defined in Article 6), or (b) the date Tenant shall open for business in the Demised Premises, and shall terminate on such date as shall be ten (10) years from the last day of the

month in which the Commencement Date shall occur; provided, however if the Commencement Date does not occur during the month of March the expiration date of the Initial Term shall be the March 31st following the date upon which the Initial Term would have expired but for the application of this provision. Notwithstanding the foregoing, the Initial Term of this lease may be extended as provided in <u>Article 13</u> hereof. The phrase "Lease Term", as used in this lease, shall be the Initial Term of this lease and any extension thereof pursuant to <u>Article 13</u>. The phrase "Lease Year" shall mean a period of twelve (12) consecutive months during the Lease Term with the exception of (i) the first Lease Year which shall commence on the Commencement Date and end one year from the last day of the month in which the Rent Commencement Date shall occur and (ii) the tenth Lease Year which shall commence upon the expiration of the ninth Lease Year and expire upon the expiration of the Initial Term.

**Annual Minimum Rent**

3.    From and after the Commencement Date and continuing during the Lease Term, Tenant shall pay to Landlord, at such place as Landlord shall designate in writing, from time to time, and without demand therefor, the following annual minimum rent unless abated or diminished, as hereinafter provided:

(a)    From the Commencement Date through the fifth Lease Year, the annual minimum rent shall be Four Hundred Eighty Six Thousand and 00/100ths Dollars ($486,000), based on a rental rate of Twenty-Seven and 00/100ths Dollars ($27.00) per square foot per annum.

(b)    For the sixth Lease Year through the balance of the Initial Term, the annual minimum rent shall be Five Hundred Thirty Four Thousand Six Hundred and 00/100ths Dollars ($534,600), based on a rental rate of Twenty-Nine and 70/100ths Dollars ($29.70) per square foot per annum.

Rent shall be paid in equal monthly installments on the first day of each month, in advance; provided, however, in the event the Commencement Date shall not be the first day of a calendar month, then the rent for such month shall be prorated on a daily basis.

Promptly after Tenant opens for business in the Demised Premises, Landlord and Tenant shall execute a Commencement Date Letter substantially in the form of **EXHIBIT "F"** attached hereto confirming the Commencement Date and the expiration date of the Initial Term.

**Additional Rent**

4.    In addition to the annual minimum rent, commencing on the Commencement Date, Tenant shall be responsible for the taxes and assessments, insurance and common area costs for the Property, as set forth in <u>Articles 5</u> and <u>14</u> below.

**Real Estate Taxes**

5.    Tenant shall pay and discharge all ad valorem real estate taxes and assessments which shall be due and payable with respect to the Property during that portion of the Lease Term commencing on the Commencement Date, including any increases resulting from any improvements made by Tenant excluding therefrom payment of special assessments that are incurred or levied as a result of the development and/or expansion of the Property or the Demised Premises, or for improvements made to the Property by Landlord after the Date of Delivery.

In the event any assessment includable as part of taxes and assessments under this lease shall be payable in a lump sum or on an installment basis, Tenant shall have the sole right to elect the basis of payment. If Tenant shall elect to pay such assessment on the installment basis, then Tenant shall pay only those installments (or Tenant's proportionate share of those installments, as applicable) that shall become due and payable during the Lease Term. Any such installments due and payable in the years in which this lease commences and terminates shall be prorated proportionately.

Tenant shall not be chargeable with nor be obligated to pay (a) any tax of any kind whatsoever that may be imposed on Landlord or the rents payable hereunder, or (b) any interest or penalties payable as a result of Landlord's failure to pay any taxes or assessments prior to delinquency, except the ad valorem real estate taxes and assessments mentioned in the first paragraph of this Article 5 if they are separately billed to Tenant, or (c) any tax attributable to an increase in valuation of the Property, or any part thereof, resulting from the sale or financing of the Property or any part thereof occurring more than once every five (5) years. Nothing contained herein shall relieve Tenant from paying its share of state sales taxes on rent from the Demised Premises, or any other tax imposed by governmental authorities in lieu thereof.

Tenant shall pay such taxes and assessments as shall be attributable to the Property directly to the taxing authority (if a separate assessment is obtained as hereinbefore provided). If the Property is not separately assessed but a certificate of assessment is available, Tenant shall pay to Landlord the amount of ad valorem real estate taxes and assessments attributable to the Property in accordance with the certificate of assessment. If the Property is not separately assessed and a certificate of assessment is not obtainable, Tenant shall pay to Landlord a proportionate amount of all ad valorem real estate taxes and assessments attributable to the Property and the improvements thereon in the manner hereinafter provided. Tenant shall pay taxes to Landlord within thirty (30) days following receipt of Landlord's written notification that such taxes and assessments are due. Landlord's written notification shall be forwarded to Tenant not later than thirty (30) days prior to the date such taxes and assessments shall be due and shall be accompanied by a copy of the tax bill or certificate and such additional information as Tenant may reasonably require to show how taxes and assessments were calculated. The taxes and assessments to which Tenant is obligated to contribute shall be reduced by (a) any amounts paid toward such taxes and assessments, any abatements, refunds or rebates made thereof or any discounts available with respect thereto.

Tenant shall have the right to participate in all negotiations of tax assessments against the Property. Landlord shall promptly advise Tenant in writing of any change in the assessment of the Property. Tenant shall have the right to contest the validity or the amount of any tax or assessment levied against the Property by such appellate or other proceedings as may be appropriate in the jurisdiction in which such Property lies and may defer payment of such obligation, pay same under protest or take such other steps as Tenant may deem appropriate; provided, however, Tenant shall take no action that will cause or allow the institution of any foreclosure proceedings or similar action against the Property. Landlord shall cooperate, at Tenant's expense, in the institution and prosecution of any such proceeding initiated by Tenant and will execute any documents reasonably required therefor.

Landlord will not unreasonably refuse to contest any such taxes or assessments upon the request of Tenant; provided, however, that the cost of such contest, including reasonable attorneys' fees, shall be the responsibility of Tenant. Should Landlord institute proceedings to contest the validity or the amount of any tax or assessment levied against the Property, Tenant, at

Landlord's expense, will cooperate in such proceedings but Tenant shall have no obligation to disclose any financial or other information in such proceeding.

Should any of the proceedings referred to in the preceding two paragraphs of this Article 5 result in reducing the total annual real estate tax and assessment liability against the Property, Tenant, after the payment of all out-of-pocket expenses incurred by Landlord and Tenant, shall be entitled to receive such refunds attributable to the Property paid by the taxing authorities. If no refund shall be secured in any given proceeding, the party instituting the proceeding shall bear the entire cost.

**Delivery by Landlord and Landlord's Work**

6.     Landlord shall deliver the Demised Premises to Tenant in its "as-is" condition, except that Landlord shall, to the extent not already provided, be required to (a) put the Demised Premises in broom-clean condition, (b) put all mechanical systems and the HVAC in good working condition, (c) provide electrical service in the manner more fully set forth in **EXHIBIT "H"**, and (d) provide a water tight roof (collectively, "Landlord's Work"). Tenant hereby accepts the Demised Premises in the condition set forth in the sentence above, subject to (a) ordinary wear and tear between the date hereof and the Commencement Date (as defined in Article 2), and (b) Landlord shall deliver possession of the Demised Premises to Tenant with Landlord's Work completed on or before February 1, 2007 ("Date of Delivery").

If the Date of Delivery does not occur by the required date set forth above, Tenant shall be entitled to a reduction in minimum rent in an amount equal to one (1) day minimum rent for each day that the Date of Delivery is delayed beyond the required date set forth above. Tenant shall have the right, in addition to other rights and remedies available to Tenant at law or in equity, to terminate this lease by written notice to Landlord if the Date of Delivery does not occur within ninety (90) days after the required date set forth above.

**Tenant's Work**

7.     Upon receipt of possession of the Demised Premises (and subject to Tenant's right of termination under Article 6), Tenant may construct such improvements and perform such work in the construction of the Demised Premises ("Tenant's Work") as set forth in Tenant's outline specifications attached hereto and made a part hereof as **EXHIBIT "C"**, provided that, subject to local ordinances, Tenant shall have the right to alter Tenant's Work in a manner consistent with Tenant's then prototypical store, or if such alterations are required pursuant to local ordinances or pursuant to specific conditions contained in the Demised Premises. Tenant shall complete such construction in a good and workmanlike manner, and in compliance with all applicable laws, ordinances, and regulations, including building codes. Tenant, at Tenant's expense, shall procure all building and other permits and approvals necessary for performing Tenant's Work, and for such purposes Landlord shall cooperate with Tenant in obtaining such permits and approvals. Tenant shall be responsible for obtaining all required permits and approvals for Tenant's building signs as more specifically described in Article 22. Landlord agrees to cooperate with Tenant in obtaining a certificate of occupancy for the Demised Premises.

Within sixty (60) days of the mutual execution of this lease Tenant shall submit for and diligently pursue its necessary permits and approvals. Notwithstanding anything to the contrary contained herein, if Tenant, despite its good faith efforts to obtain all the necessary governmental

approvals and permits for Tenant's Work ("Approvals") on or before the date that is one hundred five (105) days after Tenant submits all applications, Tenant shall have the right to terminate this lease on written notice to Landlord, given not later than the expiration of said one hundred five (105) days. Upon any termination pursuant to this <u>Article 7</u>, neither party shall have any further obligation hereunder, except those that expressly survive the termination of the lease.

**Guarantee of Materials**

8.     Landlord shall unconditionally guarantee all Landlord's Work performed by or for Landlord against defective workmanship and materials for the period of one (1) year from the Commencement Date. Landlord shall assign to Tenant any and all guarantees and/or warranties of workmanship and materials that it may receive or that are required in the Plans with respect to those portions of the Demised Premises required to be maintained and repaired by Tenant hereunder. Landlord shall correct all punch list items specified by Tenant within thirty (30) days after receipt of written notice thereof from Tenant.

**Turnover Notices**

9.     <u>Intentionally omitted</u>.

**Parking and Other Common Areas and Shopping Center**

10.     Landlord covenants that (a) the aggregate area provided for the parking of automobiles upon the Property described in **EXHIBIT "A"** is for the sole and exclusive use of Tenant, its employees, agents, contractors, invitees and licensees during the Lease Term, and constitutes part of the Demised Premises.

In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings owned by Landlord now or at any future time located beyond the limits of the land described in **EXHIBIT "A"**, utilize the common areas for parking or other purposes to an extent that shall be objectionable to Tenant, Landlord shall, at its sole expense, upon written request by Tenant, take whatever reasonable action as shall be so requested to prevent said unauthorized utilization.

Without Tenant's prior written approval, which approval may be withheld in Tenant's sole discretion, Landlord shall not make any changes to the Property, including without limitation changing the entrances to or access routes within the Property, constructing or installing any structures or other improvements on the Property (including kiosks, signs, or automated teller machines), reconfiguring or reducing the parking areas, or making any changes that would reduce the visibility of the Demised Premises from any adjacent street or reduce access to and from the Demised Premises.

During the term of this lease and any extension thereof, Tenant shall comply with any and all laws, rules, regulations, ordinances, and orders with respect to the Demised Premises and common areas, and the operation, maintenance, and repair thereof, including without limitation applicable building codes, zoning ordinances, and environmental laws. Landlord shall not perform and shall not permit any other person or party to perform any acts or carry on any practices that would damage the Demised Premises or be a nuisance or menace to Tenant or that would interfere with the right of quiet enjoyment granted to Tenant.

Landlord shall notify Tenant in writing, at least ten (10) days prior to the commencement of any reconstruction, repairing or repaving of the common areas, and/or any restriction or closure of any access roads or entrances to the Property. Landlord shall schedule its reconstruction, repairs and repaving so as to minimize the length and scope of disruptions in the operation of the common areas of the Property. If any reconstruction, repairing, repaving, restriction, and/or closure impedes or interferes with normal access to the Demised Premises in a manner that interferes with Tenant's business therein and such condition continues in excess of five (5) days after notice to Landlord from Tenant, then until such work no longer substantially impedes or interferes with normal access to the Demised Premises, the minimum rent and other charges shall abate during the period subsequent to such five-day period until such condition ceases and Tenant shall pay two percent (2%) of gross sales from the Demised Premises as rent during such period.

Tenant may utilize portions of the Property described in **EXHIBIT "A"** for outdoor shows, entertainment or such other promotional uses that tend to attract the public, Tenant shall give Landlord notification of such intended use, a reasonable time in advance thereof, and, on written request of Landlord, supply Landlord with reasonable proof of adequate insurance or indemnification against damage to property, injuries to persons and loss of life sustained in connection therewith. In addition, Tenant shall be responsible for any physical damage to the improvements upon said Demised Premises resulting from said use.

Tenant shall have the right to use the areas adjacent to its loading dock for the parking and storage of trucks, trailers and containers and for such other uses that do not impair the movement of traffic around the Property or impede fire lane access.

**Store Opening**        11.    <u>Intentionally omitted</u>.

**Landlord's Representations and Warranties**        12.    Landlord represents, warrants and covenants that:

     (a)    Prior to the date possession of the Demised Premises is delivered to Tenant, Landlord shall have completed Landlord's Work in accordance with the terms hereof;

     (b)    Landlord shall not have erected and will not erect any buildings, structures or improvements on the Property described on **EXHIBIT "A"** EXCEPT AS ARE SHOWN ON **EXHIBIT "B"**;

     (c)    Prior to the date possession of the Demised Premises is delivered to Tenant, the Demised Premises will have been properly zoned for Tenant's use;

     (d)    Prior to the date possession of the Demised Premises is delivered to Tenant, there shall be sidewalks, driveways, service drives, roadways, curb cuts and entrances for automotive and pedestrian ingress and egress to and from the common areas and adjacent public streets and highways, as depicted on **EXHIBIT "B"**;

(e)     At no cost to Landlord, Landlord shall cooperate with Tenant in obtaining government required approvals and permits (including any required variances) from the local jurisdiction for the design and installation of Tenant's building signs and for Tenant's sign panel for the pylon sign on which Tenant has a right to place a panel, as set forth in Article 22 below.

**Options to Extend Lease**

13.     Provided that as of the date Tenant exercises its option Tenant is not in monetary default beyond any applicable notice and/or cure period set forth in this lease, Tenant shall have three (3) successive options to extend the term of this lease for an additional period of five (5) years for each such option.   Each such extended term shall begin, respectively, upon the expiration of the Initial Term of this lease or of this lease as extended and the same terms and conditions as herein set forth shall apply to each such extended term, except that annual minimum rent shall be as follows:

(a)     Annual minimum rent for the first extended term shall be Five Hundred Eighty Eight Thousand Six Hundred and 00/100ths Dollars ($588,600), based on a rental rate of Thirty Two and 67/100ths Dollars ($32.67) per square foot per annum.

(b)     Annual minimum rent for the second extended term shall be Six Hundred Forty Six Thousand Eight Hundred Sixty Six and 00/100ths Dollars ($646,866), based on a rental rate of Thirty Five and 94/100ths Dollars ($35.94) per square foot per annum.

(c)     Annual minimum rent for the third extended term shall be at the fair market value consistent with market rates for like property in the commercial real estate market in which the Demised Premises is located (the "Fair Market Value").   In ascertaining Fair Market Value of the Demised Premises, Landlord shall not take into account any Tenant Improvements installed by Tenant, Landlord's Work or any brokerage commission incurred by Landlord.   Notwithstanding the foregoing, in no event shall the annual minimum rent for the third extended term be less than the annual minimum rent for the second extended term.   If the parties are unable to reach mutual agreement on the amount of annual minimum rent, then such rent shall be determined by arbitration in accordance with the commercial arbitration rules of the American Arbitration Association.

Tenant shall exercise an option to extend the term of this lease by giving written notice to Landlord not less than six (6) months prior to the expiration of the term of this lease or of this lease as extended in accordance with the terms of this lease. Notwithstanding the foregoing, Tenant's option to renew shall not lapse because of Tenant's failure to exercise any Renewal Option as provided, unless Landlord shall have given Tenant written notice that Tenant has failed to exercise its Renewal Option prior to the period provided, and Tenant shall not have exercised such option within ninety (90) days following Tenant's receipt of Landlord's notice.

**Repairs and Maintenance**

14.     Throughout the term hereof, Landlord, at its sole cost and expense, shall maintain in good condition and make all repairs and replacements:

(a)    To the roof, floor slab, foundation and the structural portions of the Demised Premises;

(b)    To all utility and building systems that extend beyond the exterior walls of the Building or beneath the floor of the Building, including without limitation the fire sprinkler system and all sewer lines;

(c)    Required because of defective or faulty installations or construction by Landlord or because of the settling of the Demised Premises or as a result of the act, default, omission or negligence of Landlord, its employees, agents, licensees or contractors;

(d)    Required for reasons unrelated to Tenant's use of the Demised Premises in order to comply with any law, order, ordinance, rule, regulation or requirement applicable to the Demised Premises;

(e)    To the Demised Premises that are not Tenant's obligations below; and

(f)    Required to replace all driveways and sidewalks if necessary to keep them reasonably free of all settling, chuck holes, fissures and cracks.

Landlord shall promptly commence and diligently complete all such repairs upon notice thereof from Tenant. Notwithstanding the foregoing, but subject to <u>Article 19</u>, Tenant shall pay for any of the foregoing repairs if such repairs are necessitated as a direct result of any negligent act or omission of Tenant, its agents, or contractors.

Throughout the term hereof, Tenant shall repair and maintain the interior of the Demised Premises in good order and condition, including window glass, interior walls, doors, floor coverings, all utility and building systems that are within and exclusively serve the Building (including sprinkler system), and the heating, ventilating and air conditioning (HVAC) system exclusively serving the Building. During the term of this lease, Tenant shall also maintain a service contract providing for the maintenance of the HVAC system on a quarterly basis. Landlord agrees to assign to Tenant (or enforce for Tenant's benefit) all warranties, extended warranties and guarantees with respect to the HVAC system, and all other systems, of any kind or nature, serving the Building and that Tenant is required to repair hereunder.

Furthermore, throughout the Lease Term hereof, Tenant, at Tenant's sole cost and expense, shall maintain and operate the Demised Premises in good order, safe condition and repair. Tenant's repair and maintenance shall include:

(a)    The removal, on an as needed basis, of all papers, debris, filth, and refuse from and thoroughly sweep the common areas, including, but not limited to, the parking lot (by mechanical sweeper), walkways, and storefront.

(b)    The operation and repair of any artificial lighting facilities as shall be reasonably required for adequate lighting, including replacement of light bulbs for the parking lot lights and Building exterior lights.

(c)    The maintenance of all fences in good condition and state of repair.

(d)    The maintenance of all landscaped areas in their current as-is condition, trimmed and making such replacements of shrubs and other landscaping as is necessary.

(e)    The maintenance, care, and replacement of all irrigation systems servicing the landscaped areas on the Property.

(f)    The removal of any trash on an as needed basis and contract for trash removal services and repair any damages to the trash enclosures caused by such removal, and periodically as needed steam clean the trash enclosure.

(g)    The maintenance of all paving and surface areas in good condition, including seal coat and striping once every seven (7) years (but expressly excluding replacement).

(h)    The maintenance and replacement of all directional and parking signs associated with the Property.

Notwithstanding the foregoing, Landlord shall pay for any of the foregoing repairs, if such repairs are necessitated as the direct result of any negligent act or omission of Landlord, its agents, employees or contractors.

Notwithstanding the foregoing, Tenant shall not be responsible for any of the following:

(i)    The initial cost of constructing and installing Landlord's Work;

(ii)    Interest, late charges, and penalties on any charges payable by Landlord;

(iii)    Costs that are reimbursed by insurance proceeds and/or condemnation awards;

(iv)    Any amounts payable under mortgages or ground leases encumbering all or any part of the Property;

(v)    Any costs and expenses of removing, maintaining or replacing any substance or matter that may be deemed hazardous under any federal, state, or local environmental law, rule, regulation, ordinance, or order, or any costs and expenses of complying with such federal, state, or local environmental law, rule, regulation, ordinance, or order, including without limitation any cost of maintaining or removing asbestos containing materials or any underground storage tanks, or any cost of complying with applicable wetlands statutes; provided, however, that, notwithstanding the foregoing, pursuant to Article 31, Tenant shall be responsible for the costs and expenses incurred as a result of any toxic or hazardous waste or substance placed on the Demised Premises by Tenant, its subtenants, agents, licensees, concessionaires, contractors or employees during the Lease Term; and

(vi)    Any administrative fee and/or management fee to Landlord or any other party.

In the event the Building or improvements constituting the Demised Premises or a portion thereof shall be rendered unusable due to Landlord's performance of (or failure to perform) required repairs, there shall be a just and equitable abatement of annual minimum rent and all other charges payable under this lease until the Demised Premises (or portion thereof) shall be made usable. Tenant, without notice to Landlord, may make emergency repairs to any portion of the Demised Premises that is Landlord's responsibility under this lease to maintain, repair or replace if such repairs are necessary to protect the Demised Premises or the contents thereof, or to keep the common areas in a neat, clean, safe and orderly condition and the cost of such repairs may be deducted by Tenant from rent subsequently accruing hereunder.

**Alterations and Additional Construction**
15.    Tenant may, at its own expense, from time to time, make such alterations, additions or changes, structural or otherwise, in and to the Demised Premises as it may deem necessary or suitable; provided, however, Tenant shall obtain Landlord's prior written consent to drawings and specifications for (i) structural alterations, additions or changes, or (ii) alterations, additions or changes that exceed One Hundred Fifty Thousand Dollars ($150,000), which consent shall not be unreasonably withheld or delayed; provided, further, Landlord shall not withhold its consent thereto if the structural integrity of the Building will not be impaired by such work. The term "structural changes," as used herein, shall not include moving of non-load bearing partitions, relocation of building entry doors, minor plumbing and electrical work, modification and rearrangement of fixtures or other minor changes. Landlord, at Tenant's cost, shall cooperate with Tenant in securing building and other permits or authorizations required from time to time for any work permitted hereunder or for installations permitted hereunder by Tenant.    All such alterations, additions, or changes shall be done in accordance with applicable laws, rules, regulations, and orders, including applicable building codes; provided, however, that if any such applicable laws, rules, regulations, orders, or building codes shall require any alterations, additions, or changes to portions of the Demised Premises that are not included within the alterations, additions, or improvements to be performed by Tenant hereunder, including without limitation any required compliance with environmental laws, rules, regulations, or orders (including any asbestos remediation or removal) or any required compliance with applicable laws concerning accommodations for disabled or handicapped persons, then Tenant, in its sole discretion, may choose to either (a) at its sole cost and expense, shall perform all such alterations, additions, or improvements required to comply with such laws, rules, regulations, orders, or building codes at its sole cost and expense; or (b) not to make Tenant's proposed alterations, additions or changes.

**Utilities**
16.    Landlord covenants and agrees that the Demised Premises shall be properly serviced with the utilities existing as of the Date of Delivery. Tenant shall pay all charges for utility services furnished to the Demised Premises during the Lease Term. If any utility services to the Demised Premises are interrupted for three (3) consecutive days as a result of Landlord's, or its agents', employees' or contractors' (i) negligence, or (ii) failure to maintain the utility systems for which Landlord is responsible under this lease, then Tenant may equitably abate minimum rent hereunder until such services are restored.

**Governmental Regulations**
17.    Tenant shall observe and comply with all requirements, rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting the Demised Premises, including the making of non-structural alterations,

insofar as they are due to Tenant's specific use (and not occupancy) of the Demised Premises. Notwithstanding the foregoing, Tenant shall have the right to contest the legality of any such requirements, rules, orders, or regulations, and during the pendency of any such contest, Tenant shall not be deemed in default hereunder. In the event such rules, orders and regulations shall either (a) require structural changes, including but not limited to, the erection of fire escapes or exits or (b) require nonstructural changes that would have been required irrespective of the nature of Tenant's use of the Demised Premises, then and in either of such events, the same shall be complied with by Landlord at its sole expense.

**Exculpation**    18.    Anything to the contrary in this lease notwithstanding, the covenants contained in this lease to be performed by Landlord shall not be binding personally, but instead, said covenants are made for the purpose of binding only the fee simple or leasehold estate that Landlord owns in the Property (including all rents, incomes, and profits and issue therefrom); provided, however, the obligations imposed by <u>Articles 8 and 31</u> of this lease shall be personally binding upon Landlord. Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord as a result of such default or breach shall include the right (a) to attach and levy execution upon the estate and property of Landlord in the Property, or (b) to offset the amount of final judgment claim against the minimum rent or additional rent payable by Tenant hereunder.

**Damage to Demised Premises**    19.    During the term of this lease, Tenant shall maintain "all risk" property insurance, with one year's rent loss coverage, written and valued at replacement cost covering the Demised Premises and all improvements, personal property and merchandise located within the Demised Premises. Such policy shall provide a maximum deductible amount of Twenty Five Thousand Dollars ($25,000.00) and that no cancellation, reduction or other material changes therein shall be effective until at least thirty (30) days after mailing of written notice thereof to Landlord. An Accord Form-27--"Evidence of Property Insurance" (or equivalent) Certificate of Insurance, shall be delivered to Landlord prior to the date Tenant takes possession of the Demised Premises, and prior to the expiration of any such policies Tenant shall deliver renewal certificates thereof to Landlord. All policies of insurance required to be maintained by Landlord under this lease shall, at all times, be written on a "first dollar" basis so that such insurance shall be the first and primary source of coverage for claims within the scope of such insurance. All such policies shall be written by insurance companies rated A-VIII or better by the then current ratings of A.M. Best & Company and shall be licensed to do business in the state in which the Demised Premises is located.

Tenant shall reimburse Landlord for the cost of such insurance and shall pay Landlord within thirty (30) days following receipt of Landlord's written notification that such insurance is due and payable. Landlord's written notification shall be forwarded to Tenant not later than thirty (30) days prior to the day such insurance payment is due and shall be accompanied by a copy of the insurance bill and such additional information as Tenant may reasonably request.

Upon any damage or destruction of the Demised Premises, Landlord shall promptly proceed to repair, restore, replace or rebuild the Demised Premises, including those tenant improvements made by Landlord to the Demised Premises under <u>Article 6</u> above, to substantially the condition in which the same were immediately prior to such damage or destruction (but excluding Tenant's alterations, trade fixtures, equipment and inventory) and Landlord thereafter shall diligently prosecute said work to completion without delay or interruption.

Notwithstanding the foregoing, if Landlord does not either (a) obtain a building permit for any repairs, rebuilding or restoration required hereunder within six (6) months of the date of such damage or destruction, or (b) complete such repairs, rebuilding or restoration in accordance with this Article 19 within twelve (12) months of such damage or destruction, then, in either event, Tenant may at any time thereafter terminate this lease upon ninety (90) days' written notice thereof to Landlord; provided, however, that such notice of cancellation shall not be effective if Landlord, within such ninety (90) day period, shall obtain such permit or complete and comply as aforesaid, as the case may be. If the damage or destruction is caused by a casualty not covered by the insurance required to be maintained by Landlord pursuant to this lease and such uninsured casualty is in excess of $100,000, then Landlord shall have the right to terminate this lease by written notice to Tenant within ninety (90) days following the date of such damage or destruction; provided, however, that such notice of cancellation shall not be effective if Tenant, within thirty (30) days after its receipt of Landlord's notice, notifies Landlord that Tenant will reimburse Landlord for Tenant's proportionate share of the uninsured casualty loss in excess of $100,000.

Notwithstanding anything to the contrary set forth above, if such damage or destruction shall occur during the last year of the term of this lease, and shall amount to twenty percent (20%) or more of the replacement cost of the Demised Premises (exclusive of the land and foundations), this lease may be terminated at the election of either Landlord or Tenant upon written notice to the other party within thirty (30) days after the occurrence of such damage or destruction; provided, however, that if Landlord shall elect to terminate this lease, such cancellation shall be of no force and effect if Tenant shall give Landlord written notice within thirty (30) days after receipt of such notice of termination that Tenant has elected to renew this lease pursuant to Article 13 above. Upon any such renewal, this lease shall remain in full force and effect, and the Demised Premises shall be restored in accordance with the terms and conditions of this Article 19.

Upon any damage or destruction to the Demised Premises, minimum rent and any other charges payable hereunder shall be abated as set forth herein. If the whole of the Demised Premises shall be damaged or destroyed, or if a substantial portion thereof shall be damaged or destroyed to the extent that Tenant, in its reasonable judgment, determines that it cannot conduct business in the Demised Premises, then minimum rent and any other charges payable hereunder shall be abated entirely until Tenant is obligated to recommence paying rent in accordance with this Article 19. If less than such substantial part of the Demised Premises shall be damaged or destroyed, then minimum rent and any other charges payable hereunder shall be abated in proportion to that portion of the Demised Premises that Tenant shall be deprived on account of such damage or destruction and the repair, restoration, rebuilding or replacement or any combination thereof, of the improvements so damaged or destroyed, and Tenant shall again be obligated to recommence paying rent in accordance with this Article 19. If this lease is terminated under this Article 19, any minimum rent or other charges paid in advance by Tenant shall be refunded to Tenant, and the parties shall be released hereunder, each to the other, from all liability and obligations hereunder thereafter arising.

If this lease has not been cancelled hereunder as a result of any damage or destruction of the Demised Premises, Tenant shall not be required to accept delivery or possession of the Demised Premises and recommence paying minimum rent and other charges (or such abated portion thereof) until all of the following shall have occurred:

(a)    The damaged or destroyed portion of the Demised Premises shall have been completed as nearly as practicable to the condition existing immediately prior to such destruction or damage and in compliance with all laws, ordinances, regulations and requirements of governmental authorities having jurisdiction thereof and the National Board of Fire Underwriters and/or Insurance Service Organization ("ISO");

(b)    If required, a certificate of occupancy or an equivalent use permit and all other requisite permits, if any, including an inspection certificate of approval by the National Board of Fire Underwriters and/or ISO (if required) shall have been issued by the appropriate legal authorities issuing same, and Landlord shall have delivered to Tenant such certificate(s) or photostatic copies thereof; and

(c)    If the Demised Premises have been totally damaged or destroyed, Landlord shall have delivered written notice to Tenant of the date of completion of the Demised Premises as required herein, and Tenant shall have a period of sixty (60) days from and after such date of completion to install all trade fixtures, merchandise, equipment, and other personal property damaged or destroyed in connection with such damage or destruction of the Demised Premises.

Landlord and Tenant hereby release each other from any and all liability or responsibility (to the other or anyone claiming through or under them by way of subrogation or otherwise) for any loss or damage to property (but not for claims due to injury to persons) located on or that constitutes all or any part of the Demised Premises or the Property caused by fire or any other casualties insured against or required to be insured against hereunder (including deductible portions), even if such fire or other casualty shall have been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible, and each party hereby waives any right of subrogation for all or any insurance maintained by either party with respect to loss or damage to property. Each party shall cause each insurance policy carried by it hereunder to be written in such manner to provide that the insurer waives all right of recovery by way of subrogation against the other party hereunder in connection with any loss or damage covered by such policy.

**Eminent Domain**    20.    In the event that all of the Demised Premises shall be expropriated or the points of ingress and egress to the public roadways, substantially as depicted on **EXHIBIT "B"**, shall be materially impaired by a public or quasi-public authority so as to render, in Tenant's sole but reasonable opinion, the Demised Premises unsuitable for its intended purpose, Tenant shall have the option to terminate this lease as of the date Tenant shall be deprived or denied thereof.

In the event that less than the whole but more than ten percent (10%) of the Demised Premises shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be dispossessed from the part so expropriated by giving written notice to Landlord of such election so to terminate within ninety (90) days from the date of such dispossession.

In the event of an expropriation of any portion of the Demised Premises and if this lease shall not be terminated as hereinabove provided, this lease shall continue as to that portion of the Demised Premises that shall not have been expropriated or taken. In such event, Landlord shall, at its sole cost and expense, promptly and with due diligence restore the Demised Premises, as nearly as practicable, to a complete unit of like quality and character as existed just prior to such

expropriation. If Landlord does not either (a) apply to obtain a building permit for any repairs or restoration required hereunder within three (3) months of the date of taking, or (b) complete such repairs or restoration in accordance with this <u>Article 20</u> within nine (9) months of such taking, then, in either event, Tenant may at any time thereafter terminate this lease upon thirty (30) days written notice thereof to Landlord; provided, however, that such notice of cancellation shall not be effective if Landlord, within such thirty (30) day period, shall apply to obtain such permit or complete and comply as aforesaid, as the case may be. The annual minimum rental and other charges payable by Tenant hereunder shall abate during the period of demolition and restoration. Following restoration by Landlord, the annual minimum rental and the dollar amounts set forth in the first paragraph of <u>Article 4</u> hereof, shall be reduced in the proportion the floor area of the part of the Demised Premises so expropriated shall bear to the total floor area of the Demised Premises prior to such expropriation.

If Tenant shall be deprived of the use of any of Tenant's pylon sign(s) as the result of a condemnation, Landlord shall make available a site (and power thereto) for a substitute pylon within the Property either at a strategic location that is visible to automobile traffic on roadways adjoining the Property or at an entrance to the Property.

In the event access to the Property shall be interrupted or materially impaired by any action of a governmental or quasi-governmental authority and such interruption or impairment continues in excess of five (5) consecutive days Tenant was to be regularly scheduled to open after notice to Landlord from Tenant, then until such interruption or impairment ceases, the minimum rent and other charges shall abate during the period subsequent to such five-day period until such condition ceases, and Tenant shall pay one percent (1%) of gross sales from the Demised Premises as rent during such period.

Without limiting the foregoing, in the event that any of the Property described in **EXHIBIT "A"** shall be expropriated by public or quasi-public authority, Landlord shall make every effort to substitute equivalent and similarly improved lands contiguous to and properly integrated with the remainder of the site depicted on **EXHIBIT "B"**. If Landlord shall be unable to substitute such lands and if one or more expropriations shall in total deprive Tenant of the use of more than ten percent (10%) of the Property described in **EXHIBIT "A"**, or reduce the number of parking spaces in the Property by more than five percent (5%), then, in any such event, Tenant shall have the option to terminate this lease at any time within twelve (12) months after such deprivation becomes effective by giving written notice to Landlord.

In the event this lease shall be terminated pursuant to this <u>Article 20</u>, any annual minimum rental and other charges paid in advance shall be refunded to Tenant and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the Demised Premises. In the event that at the time of any expropriation of the Demised Premises, Tenant shall not have fully amortized expenditures that it may have made on account of any improvements, alterations or changes to the Demised Premises, Landlord shall assign to Tenant that portion of any award payable as a result of such expropriation as shall equal the unamortized portion of Tenant's said expenditures. Said unamortized portion of Tenant's said expenditures shall be determined by multiplying such expenditures by a fraction, the numerator of which shall be the number of remaining years of the Lease Term at the time of such expropriation and the denominator of which shall be the number of remaining years of the Lease Term at the time such expenditures shall have been made, plus the number of years for which the Lease Term may have been subsequently extended.

Tenant shall not be entitled to share in any award made by reason of expropriation of the Building or the Demised Premises, or any part thereof, by public or quasi-public authority, and expressly waives such right or claim except as set forth in the preceding paragraph of this <u>Article 20</u> relative to unamortized expenditures by Tenant and then only if the award for such unamortized expenditures shall be made by the expropriating authority in addition to the award for the land, building and other improvements (or portions thereof) comprising the Demised Premises; provided, however, Tenant's right to receive compensation for damages or to share in any award shall not be affected in any manner hereby if said compensation, damages or award is made by reason of the expropriation of any land or buildings or improvements constructed, made or owned by Tenant. Tenant shall have the right to make or claim against the condemning authority for a separate award for the value of its trade fixtures, furniture and personal property, damages for interruption or relocation of business, loss of good will, moving and remodeling expenses and value of any leasehold improvements made by Tenant on or to the Property that are not otherwise compensated for in this paragraph.

**Use, Assignment,**
**Subletting,**
**and Other**
<u>**Restrictions**</u>

21.     The Demised Premises may be used for any lawful purpose permitted by the Town of Colma and not restricted by covenant or deed as listed on **EXHIBIT "D"** attached hereto and incorporated herein by reference. Tenant may assign this lease or sublet the whole or any part of the Demised Premises, but if it does so, it shall remain liable and responsible under this lease; provided, however, that if such assignee (or its guarantor) has a net worth equal to or greater than ONE HUNDRED MILLION DOLLARS ($100,000,000.00) (the "Minimum Net Worth"), Tenant shall be released from any further liability hereunder from and after the effective date of such assignment. If the assignee (or its guarantor) does not have the Minimum Net Worth as of the effective date of such assignment, then effective as of such date thereafter as such assignee (or its guarantor) obtains the Minimum Net Worth, Tenant shall be released from further liability hereunder. The sale, issuance, or transfer of stock in Tenant shall not be deemed to be an assignment of this lease.

If at any time during the term of this lease (and any renewals hereunder) Landlord (or any entity in which Landlord or any shareholder, partner, or member of Landlord owns or controls a beneficial interest, or any affiliate of Landlord) shall purchase, acquire, lease, or otherwise obtain the ownership or beneficial use of any property within a one (1) mile radius of the Property, Landlord covenants that it will not change the use from or at the date of acquisition or thereafter permit such property to be used for the Prohibited Uses listed on **EXHIBIT "G"**, which shall be deemed to be covenants running with such additional property and shall bind and burden during the time Landlord owns or has direct interest in such additional property and shall inure to the benefit of the Demised Premises and Tenant. In the event of a violation of the foregoing restriction, Tenant shall have the right, in addition to all other rights and remedies at equity or in law, to terminate this lease upon sixty (60) days advance written notice to Landlord; provided, however, if Tenant does not terminate this lease, then so long as such Prohibited Use continues, Tenant shall have the right (i) to pay as rent hereunder either (A) the minimum rent herein provided less the total rental paid by the tenant(s) of such other property (or their assignees, subtenants, licensees, concessionaires, or other occupants) or any portion thereof for the Prohibited Use for such period, or (B) one percent (1%) of gross sales from the Demised Premises during such period; and (ii) to terminate this lease at any time such Prohibited Use continues upon sixty (60) days advance written notice to Landlord.

**Signs**    22.    The Demised Premises shall be referred to by only such designation as Tenant may indicate.    Landlord expressly recognizes that the service marks and trademarks "OfficeMax", "FurnitureMax" and "CopyMax" are the valid and exclusive property of Tenant and Landlord agrees that it shall not either during the term of this lease or thereafter, directly or indirectly, contest the validity of any of said marks or any of Tenant's registrations pertaining thereto, in the United States or elsewhere, nor adopt or use any of said marks or any term, word, mark or designation which is in any aspect similar to any of the marks of Tenant.    Landlord further agrees that it will not at any time during the Lease Term, permit any other tenant or occupant of the Property to use the words "Max" or "Maxx" on signage or as part of such tenant's or occupant's name or tradename, nor will Landlord do or cause to be done any act or thing, directly or indirectly, that contests or in any way impairs or tends to impair any part of Tenant's right, title and interest in any of Tenant's marks and Landlord shall not in any manner represent that it has any ownership interest in any of the aforesaid marks or registrations therefor. Landlord specifically acknowledges that any use thereof pursuant to this lease shall not create in Landlord any right, title or interest in any of the aforesaid marks.

Tenant shall have the right to install signs of such height and other dimensions as Tenant shall determine, bearing such legend or inscription as Tenant shall determine, upon any portion of the Demised Premises.    Landlord warrants that local codes and ordinances will permit the exterior signage as shown in **EXHIBIT "C-2"** and acknowledges that Tenant will seek to obtain permits for such signage; provided, however, that if local codes and ordinances (including variances) will permit Tenant to erect greater signage than is shown on **EXHIBIT "C-2"**, Tenant shall have the right to install such greater signage.    Tenant shall have the option to utilize the lighting standards in the parking lot for advertising purposes by attaching, or causing to be attached, signs advertising any and all products and services as Tenant shall elect and Tenant's name; provided, however, that Tenant first obtains and provides to Landlord an opinion from a structural engineer that the light standards can support such signage.

Landlord acknowledges and agrees that Tenant may seek to install a pylon sign in the location shown on **EXHIBIT "B"** and in the position shown on **EXHIBIT "C-3"**, provided that Tenant obtains all necessary local or municipal approvals.    Landlord shall reasonably cooperate with Tenant, at Tenant's cost and expense, in seeking and obtaining all such approvals.    If for any reason Tenant is restricted from, or is denied, from using the pylon sign by Landlord after such installation has been approved and the use of said sign cannot be restored within ten (10) days after notice to Landlord from Tenant, then until such use is restored, the annual minimum rent shall abate during the period subsequent to such five-day period until such condition ceases, and Tenant shall pay two percent (2%) of gross sales from the Demised Premises as rent during such period.    In the event the pylon is not restored within one hundred twenty (120) days after the date of Tenant's notice, then Tenant may elect to terminate this lease upon sixty (60) days' written notice to Landlord.

Landlord shall not permit any other signs, billboards or posters to be displayed on any portion of the Demised Premises, nor shall Landlord erect a pylon sign on any portion of the Property described in **EXHIBIT "A"** without the consent of Tenant.    Tenant reserves the right to approve the overall composition, elevation and specifications of any pylon sign.

Upon any assignment of this lease or subletting of the Demised Premises, the assignee and/or subtenant shall have the right, at its sole expense and in conformity with applicable laws and ordinances, to erect and thereafter to maintain and/or replace signs on the exterior walls of the Demised Premises and panels on any and all pylon signs for which Tenant has the right to

install a panel hereunder, in accordance with such assignee's and/or subtenant's standard sign specifications.

**Landlord's Remedies**
23.

23.1    Events of Default; Remedies.  If Tenant shall at any time: (a) be in default in the payment of rental or any other charges hereunder or in the performance of any of the covenants of this lease beyond any applicable grace or cure period, and Tenant shall fail to remedy such default within (i) ten (10) days after receipt of written notice thereof, or (ii) within thirty (30) days after receipt of written notice thereof if such default is nonmonetary (but Tenant shall not be deemed in default if it commences to remedy such default within said thirty (30) day period and completes such remedy with due diligence), or (b) if proceedings under the Bankruptcy Code shall be instituted by or against Tenant and the same shall not be dismissed by the Court within ninety (90) days after being filed, or if Tenant shall make an assignment for the benefit of creditors, or if a receiver of any property of Tenant in or upon the Demised Premises be appointed in any action, suit or proceeding by or against Tenant and not removed within sixty (60) days after appointment, or if any event shall happen (other than a permitted assignment or sublease under Article 21) which, aside from this Article, would cause any assignment, transfer, or devolution of Tenant's interest or occupancy hereunder by operation of law; (c) if the interest of Tenant in the Demised Premises shall be sold under execution or other legal process; (d) commit waste upon the Demised Premises; (e) fail to vacate the Demised Premises immediately upon termination of this lease, by lapse of time or otherwise; Landlord may by notice to Tenant, terminate this lease, or without terminating this lease, re-enter or upon the Demised Premises by summary proceedings, proceedings in unlawful detainer, eviction, or as otherwise permitted by law, and may dispossess Tenant.  Any written notice given by Landlord pursuant to clauses (a)(i) and (a)(ii) of this Article 23.1 shall be in lieu of, and not in addition to, any preliminary notice required by California law for summary dispossession proceedings in unlawful detainer or otherwise.

23.2    Landlord's Right to Relet.  If Tenant abandons the Demised Premises or if Landlord elects to terminate Tenant's right to possession only without terminating this lease as above provided, Landlord may remove from the Demised Premises any and all property found therein and such repossession shall not release Tenant from Tenant's obligation to pay the rental herein.  After any such repossession by Landlord without termination of the lease, Landlord may relet the Demised Premises or any part thereof to any person, firm or corporation and for such time and upon such terms as Landlord in Landlord's sole discretion may determine.  Landlord shall only be required to use the same efforts Landlord then uses to lease other properties Landlord owns or manages (or, if the Demised Premises is then managed for Landlord, then Landlord will instruct such manager to use the same efforts such manager then uses to lease other space or properties which it owns or manages).  In addition, Landlord shall not be required to observe any instruction given by Tenant with respect to such reletting or accept any tenant offered by Tenant unless such offered tenant has a creditworthiness reasonably acceptable to Landlord, leases the entire Demised Premises, and leases the Demised Premises for at least the same rent, and for at least the same term, and on the same other terms and conditions as in this lease.  Landlord may make repairs, alterations and additions in and to the Demised Premises and redecorate the same to the extent deemed by Landlord necessary or desirable and Tenant, upon demand in writing, shall pay the reasonable cost thereof (excluding tenant improvements for the replacement tenant) together with Landlord's reasonable expenses of

reletting, including any commissions and attorneys' fees relative thereto. If the rents collected by Landlord upon any such reletting are not sufficient to pay monthly the full amount of the monthly rent and other charges reserved herein, together with the reasonable costs of such repairs, alterations (excluding tenant improvements for any replacement tenant), additions, redecorating, and expenses, Tenant shall pay to Landlord the amount of each monthly deficiency upon demand in writing.

23.3    <u>Landlord's Right to Remove Chattels</u>.  Any and all property that may be removed from the Demised Premises by Landlord in accordance with the terms of this lease may be handled, removed, stored or otherwise disposed of by Landlord at the risk and expense of Tenant, and Landlord in no event shall be responsible for the preservation or safekeeping thereof.  Tenant shall pay to Landlord upon demand in writing, any and all reasonable expenses incurred in connection with such removal and all storage charges against such property so long as the same shall be in Landlord's possession or under Landlord's control. If any property shall remain in the Demised Premises or in the possession of Landlord and shall not be retaken by Tenant within a period of ten (10) days from and after the time when the Premise are either abandoned by Tenant or repossessed by Landlord under the terms of this lease, said property shall conclusively be deemed to have been forever abandoned by Tenant.

23.4    <u>Landlord's Nonwaiver</u>.  No failure by Landlord to insist upon the strict performance of any agreement, term, covenant or condition hereof or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial rent during the continuance of any such breach or of such agreement, term, covenant, or condition.  No agreement, term, covenant or condition hereof to be performed or complied with by Tenant, and no breach thereof, shall be waived altered or modified except by a written instrument executed by Landlord.  No waiver of any breach shall affect or alter this lease, but each and every agreement, term, covenant and condition hereof shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

23.5    <u>Other Remedies</u>.  In the event Tenant has failed to cure a non-monetary default as otherwise provided in <u>Article 23.1</u>, then Landlord may, upon ten (10) days' additional prior written notice to Tenant, cure such default and charge Tenant with the actual, reasonable costs of such cure with interest at the rate of twelve percent (12%) of such costs until repaid as an administrative charge, and such costs and interest shall be additional rent.  Tenant shall pay such additional rent within five (5) days after written demand therefor by Landlord, and Tenant's failure to pay such additional rent shall thereafter bear interest at the rate of Default Interest until paid in full.  The rights and remedies of Landlord set forth in this Article shall be in addition to any other rights or remedies provided to Landlord at law or in equity, provided that the exercise of all such other rights or remedies shall not be in conflict with the expressed rights and remedies provided to Landlord herein, and in particular in no event shall minimum rent or other rent due hereunder be accelerated upon the first default by Tenant during the term or extended term of this lease in the payment of annual minimum rent or additional rent under this lease unless Tenant fails, for two (2) consecutive months after Tenant's receipt of any notice of default pursuant to <u>Article 23.1</u>, to pay in full all of the sums required to be paid by Tenant pursuant to such notice of default.  If Tenant shall be in default under this lease again after curing such first default, then Landlord may accelerate annual minimum rent or any additional rent as otherwise permitted by the laws of California without waiting for two (2) consecutive months to pass from the date of Tenant's receipt of any such subsequent notice of default.  If minimum rent

or any other rent may be accelerated, pursuant to the above requirements, it shall be computed as follows:

        (a)    The worth at the time of award of the unpaid Rental that had been earned at the time of termination; plus

        (b)    The worth at the time of award of the amount by which the unpaid Rental that would have been earned after termination until the time of award exceeds the amount of such Rental loss that Tenant proves could have been reasonable avoided; plus

        (c)    The worth at the time of award of the amount by which the unpaid Rental for the balance of the term after the time of award exceeds the amount of Rental loss that Tenant proves could have been reasonably avoided; plus

        (d)    Any other amount necessary to compensate Landlord for any costs or expenses incurred by Landlord in (i) retaking possession of the Demised Premises, including reasonable attorneys' fees (including charges of in-house counsel) therefor, (ii) maintaining or preserving the Demised Premises after any default, (iii) payment of leasing commissions, and (iv) payment of any other costs necessary or appropriate to relet the Demised Premises. As used in Article 23.5(a) and (b) above, the "worth at the time of the award" shall be computed by allowing interest at the Default Interest. As used in Article 23.5(c) above, the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award, plus one percent (1%). As used in this Article 23.5, "**Rental**" shall mean minimum rent, additional rent, and all other sums required to be paid by Tenant under the terms of this lease.

**Bankruptcy**    24.    If a petition of bankruptcy or reorganization shall be filed by or against Tenant and not dismissed within ninety (90) days of filing, Tenant shall become bankrupt, Tenant shall make a general assignment for the benefit of creditors, or in any proceeding based upon the insolvency of Tenant a receiver or trustee of all of the property of Tenant shall be appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may terminate this lease by giving written notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, reorganization, an assignment for the benefit of creditors nor the appointment of a receiver or trustee shall affect this lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant, or someone claiming under it.

**Covenant**
**of Title and**
**Assurances**    25.    Landlord covenants, represents and warrants that it has full right and power to execute and perform this lease and to grant the estate demised herein subject to Tenant's use being permitted by the Town of Colma and reviewed by the reviewing trade associations as part of Tenant's permit process and that Tenant, on payment of the rent and performance of the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the Demised Premises and all rights, easements, appurtenances and privileges belonging in or otherwise appertaining thereto during the lease term without molestation or hindrance of any person whomsoever, and if, at any time during the term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised, Tenant

shall have the option, at Landlord's expense, to correct such defect and to offset the cost thereof against the rent and other charges payable to Landlord hereunder or to annul and void this lease with full reservation of its right to damages, if any.

Landlord shall, without expense to Tenant, furnish to Tenant (a) a copy of Landlord's American Land Title Policy of title insurance and court orders of distribution (the "Title Policy") as evidence that Landlord's title is as herein represented and insuring that the Demised Premises depicted on **EXHIBIT "B"** are within the bounds of the property described in **EXHIBIT "A"**, (b) a survey by a licensed surveyor of the lands described in **EXHIBIT "A"** that shall be consistent with the Title Policy, and (c) agreements wherein each holder of any lien against the Demised Premises shall consent to this lease and warrant that Tenant's possession and right of use under this lease in and to the Demised Premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

In the event Landlord's estate is derived from a leasehold interest in a ground lease, Landlord shall, prior to the commencement of construction of the improvements required hereunder, deliver to Tenant an agreement, executed by the fee owner of the Demised Premises, wherein the fee owner recognizes this lease and Tenant's rights hereunder and agrees that, notwithstanding any default by the Landlord and subsequent termination of said ground lease, Tenant's possession and right of use under this lease in and to the Demised Premises shall not be disturbed by such fee owner unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

To induce Tenant to execute this lease, and in consideration thereof, Landlord, to the best of its knowledge, warrants, represents, covenants and agrees as follows:

(a)    Landlord is seized of an indefeasible estate in fee simple or has a good and marketable leasehold title to the lands described in **EXHIBIT "A"**, free and clear of any liens, encumbrances, restrictions and violations (or claims or notices thereof), except as set forth in **EXHIBIT "D"** attached hereto.

(b)    The Demised Premises now enjoy, and Landlord will provide for the period of this lease and any extension thereof, ingress and egress facilities to the adjoining public streets and highways in the number and substantially in the locations depicted on **EXHIBIT "B"**, subject to unavoidable temporary closings or temporary relocations necessitated by public authority or other circumstances.

(c)    Other than as have been disclosed to Tenant, there are no restrictions or other legal impediments either imposed (i) by law (including applicable zoning and building ordinances) (ii) by any instrument (including the items set forth on **EXHIBIT "D"**) or (iii) by any pending governmental actions, that would prevent (1) construction of the Demised Premises in accordance with the Plans, (2) the use of the Demised Premises as an OfficeMax store or otherwise for the purposes permitted herein after completion of construction thereof by Tenant in accordance with applicable law and the requirements of applicable governmental authorities, or (3) the use of the common areas, including all access routes and entrances to the Property, in the manner contemplated by this lease. If at any time during the term of this lease (or any renewal thereof) applicable law shall not permit the use of the Demised Premises or the common areas for the purposes permitted

herein, then Tenant, without waiving any other rights Tenant may have on account thereof, may terminate this lease by giving Landlord notice thereof.

(d)    The Property now complies, and throughout the term of this lease Landlord, except to the extent the obligations are those of Tenant as herein provided, shall cause the Property to comply, with all applicable laws, rules, regulations, ordinances, and orders of all applicable governmental authorities, including without limitation all building codes, zoning ordinances, and all environmental laws and regulations applicable to the Property and the uses made thereof, including, without limitation, laws and regulations relating to any toxic or hazardous wastes or substances.

(e)    Landlord has no knowledge or notice of any pending or threatened condemnation or eminent domain proceedings with respect to the Property, nor has Landlord any knowledge or notice that the Property, or any portion thereof, is in violation of any applicable statute, law, rule, regulation, or order of any governmental authority, including any zoning ordinances or building codes.

(f)    The execution and performance of this lease by Landlord will not violate or cause a default under any agreement, instrument, or other transaction to which Landlord is a party or by which Landlord and/or the Property are bound.

If Landlord shall breach any warranty, representation, covenant or agreement set forth above, and Landlord does not commence to cure such breach within a period of thirty (30) days after notice thereof from Tenant to Landlord (or, if such breach is a type that would reasonably take more than sixty (60) days to cure, if Landlord has not commenced to cure such breach within said sixty (60) days and diligently pursued the same to completion), Tenant shall have the right, in addition to all other remedies, to terminate this lease at any time within ninety (90) days after the occurrence of such failure or breach by giving Landlord notice thereof prior to the full compliance by Landlord with such requirements, warranties, representations, covenants and agreements; provided, however, that so long as Tenant shall not terminate this lease but such warranty, representation, covenant or agreement shall remain uncured, Tenant shall have the right to pay one percent (1%) of gross sales from the Demised Premises as rent during such period.

**Cotenancy**    26.    **Intentionally omitted.**

**Mortgage Subordination**    27.    Prior to commencement of construction, Landlord shall cause any mortgagee holding an interest in the Demised Premises superior to Tenant and/or any mortgagee requiring Tenant to subordinate this lease to such mortgagee's interest to execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in the form of **EXHIBIT "E"** to this lease.  Upon written request by Landlord, Tenant shall execute and deliver an agreement subordinating this lease to any first mortgage upon the Demised Premises; provided, however, such subordination shall be in the form of **EXHIBIT "E"** and be upon the express condition that the validity of this lease shall be recognized by the mortgagee and that, notwithstanding any default by the mortgagor with respect to said mortgage or any foreclosure thereof, Tenant's possession and right of use under this lease in and to the Demised Premises shall not be disturbed by such mortgagee unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Indemnity**          28.    During the Lease Term Tenant shall indemnify, defend and save Landlord harmless against all penalties, claims or demands of whatsoever nature arising from injury to persons or property caused occurring in the Demised Premises, except those that shall result, in whole or in part, directly or indirectly, from the default or negligence of Landlord, any ground lessor or prime lessor of Landlord, or their respective agents, employees, contractors, or invitees.

During the Lease Term, Landlord shall indemnify, defend and save Tenant harmless against all penalties, claims, or demands of whatsoever nature arising from injury to persons or property caused, in whole or in part, directly or indirectly, from the default or negligence of Landlord, its agents, employees, contractors, or invitees.

**Tenant's
Right to Cure
Landlord's
Defaults**          29.    In the event Landlord shall neglect to pay when due any obligations on any mortgage or encumbrance affecting title to the Demised Premises and to which this lease shall be subordinate or shall fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for thirty (30) days after written notice thereof by Tenant to Landlord, pay said principal, interest or other charges or cure such default all on behalf of and at the expense of Landlord and do all necessary work and make all necessary payments in connection therewith and Landlord shall, on demand, pay Tenant, forthwith, the amount so paid by Tenant together with interest thereon at the rate of twelve percent (12%) per annum (or the highest rate permitted by law, if less than 12%) from the date of payment until re-payment and Tenant may, to the extent necessary, withhold any and all rent payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

Provided the holder of a properly recorded first mortgage shall have notified Tenant, in writing, that it is the holder of such lien on the Demised Premises and shall so request, Tenant shall provide such holder with a duplicate copy of any notice sent to Landlord covering a default hereunder and such holder shall be granted sixty (60) days after receipt thereof to correct or remedy such default but nothing herein shall limit Tenant's rights under the last paragraph of Article 14.

**Condition of
Premises at
Termination**          30.    At the expiration or earlier termination of the Lease Term Tenant shall surrender the Demised Premises, together with alterations, additions and improvements then a part thereof, in good order and condition, except for (a) ordinary wear and tear, (b) repairs required to be made by Landlord, and (c) loss or damage by fire, the elements and other casualty subject to the provisions of Article 19. All furniture and trade fixtures installed in said building at the expense of Tenant, or other occupant, shall remain the property of Tenant, or such other occupant, including, without limitation, Tenant's baler, energy management system, signs, and light fixtures; provided, however, Tenant shall, at any time and from time to time, during the Lease Term, have the option to relinquish its property rights with respect to such trade fixtures, which option shall be exercised by written notice of such relinquishment to Landlord and, from and after the exercise of said option, the property specified in said notice shall be the property of Landlord.

-22-

**Hazardous Waste**

31.   Landlord has provided Tenant with a Phase I Environmental Site Assessment prepared by Professional Services Industries, Inc. dated July 27, 1998.  Landlord represents that it has made a thorough investigation of the physical condition of the Demised Premises and Property, that it is fully familiar with the present and prior uses of the Demised Premises and Property during Landlord's ownership of the Property and that during Landlord's ownership of the Property there have not been any toxic or hazardous wastes or substances used, generated, stored, treated or disposed on the Demised Premises and/or the Property.  Landlord hereby indemnifies Tenant from and against any loss, liability, claim or expense, including, without limitation, cleanup, engineering and attorneys fees and expenses that Tenant may incur by reason of the above representation being false or by reason of any investigation or claim of any governmental agency or third parties in connection therewith.  Landlord's representations and indemnity to Tenant under this paragraph shall survive the cancellation or termination of this lease.

In addition, notwithstanding any investigation by Landlord or Tenant, Landlord hereby indemnifies Tenant from and against any loss, liability, claim or expense, including, without limitation, cleanup, engineering and reasonable attorneys' fees and expenses that Tenant may incur by reason of the present or future presence on the Demised Premises or common areas of any toxic or hazardous waste or substance not placed by Tenant or by any subtenant, agent, licensee, concessionaire, contractor or employee of Tenant, or by reason of Landlord's failure to cause the Property to be in compliance with all applicable laws, rules and regulations with respect to toxic or hazardous wastes or substances, or by reason of any investigation or claim of any governmental agency or third party in connection with the presence of toxic or hazardous wastes or substances upon the Demised Premises or the common area except for any toxic or hazardous wastes or substances used, generated, stored, treated or disposed on the property by the Tenant, its subtenants, agents, licensees, concessionaires, contractors and employees during the term of this lease.  Landlord's representations and indemnity to Tenant under this paragraph shall survive the cancellation or termination of this lease.

At any time from and after the date of this lease, Tenant (or Tenant's contractor) may inspect the Demised Premises and/or the Property for the presence of such wastes or substances.  If toxic or hazardous wastes or substances are discovered in the Demised Premises and/or the Property that were not placed by Tenant, or by any subtenant, agent, licensee, concessionaire, contractor or employees of Tenant and Landlord fails to take appropriate action within ninety (90) days of such discovery, then Tenant may cancel this lease by giving notice to Landlord, provided, however, that during said ninety (90) day period and thereafter until such remediation is completed, rent shall abate if such discovery and existence of toxic or hazardous wastes or substances materially impairs Tenant's ability to use and/or operate the Demised Premises.

As used in this lease, "toxic or hazardous wastes or substances" mean any substance, product, waste or other material of any nature whatsoever which is, or becomes identified, listed, published, or defined as a hazardous substance, hazardous waste, hazardous material, toxic substance, solid waste, acutely hazardous waste, extremely hazardous waste, infectious waste, retrograde material, volatile organic compound, waste, air contaminant, air pollutant, or pollutant, or is otherwise regulated, restricted or addressed under or pursuant to any local, state or federal law, or any rule, order, ordinance, permit, regulation, decision, or decree adopted pursuant thereto, as the same may be amended from time to time, including, without limitation, asbestos and asbestos containing materials.

-23-

**Holding Over**

32.    In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of the Demised Premises after the expiration of the lease term it shall so remain as a tenant from month-to-month and all provisions of this lease applicable to such tenancy shall remain in full force and effect except that minimum rent shall be one twenty-five percent (125%) of the amount paid for the immediately preceding term.

**Investment Tax Credit**

33.    **Intentionally omitted.**

**Notices**

34.    Notices required under this lease shall be in writing and deemed to be properly served on receipt thereof if sent by certified or registered mail or by a commercially recognized overnight delivery service to Landlord at its last address above or to Tenant at 263 Shuman Blvd., Naperville, IL 60563, Attention: Vice President of Real Estate, with a copy to OfficeMax North America, Inc., 263 Shuman Blvd., Naperville, IL 60563, Attention: General Counsel, or to any subsequent address that Landlord and/or Tenant shall designate in writing for such purpose. The date of notice shall be the date on which such notice is received by the party to whom it is addressed.

**Captions and Definitions**

35.    Marginal captions of this lease are solely for convenience of reference and shall not in any way limit or amplify the terms and provision thereof. The necessary grammatical changes that shall be required to make the provision of this lease apply (a) in the plural sense, if there shall be more than one Landlord and (b) to any landlord which shall be either a corporation, an association, a partnership or an individual, male or female, shall, in all instances, be assumed as though in each case fully expressed. Unless otherwise provided, upon the termination of this lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder except as to acts, omissions or defaults occurring prior to such termination.

**Partial Invalidity**

36.    If any term, covenant or condition of this lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this lease or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term, covenant or condition of this lease shall be valid and be enforced to the fullest extent permitted by law.

**Entire Agreement; Construction**

37.    This lease, the Exhibits, and Amendments or Addendum, if any, attached hereto and forming a part hereof set forth all the covenants, promises, agreements, conditions, provisions and understandings between Landlord and Tenant concerning the Demised Premises and there are no covenants, promises, agreements, conditions, provisions or understandings, either oral or written between them other than are herein set forth. No alteration, amendment, change or addition to this lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by each party. Each party to this lease acknowledges that it has been represented by counsel and agrees that this lease shall be construed without regard to any presumption or other rule requiring construction against the party causing this lease to be drafted.

**Successors
and Assigns**   38.    The conditions, covenants and agreements contained in this lease shall be binding upon and inure to the benefit of the parties hereof and their respective heirs, executors, administrators, successors and assigns. All covenants and agreements of this lease shall run with the land.

**Memorandum
of Lease**   39.    The parties hereto have, simultaneously with the execution and delivery of this lease, executed and delivered a Memorandum of Lease that Landlord shall, at its sole expense, cause to be recorded within sixty (60) days following the Rent Commencement Date and returned to Tenant by Landlord within sixty (60) days thereafter. Upon the expiration or termination of this lease Tenant shall cooperate with Landlord and execute such documents as are reasonably necessary to remove the Memorandum of Lease from Landlord's title.

**Attorneys'
Fees**   40.    If either party hereto be made or becomes a party to any litigation commenced by or against the other party involving the enforcement of any of the rights and remedies of such party, or arising on account of the default of the other party in the performance of such party's obligations hereunder, then the prevailing party in any such litigation, or the party becoming involved in such litigation because of a claim against such other party, as the case may be, shall receive from the other party all costs and reasonable attorneys' fees incurred by such party in such litigation.

**Brokerage**   41.    Landlord and Tenant represent and warrant each to the other that each has not dealt with any real estate agent or broker in connection with this transaction other than Terra National Real Estate Group and/or Colliers International and Terranomics and agree to indemnify and save each other harmless from and against all loss, cost and expense incurred by reason of the breach of such representation and warranty. Landlord agrees to pay said broker any commissions owing in connection with this transaction.

**Condition**   42.    Upon the execution of this lease by Landlord, the same shall be delivered to the Executive Real Estate Committee of Tenant for approval, and this lease shall be conditioned upon the approval hereof by such Executive Real Estate Committee.

**Right of
First
Refusal**   43.    **Intentionally omitted.**

**Satellite
Dish**   44.    Tenant, at some time in the future, may wish to install a satellite dish, antenna or other data transmission or receiving devices on or about the Demised Premises. Subject to applicable law and matters of title, Tenant, at its sole cost and expense, has the right to install such satellite dish, antenna or other data transmission or receiving devices on the roof of the Building, on the ground or erected on a pole adjacent and contiguous to the Demised Premises. The location of the installation shall be at a site acceptable to Landlord, and approval of the location shall not be unreasonably withheld or delayed. Tenant shall install the satellite dish, antenna or other data transmission or receiving devices in accordance with sound construction practices. Tenant shall use any specified roofing contractor required to comply with the existing roof warranties. Tenant shall indemnify, defend and hold Landlord harmless from and against

any and all liability or loss arising from or out of the installation of the satellite dish or antenna. At lease expiration or termination Tenant shall remove any such equipment installed, excluding any wiring or conduit, and shall be responsible for the repair of any damage to any position of the Demised Premises caused by Tenant's installation, use or removal of such equipment at Tenant's expense.

**Estoppel Certificates**

45.    Within fifteen (15) days after either party's request, from time to time, the other party shall execute and deliver to the requesting party or, as directed by the requesting party, an estoppel letter in a form reasonably acceptable to such party (See **EXHIBIT "I"** for acceptable form of Tenant's estoppel certificate), certifying as to the terms and status of payments and other matters relating to the lease which may reasonably be requested.

**Gross Sales Defined**

46.    The term "gross sales" means all gross sales and revenues of Tenant from all business conducted upon or from the Demised Premises by Tenant, except (i) the amount of any sales tax, use tax, gross receipts tax, successor tax or similar tax by whatever name called, imposed by a federal, state, municipal or governmental authority directly on sales and collected from customers provided that the amount thereof is added to the selling price or absorbed therein, and actually paid by Tenant to such governmental authority; (ii) delivery charges; (iii) proceeds of claims for damages or loss of merchandise; (iv) interest, service, finance or sales carrying charges applicable to credit transactions which are separately stated and are in addition to the purchase price; (v) sales of gift certificates, provided that if gift certificates are sold from the Demised Premises or elsewhere but are redeemed at the Demised Premises, such redemption shall constitute a sale; (vi) credit card charges paid by Tenant to credit card companies such as Visa and Mastercard not to exceed two percent (2%) of Tenant's gross sales in such fiscal year; (vii) forfeited deposits or installments on customers' special order purchases or merchandise provided such merchandise is not resold within the reporting period; (viii) income from telephone or vending machines in non-sales areas of the Demised Premises; (ix) sums raised for and donated to charitable organizations; (x) the exchange of merchandise between the stores of Tenant, if any, where such exchange of goods or merchandise is made solely for the convenient operation of the business of Tenant and not for the purpose of consummating a sale and depriving Landlord of the benefit of a sale that otherwise would be made from the Demised Premises; (xi) the amount of returns to shippers and manufacturers; (xii) proceeds from the sale of trade fixtures, machinery and equipment not carried as stock in trade by Tenant; (xiii) the amount of any cash or credit refund made upon any sale from the Demised Premises, previously included in gross sales, where the merchandise sold is thereafter returned by the purchaser and accepted by Tenant; (xiv) sales of merchandise discounted to employees provided such sales are not in excess of five percent (5%) of Tenant's gross sales; and (xv) catalog, internet and other sales if not delivered from the Demised Premises. Notwithstanding any provision herein to the contrary, each charge or sale upon installment or credit shall be treated as a sale for the full price in the month during which such charge or sale shall be made irrespective of the time when Tenant shall receive payment.

**Counterparts**

47.    This lease may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one document.

**Late Charge**

48.    If any installment of rent or any other sum due from Tenant shall not be received by Landlord within five (5) days after Landlord's delivery of written notice to Tenant that such

amounts are late, then Tenant shall pay a late charge equal to twelve percent (12%) of such overdue amount; provided, however, that such late charge shall be charged only if Tenant has been late more than twice in any calendar year.

**Tenant's**
**Insurance**

49.    Tenant shall, at Tenant's expense, maintain during the term of this lease, commercial general liability insurance on the Demised Premises in the amount of not less than THREE MILLION DOLLARS ($3,000,000) combined single limit. The aforesaid insurance shall name Landlord and Landlord's mortgagee as an additional insured (as their interests may appear) and Tenant shall furnish Landlord with a Certificate of Insurance as evidence thereof prior to the date Tenant takes possession of the Demised Premises. Such insurance policies may not be cancelled without thirty (30) days' written notice to Landlord. Such insurance shall be written by insurance companies rated A-/VIII or better by the then current ratings of A.M. Best & Company and shall be licensed to do business in the state in which the Demised Premises is located.

Tenant shall, at Tenant's expense, maintain insurance on all alterations, additions, partitions, and improvements erected by or on behalf of Tenant in, on, or about the Demised Premises (excluding Landlord's construction), and on all furniture, furnishings, trade fixtures, inventory and equipment, of Tenant placed in the Demised Premises for the full replacement value thereof. Tenant's personal property shall be kept and stored at its own risk.

Notwithstanding any provisions of this lease to the contrary, during such time as Tenant has a tangible net worth equal to or greater than One Hundred Million Dollars ($100,000,000.00), Tenant may elect to self-insure for all or any portion of the insurance required to be maintained by Tenant under this lease. Prior to instituting any self-insurance program, Tenant agrees to certify to Landlord, and shall recertify annually upon Landlord's request, such net worth and send Landlord evidence of such net worth reasonably satisfactory to Landlord. In the event Tenant elects to self-insure, any waivers of subrogation or other limitations of liability applicable to insurance or insurance obligations under this lease shall continue to apply.

**IN WITNESS WHEREOF**, the parties hereto have executed this agreement as of the day and year first above written.

WITNESSES:                              LANDLORD:

_____

PRINT NAME_____


_____        _____

PRINT NAME_____        GARY GAVELLO, an individual


_____        **INTERNATIONAL SETTLEMENT HOLDING**

PRINT NAME_____        **CORPORATION,** a California corporation


_____        By:_____

PRINT NAME_____


                                        TENANT:


_____        OFFICEMAX NORTH AMERICA, INC., an Ohio

PRINT NAME_____        corporation (formerly OfficeMax, Inc.)


_____        By:_____

PRINT NAME_____            Greg A. Darus, Vice President, Real Estate

**IN WITNESS WHEREOF**, the parties hereto have executed this agreement as of the day and year first above written.

WITNESSES:                                      **LANDLORD:**

PRINT NAME _KRISTINA MILLER_

PRINT NAME _Steven D. Bird_                      _____
                                                GARY GAVELLO, an individual

PRINT NAME _KRISTINA MILLER_                     **INTERNATIONAL SETTLEMENT HOLDING
                                                CORPORATION,** a California corporation

PRINT NAME _Steven D. Bird_                      By: _____



                                                **TENANT:**


_____                   OFFICEMAX NORTH AMERICA, INC., an Ohio
PRINT NAME_____                  corporation (formerly OfficeMax, Inc.)


_____                   By: _____
PRINT NAME_____                      Greg A. Darus, Vice President, Real Estate

**STATE OF ILLINOIS**     )
                          ) SS:

**COUNTY OF DUPAGE**    )

       **BEFORE ME,** a Notary Public in and for said County and State, did personally appear **OFFICEMAX NORTH AMERICA, INC.,** an Ohio corporation (formerly OfficeMax, Inc.), by Greg A. Darus, its Vice President, Real Estate, who acknowledged to me that he did sign the foregoing instrument as such officer and that the same is his free act and deed, both individually and as such officer of said corporation.

                  **IN TESTIMONY WHEREOF,** I have hereunto set my hand official seal at Naperville, Illinois, this _____ day of _____, 2006.

Notarial Seal



                                                                  _____

                                                                    NOTARY PUBLIC

                                                        My commission expires:_____

This Instrument Prepared By:

OfficeMax North America, Inc.
263 Shuman Blvd.
Naperville, Illinois 60563

-30-

**STATE OF CALIFORNIA)**

)SS:

**COUNTY OF** *Contra Costa*

       **BEFORE ME,** a Notary Public in and for said County and State, did personally appear **GARY GAVELLO [and _____],** an individual, who acknowledged to me that he did sign the foregoing instrument and that the same is his free act and deed.

       **IN TESTIMONY WHEREOF,** I have hereunto set my hand and official seal at *San Ramon, California* , this 7th day of *December* , 2006.

Notarial Seal

_Lisa Price_
NOTARY PUBLIC

My commission expires: *January 19, 2009*

LISA PRICE
Commission # 1541800
Notary Public - California
Alameda County
My Comm. Expires Jan 19, 2009

---

**STATE OF CALIFORNIA )**

)SS:

**COUNTY OF** *Contra Costa*

       **BEFORE ME,** a Notary Public in and for said County and State, did personally appear **INTERNATIONAL SETTLEMENT HOLDING CORPORATION,** a California corporation, by *Gary Gavello* , its *PRESIDENT* , who acknowledged to me that s/he did sign the foregoing instrument as such officer and that the same is his/her free act and deed, both individually and as such officer of said corporation.

       **IN TESTIMONY WHEREOF,** I have hereunto set my hand official seal at *San Ramon, California* ~~Naperville, Illinois~~, this 7th day of *December* , 2006.

Notarial Seal

_Lisa Price_
NOTARY PUBLIC

My commission expires: *January 19, 2009*

LISA PRICE
Commission # 1541800
Notary Public - California
Alameda County
My Comm. Expires Jan 19, 2009

**EXHIBIT A**

**Legal Description of Property**

Situated in the State of California, County of San Mateo, Town of Colma and further described as follows:

Parcel 14, as designated on that certain Parcel Map being a Resubdivision of Parcel 8, of that certain Parcel Map recorded November 25, 1970 in Volume II of Parcel Maps at Page 24 also being a Resubdivision of a portion of Lot 2, C. C.&F. Serra Center recorded October 24, 1969 in Volume 70 of Maps at Pages 18 and 19 San Mateo County Records, filed August 26, 1971 in the office of the Recorder of San Mateo County, State of California in Volume 13 of Parcel Maps at Page 47.

EXCEPTING THEREFROM all oil, gas hydrocarbon substances and mineral rights now or hereafter in or under or recoverable from said real property lying below a depth of five hundred (500) feet beneath the present surface of said real property, such reservation and exception, however, not to include any right to enter on or perform any mining, or drilling operations in or on any part of the surface of said real property above a depth of five hundred (500) feet below the present surface of said real property for the purpose of recovering any such reserved oil, gas, hydrocarbons or minerals, as reserved in the deed from Zita Corporation, a California corporation, to Fred Ferrando and Florence Ferrando, his wife, as to an undivided ½ interest, in joint tenancy, and Arthur "Buzz" Haskins and Bonnie M. Haskins, his wife, as to an undivided ½ interest in joint tenancy dated November 29, 1965 and recorded December 29, 1965 in Book 5086 Official Records of San Mateo County, Page 741.

**EXHIBIT B**

**Site Plan**

PARCEL MAP

BEING A RESUBDIVISION OF PARCEL 6, OF THAT CERTAIN PARCEL MAP
RECORDED NOVEMBER 25, 1970, IN VOLUME II OF PARCEL MAPS
ALSO BEING A RESUBDIVISION OF A PORTION OF
PARCEL 2, 6, & F SERRA CENTER
RECORDED OCTOBER 24, 1969 IN VOLUME 70 OF MAPS AT
SAN MATEO COUNTY RECORDS PAGES 18 & 19

COLMA                SAN MATEO COUNTY            CALIFORNIA

PARCEL 7

VOLUME 11 OF PARCEL 24 MAPS

PARCEL 13

PARCEL 3

PARCEL 14

SERRA CENTER

COLLINS AVENUE

SERRAMONTE BOULEVARD

SUBJECT
785 SERRAMONT

VILLA HOMESTEAD ASSOCIATION
VOL C MAPS PG 52



**Site Plan**

## EXHIBIT C
### Tenant's Outline Specifications

TENANT IS TAKING THIS PROPERTY "AS IS." THE ATTACHED OUTLINE SPECIFICATIONS ARE INCLUDED SOLELY TO OUTLINE THE POSSIBLE SCOPE OF WORK TO BE PERFORMED BY TENANT AT TENANT'S EXPENSE. ANY REFERENCE TO LANDLORD RESPONSIBILITY OR LANDLORD WORK IN THE ATTACHED OUTLINE SPECIFICATIONS ARE INAPPLICABLE AND VOID IN THEIR ENTIRETY.

SOLICITORS, 34255, 01333, 101584372.1

# OfficeMax®

## NEW STORE OUTLINE SPECIFICATIONS

These Outline Specifications are dated: **September 15, 2006**

| OfficeMax<br>**Store Development Department** | | OfficeMax<br>**Prototype Architect of Record** |
|---|---|---|
| OfficeMax, Inc.<br>25001 Emery Road, #400<br>Cleveland, OH 44128<br><br>T: 216-223-3260<br>F: 630-647-3897<br>RKoss@officemax.com<br><br>Ron Koss<br>Development Manager<br>Eastern United States | OfficeMax, Inc.<br>263 Shuman Blvd.<br>Naperville, Illinois 60563<br><br>T: 630/864-6343<br>F: 630/647-3925<br>MichaelWill@officemax.com<br><br>Michael Will<br>Development Manager<br>Western United States | Herschman Architects, Inc.<br>25001 Emery Road, #400<br>Cleveland, OH 44128<br><br>T: 216/223-3250<br>F: 216/223-3210<br>jquinn@herschmanArchitects.com<br><br>John Quinn<br>Program Manager |

No modification to these New Store Outline Specifications shall be considered binding unless initialed and dated by the OfficeMax Director of Store Planning & Construction below.

____ Modification Addendum Date:    __/__/____

**OfficeMax** New Store Outline Specifications

# OVERVIEW

The following sections provide the written specifications and description of the physical facility conditions required by OfficeMax for the development, design, and construction of all new OfficeMax store locations. These sections represent specification requirements for new OfficeMax stores only. It shall be the Landlord and Landlord's Shell Architect's responsibility to apply all Landlord "Construction Responsibility" specifications (noted below in the "Construction Responsibility Chart"), within local, state and national building codes, ordinances and requirements including the Americans with Disabilities Act (ADA), and to bear any and all costs related to compliance with all such code requirements.

The following sections are designed to be used in conjunction with the current OfficeMax Prototype Architectural and engineering plans, which are provided for conceptual intent only and are to be used strictly for design purposes. Neither prototype plans nor the following Outline Specification, are to be used in specifying quantities. Quantities, etc. are to be determined by site specific conditions and design through the plan review / approval process.

OfficeMax shall have final review and approval of all construction for its stores. The Specifications, designs, and criteria set forth herein, as well as the Prototype plans, are proprietary to OfficeMax, and shall be maintained and held in the strictest of confidence.

# INDEX

| SECT. | DESCRIPTION | PAGE |
|---|---|---|
| A. | CONSTRUCTION RESPONSIBILITY CHART | 3 |
| 1. | GENERAL INFORMATION | 10 |
| | 1.1 Plan Development / Plan Submittals | 10 |
| | 1.2 Construction Documents Approvals Process | 10 |
| | 1.3 Construction Management | 11 |
| | 1.4 General Requirements | 14 |
| | 1.5 OfficeMax Required Vendor List / Purchasing Requirements | 16 |
| | 1.6 OfficeMax General Contractor Referral List | 19 |
| | 1.7 OfficeMax Required Interior Tenant Improvement Design Team List | 20 |
| 2. | SITE | 20 |
| 3. | BUILDING SHELL | 21 |
| 4. | UTILITES | 22 |
| 5. | SIGNAGE / SIGNAGE REQUIRMENETS | 23 |
| 6. | STOREFRONT | 24 |
| 7. | VESTIBULE | 24 |
| 8. | SALES AREA | 25 |
| 9. | CASH OFFICE / MANAGER'S OFFICE | 28 |
| 10. | WAREHOUSE | 28 |
| 11. | LOADING DOCK | 29 |
| 12. | EMPLOYEE LOUNGE | 30 |
| 13. | RESTROOMS / CORRIDOR | 30 |
| 14. | PLUMBING | 31 |
| 15. | HVAC SYSTEM | 31 |
| 16. | FIRE PROTECTION / SPRINKLER SYSTEM | 34 |
| 17. | ELECTRICAL SYSTEM | 35 |
| 18. | SPECIALITY SYSTEMS | 37 |
| 19. | "STORE CONSTRUCTION COORDINATION GUIDE" | 41 |

**OfficeMax** New Store Outline Specifications

A.  **CONSTRUCTION RESPONSIBILITY CHART**

### (LANDLORD PROVIDED COLD SHELL)

The following chart is to clarify construction responsibility between the Landlord's Contractors and OfficeMax's Contractors only. The following responsibilities are to coincide with the Division and Section references found in the proceeding Outline Specifications. For specific delineation of transition of responsibility between the Landlord and OfficeMax, in addition to the Approved Plans, the following Outline Specifications are to be referenced.

| 1. GENERAL INFORMATION | RESPONSIBILITY |
| --- | --- |
| 1.1 Plan Development / Plan Submittals | N/A |
| 1.2 Construction Documents Approvals Process | N/A |
| 1.3 Construction Management | Landlord / OfficeMax |
| 1.4 General Requirements | Landlord / OfficeMax |
| 1.5 OMX Required Vendor List / Purchasing Requirements | Landlord / OfficeMax |
| 1.6 OMX General Contractor Referral List | Landlord |
| 1.7 OMX Required Interior Tenant Improvement Design Team List | Landlord |

| 2. SITE | CONSTRUCTION RESPONSIBILITY |
| --- | --- |
| 2.1 Parking spaces (by) - | Landlord |
| 2.2 Handicap accessible parking (by) - | Landlord |
| 2.3 Storefront sidewalk (by) - | Landlord |
| 2.4 Loading truck turning radii at loading dock (by) - | Landlord |
| 2.6 Landscaping (by) - | Landlord |
| 2.7 Site lighting (by) - | Landlord |
| 2.8 Bollards and/or guardrails (by) - | Landlord |
| 2.9 Exit egress ramp / walkway(by) - | Landlord |
| 2.10 Concrete dumpster pad (by) - | Landlord |
| 2.11 Fencing / construction barricades(by) - | Landlord |

| 3. BUILDING SHELL | CONSTRUCTION RESPONSIBILITY |
| --- | --- |
| 3.1 Exterior wall construction (by) - | Landlord |
| 3.2 Envelope's R-values (by) - | Landlord |
| 3.3 Roofing system / construction (by) - | Landlord |
| 3.4 Shell / structural system (by) - | Landlord |
| 3.4 HVAC unit support (by) - | Landlord |
| 3.5 Egress doors (non-vestibule) / hardware (by) - | Landlord |
| 3.6 Concrete floor slab (by) - | Landlord |

**OfficeMax** New Store Outline Specifications

| 4. UTILITIES | CONSTRUCTION RESPONSIBILITY |
|---|---|
| **4.1** Domestic water – *from existing / main distribution source on site to the point as shown on the approved plans* (by) - | Landlord |
| Domestic water – *from the point as shown on the approved plans to the final location as required* (by) - | OfficeMax |
| Sprinkler/ fire protection water line - *from existing / main distribution source on site to the point as shown on the approved plans* (by) - | Landlord |
| Sprinkler/ fire protection water line - *from the point as shown on the approved plans to the final location as required* (by) - | Landlord |
| Natural gas - *from existing / main distribution source on site to the point as shown on the approved plans* (by) - | Landlord |
| Natural gas - *from the point as shown on the approved plans to the final location as required* (by) - | Landlord |
| Sanitary sewer - *from existing / main distribution source on site to the point as shown on the approved plans* (by) - - | Landlord |
| Sanitary sewer - *from the point as shown on the approved plans to the final location as required* (by) - | Landlord |
| Storm drainage system - *from existing / main distribution source on site to the point as shown on the approved plans* (by) - | Landlord |
| Storm drainage - *from the point as shown on the approved plans to the final location as required* (by) - | Landlord |
| Electrical service - *from existing / main distribution source on site to the point as shown on the approved plans* (by) - | Landlord |
| Electrical service - *from the point as shown on the approved plans to the final location as required* (by) - | Landlord |
| Telephone service - *from existing / main distribution source on site to the point as shown on the approved plans* (by) - | Landlord |
| Telephone service - *from the point as shown on the approved plans to the final location as required* (by) - | Landlord |
| **4.2** Utilities metering (by) - | OfficeMax |

| 5. SIGNAGE / SIGNAGE REQUIREMENTS | CONSTRUCTION RESPONSIBILITY |
|---|---|
| **5.1** Sign fascia (by) - | Landlord |
| **5.2** Storefront sign (by) - | OfficeMax |
| **5.3** Secondary sign(s) (by) - | OfficeMax |
| **5.4** New and/or existing pylon or monument signage / repairs (by) - | OfficeMax |
| **5.5** Signage approvals / permits (by) - | OfficeMax |
| **5.7** Temporary / construction banner sign (by) - | OfficeMax |
| **5.8** Eye-bolts / storefront elevation banner sign (by) - | OfficeMax |

| 6. STOREFRONT | CONSTRUCTION RESPONSIBILITY |
|---|---|
| **6.1** Storefront system (by) - | Landlord |

| | |
|---|---|
| **6.2** Storefront canopy / soffit (exterior) (by) - | Landlord |
| **6.3** Storefront glazing (by) - | OfficeMax |
| **6.4** Stainless steel pipe bollards (by) - | Landlord |
| **6.5** Roll-up security grilles (by) - | OfficeMax |
| **6.6** Decorative lighting fixtures (by) - | OfficeMax |
| **6.7** Key lock box ("Knox" Box) (by) - | OfficeMax |

| **7. VESTIBULE** | **CONSTRUCTION RESPONSIBILITY** |
|---|---|
| **7.1** Doors / hardware (by) - | OfficeMax |
| **7.2** Interior glass framing (by) - | OfficeMax |
| **7.3** Ceiling (by) - | OfficeMax |
| **7.4** Lighting (by) - | OfficeMax |
| **7.5** Electrical service for Electronic Article Surveillance (EAS) system (by) - | OfficeMax |
| **7.6** Floor covering / finishes (by) - | OfficeMax |
| **7.7** Conditioned air (by) - | OfficeMax |

| **8. SALES AREA** | **CONSTRUCTION RESPONSIBILITY** |
|---|---|
| **8.1** Floor covering / finishes (by) - | OfficeMax |
| **8.2** Wall / wall furring construction (by) - | OfficeMax |
| **8.3** Columns (by) - | OfficeMax |
| **8.4** Ceiling (by) - | OfficeMax |
| **8.5** Lighting (by) - | OfficeMax |
| **8.6** Plugmolding (by) - | OfficeMax |
| **8.7** Power to cash registers / counters(by) - | OfficeMax |
| **8.8** Painting (by) - | OfficeMax |
| **8.9** Stainless steel corner guards (by) - | OfficeMax |
| **8.10** Vinyl base (by) - | OfficeMax |
| **8.11** Doors / frames / hardware (by) - | OfficeMax |
| **8.12** Warehouse service door (by) - | OfficeMax |
| **8.13** Checkouts / counters (by) - | OfficeMax |
| **8.14** Copy Center (by) - | OfficeMax |
| Cabinetry (by) - | OfficeMax |
| Electrical requirements (by) - | OfficeMax |
| Production equipment (by) - | OfficeMax |
| **8.15** Storage racks (by) - | OfficeMax |
| **8.16** "Focal Display" power / lighting (by) - | OfficeMax |
| **8.17** Non-vestibule exit doors / hardware (by) - | OfficeMax |
| **8.18** Furniture Sales Area (by) - | OfficeMax |

**OfficeMax** New Store Outline Specifications

| | |
|---|---|
| Partition walls (by) - | OfficeMax |
| Electrical requirements (by) - | OfficeMax |

| **9. CASH / MANAGER'S OFFICE** | **CONSTRUCTION RESPONSIBILITY** |
|---|---|
| 9.1 Cash Office (by) - | OfficeMax |
| Walls, ceiling, flooring and finishes (by) - | OfficeMax |
| Door / hardware (by) - | OfficeMax |
| Lighting (by) - | OfficeMax |
| Millwork (by) - | OfficeMax |
| Electrical requirements (by) - | OfficeMax |
| 9.2 Manager Office (by) - | OfficeMax |
| Walls, ceiling, flooring and finishes (by) - | OfficeMax |
| Door (by) - | OfficeMax |
| Lighting (by) - | OfficeMax |
| Millwork (by) - | OfficeMax |
| Electrical requirements (by) - | OfficeMax |

| **10. WAREHOUSE** | **CONSTRUCTION RESPONSIBILITY** |
|---|---|
| 10.1 Concrete slab / finishing(by) - | Landlord |
| 10.2 Walls (by) - | Landlord |
| 10.3 Ceiling (by) | Landlord |
| 10.4 Lighting (by) - | OfficeMax |
| 10.5 Electrical requirements (by) - | OfficeMax |
| 10.6 Cardboard baler (by) - | OfficeMax |
| 10.7 Unit heater (by) - | OfficeMax |
| 10.8 Roof ladder / hatch (by) - | OfficeMax |
| 10.9 Storage racks (by) - | OfficeMax |
| 10.10 Padlocks (by) - | OfficeMax |
| 10.11 Wire grid extensions (by) - | OfficeMax |

| **11. LOADING DOCK** | **CONSTRUCTION RESPONSIBILITY** |
|---|---|
| 11.1 Concrete slab / finishing (by) - | Landlord |
| 11.2 Overhead door (by) - | OfficeMax |
| 11.3 'Edge of dock' (by) - | OfficeMax |
| 11.4 Receiving door / hardware (by) - | OfficeMax |
| 11.5 Exterior lighting (by) - | OfficeMax |
| 11.6 Interior loading light (by) - | OfficeMax |
| 11.7 Receiving counter area (by) - | OfficeMax |

**OfficeMax** New Store Outline Specifications

| | CONSTRUCTION RESPONSIBILITY |
|---|---|
| Counter (by) - | OfficeMax |
| Lighting (by) - | OfficeMax |
| Electrical requirements (by) - | OfficeMax |
| **11.8** Steel bollards for sprinkler riser (by) - | OfficeMax |

| **12. EMPLOYEE LOUNGE** | CONSTRUCTION RESPONSIBILITY |
|---|---|
| **12.1** Walls, ceiling, flooring and finishes (by) - | OfficeMax |
| **12.2** Lighting (by) - | OfficeMax |
| **12.3** Millwork (by) - | OfficeMax |
| **12.4** Locker units (by) - | OfficeMax |
| **12.5** Metal rod / shelf (by) - | OfficeMax |
| **12.6** Electrical requirements (by) - | OfficeMax |

| **13. RESTROOMS / CORRIDOR** | CONSTRUCTION RESPONSIBILITY |
|---|---|
| **13.1** Restrooms (by) - | OfficeMax |
| Walls, ceiling, flooring and finishes (by) - | OfficeMax |
| Doors / hardware (by) - | OfficeMax |
| Lighting (by) - | OfficeMax |
| Plumbing fixtures (by) - | OfficeMax |
| Toilet partitions (by) - | OfficeMax |
| Restroom accessories (by) - | OfficeMax |
| Electrical requirements (by) - | OfficeMax |
| **13.2** Corridor (by) - | OfficeMax |
| Walls, ceiling, flooring and finishes (by) - | OfficeMax |
| Lighting (by) - | OfficeMax |
| Alcove / electric water coolers (by) - | OfficeMax |
| Service sink (by) - | OfficeMax |
| Electrical requirements (by) - | OfficeMax |

| **14. PLUMBING** | CONSTRUCTION RESPONSIBILITY |
|---|---|
| **14.2** Roof drains (by) - | Landlord |
| **14.3** Downspouts (by) - | Landlord |
| Condensate drains (by) - | Landlord |
| Trench drains (by) - | Landlord |
| Floor drains (by) - | Landlord |
| Supports (by) - | Landlord |
| Insulation (by) - | Landlord |

**OfficeMax** New Store Outline Specifications

| 15. HVAC SYSTEM | CONSTRUCTION RESPONSIBILITY |
|---|---|
| **15.5** HVAC units (by) - | OfficeMax |
| Gas / electric rooftop heating / cooling units (by) - | OfficeMax |
| Smoke detectors in units (by) - | OfficeMax |
| Wiring of smoke detectors to fire alarm control panel (by) - | OfficeMax |
| Remote indicator light / test key switch (by) - | OfficeMax |
| Factory installed electric heat option (when gas not available) (by) - | OfficeMax |
| Conduit and junction box for carbon dioxide sensors (by) - | OfficeMax |
| Equipment Operation Check (EOC) report (by) - | OfficeMax |
| **15.7** HVAC distribution (by) - | OfficeMax |
| Flexible connections / supply and return air ducts (by) - | OfficeMax |
| Smoke and / or heat detectors (by) - | OfficeMax |
| Supply / return ductwork (by) - | OfficeMax |
| Sidewall supply air registers (by) - | OfficeMax |
| Supply diffusers (by) - | OfficeMax |
| Exposed ductwork (by) - | OfficeMax |
| Manual volume dampers / turning vanes at all elbows (by) - | OfficeMax |
| Certified air balance report (by) - | OfficeMax |
| Roof mounted exhaust fan from restrooms (by) - | OfficeMax |
| Recessed ceiling mounted cabinet heater at vestibule (by) - | OfficeMax |
| Unit heater at loading dock overhead door (by) - | OfficeMax |
| Unit heater "Lightstat" thermostats / unit temperature sensors (by) - | OfficeMax |
| Volume control terminal at lounge (by) - | OfficeMax |
| Ventilation fan at cash room (by) - | OfficeMax |
| Electric wall heaters with integral thermostat at restrooms and lounge (by) - | OfficeMax |
| Scheduling of all mechanical equipment (by) - | OfficeMax |
| Contacting to security of all roof openings / security bars for misc. (by) - | OfficeMax |

| 16. FIRE PROTECTION / SPRINKLER SYSTEM | CONSTRUCTION RESPONSIBILITY |
|---|---|
| **16.1** System designed densities (by) - | OfficeMax |
| Dedicated sprinkler riser system (by) - | OfficeMax |
| Sprinkler heads (by) - | OfficeMax |
| Building access points (by) - | OfficeMax |
| Smoke / heat removal (by) - | OfficeMax |
| Smoke curtains (by) - | OfficeMax |

**OfficeMax** New Store Outline Specifications

| Small hose connections (by) - | OfficeMax |
|---|---|
| Identification of sprinkler system / signage (by) - | OfficeMax |
| **16.4** Fire extinguishers (by) - | OfficeMax |

| **17. ELECTRICAL SYSTEM** | **CONSTRUCTION RESPONSIBILITY** |
|---|---|
| **17.3** Main electrical service - 400 amp / 480/277 volt / 3 phase / 4 wire - *from existing / main distribution source on site to the point as shown on the approved plans* (by) - | Landlord |
| *Main electrical service - 400 amp / 480/277 volt / 3 phase / 4 wire - from the point as shown on the approved plans to the final location as required* (by) - | OfficeMax |
| **17.4** Pre-manufactured electrical distribution center (EDC) (by) - | OfficeMax |
| **17.5** Emergency / night lighting circuits (by) - | OfficeMax |
| **17.6** Lighting / light fixtures (by) - | OfficeMax |
| **17.7** Electrical requirements for energy management system (by) - | OfficeMax |
| **17.8** All outlets / duplex receptacles (by) - | OfficeMax |
| **17.9** Night lighting (by) - | OfficeMax |
| **17.10** Electric panels (by) - | OfficeMax |
| **17.11** Computer network cabling (by) - | OfficeMax |
| **17.12** Diesel powered generator (for stores outside of 48 US states) (by) - | OfficeMax |
| **17.13** On-site prime power generation system (when permanent power not available) (by) - | OfficeMax |

| **18. SPECIAILTY SYSTEMS** | **CONSTRUCTION RESPONSIBILITY** |
|---|---|
| **18.2** Energy Management System (by) - | OfficeMax |
| **18.3** Telecommunication System (by) - | OfficeMax |
| **18.4** Security/Fire Alarm System (by) - | OfficeMax |
| **18.5** Power Conditioner (by) - | OfficeMax |
| **18.6** Electrical requirements (EAS) system (by) - | OfficeMax |
| **18.7** Network Cable System (by) - | OfficeMax |

**OfficeMax** New Store Outline Specifications

# 1. GENERAL INFORMATION

## 1.1. Plan Development / Plan Submittals

1.1.1. Landlord or Landlord's Shell Architect shall be required to enter into a contract for Architectural and M/E/P engineering services with the OfficeMax TI Architect and which the OfficeMax TI (M/E/P) Engineer (The OfficeMax Required Interior Tenant Improvement Design Team) for the production of interior tenant improvement plans (see Required Interior Tenant Improvement Design Team List). Landlord may also utilize the OfficeMax Required Interior Tenant Improvement Design Team as the Landlord's building shell design team for the production of the building shell plans.

1.1.1.1. A written list of Architectural and engineering firms for the project is to be provided to the OfficeMax Construction Manager ten (10) days prior to issuance of contracts for such services.

1.1.1.2. OfficeMax shall have ten (10) days to advise Landlord of any unacceptable Architectural or engineering firm, in which case the Landlord shall be required to comply with such rejections and obtain alternatives acceptable to OfficeMax.

1.1.2. The following drawings / information is to be provided to the Landlord from OfficeMax via electronic media:

1.1.2.1. Current OfficeMax prototype plans, including details, specifications, and schedules for use in producing building shell drawings and civil (site) plans.

1.1.2.2. These documents are to be provided based on the most current OfficeMax prototype criteria to date only and may need to be modified to conform to site specific conditions and all prevailing code requirements (with OfficeMax review and approval).

1.1.3. The following drawings / information is to be provided to the OfficeMax TI Architect from the Landlord or Landlord's Shell Architect via electronic media and hard-copy format:

1.1.3.1. Shell building and civil plans, including detailed site specific information, for use in producing interior tenant improvement plans.

1.1.3.2. These plans are to be provided based on the most current revision available to date. Should Landlord or Landlord's Shell Architect provide old or out of date drawings which causes the OfficeMax TI Architect additional time in having to modify the TI drawings, etc., then Landlord shall be responsible for any additional costs for changes which are above and beyond the contract price as negotiated.

1.1.4. The following drawings / information is to be provided to the OfficeMax Development Manager from the Landlord or Landlord's Shell Architect via electronic media and hard-copy format:

1.1.4.1. Shell building's floor plan (including column placement).

1.1.4.2. Storefront elevation (including all information pertaining to exterior signage)

1.1.4.3. Color rendered storefront elevation (including actual samples for all storefront / exterior finishes.)

1.1.4.4. Site plans including topography, site lighting with photometric lighting levels, parking areas, utilities, loading dock orientation, nearby road ways and access drives.

## 1.2. Construction Documents Approvals Process

1.2.1. Incomplete submittals for plan approval to the OfficeMax Development Manager / OfficeMax's TI Architect or submittal deviations from procedure noted above will immediately be rejected.

1.2.2. During exchange of drawings / information between Landlord's Shell Architect and OfficeMax's TI Architect, Landlord's Shell Architect is to coordinate any necessary revisions to the shell building drawings and civil plans concurrently with the ongoing production of the interior tenant improvement plans and resubmit such revisions.

1.2.3. Upon full receipt of plans by OfficeMax, OfficeMax will review and return a set of such drawings to the Landlord marked as either "APPROVED", "APPROVED AS NOTED", or "REVISE AND RESUBMIT". If construction commences prior to OfficeMax approval of such plans, Landlord assumes all risks in being responsible for making any necessary modifications to conform to the approved plans.

1.2.3.1. If plans are marked "APPROVED AS NOTED", all comments and corrections noted on such

plans must be incorporated into the final working plans and be implemented into the construction of the OfficeMax store.

1.2.3.2.  If plans are marked "APPROVED" or "APPROVED AS NOTED", these notes do not imply that the requirements described below in the Outline Specifications are now void. The approved plans are to accompany this Outline Specifications scope of work through construction completion.  Any deviation from these Outline Specifications shall be corrected by the Landlord at no cost to OfficeMax.

1.2.3.3.  If plans are marked "REVISE AND RESUBMIT", Landlord shall revise the plans accordingly and resubmit to OfficeMax for review, following the same submittal process listed above. Revised plans are to be submitted to OfficeMax within the time frame as specified within the Lease Agreement.

1.2.4.  Upon final approval of the plans, an OfficeMax plan approval letter, indicating plans as either "APPROVED" or "APPROVED AS NOTED", shall be required for issuance of the "Notice of Intent to Turnover" as stated in the section on CONSTRUCTION MANAGEMENT.

1.2.5.  Upon final approval of the plans by OfficeMax, Landlord and/or Landlord's Architect shall revise the documents once more accordingly and distribute to the following as follows:

1.2.5.1.  Final working drawings to the OfficeMax Development Manager -

1.2.5.1.1.  One (1) set of 11" x 17" original plots (not photo reductions) on bond.

1.2.5.1.2.  One (1) set of drawings on CD-ROM in AutoCAD format.

1.2.5.2.  Final working drawings to the OfficeMax Construction Manager -

1.2.5.2.1.  One (1) set of full size reproductions.

1.2.5.2.2.  Two (2) sets of 11" x 17" original plots (not photo reductions) on bond.

1.2.5.3.  Final documents to the OfficeMax TI Architect -

1.2.5.3.1.  One (1) set of 11" x 17" original plots (not photo reductions) on bond.

1.2.5.3.2.  One (1) set of drawings on CD-ROM in AutoCAD format.

1.2.5.4.  Final documents to OfficeMax Required Vendors (see REQUIRED VENDOR LIST).

1.2.6.  Landlord / Landlord's Shell Architect shall be responsible for the certification (stamping and/or sealing) of Architectural and engineering plans as required by all prevailing code enforcement agencies.

1.2.7.  Permitting

1.2.7.1.  Landlord / Landlord's Shell Architect shall submit all building shell and all civil drawings for any necessary national, state and local permits as required.  Drawings shall be submitted for permit expeditiously and any revisions as required from jurisdictions having authority shall be modified accordingly and resubmitted for final approval to maintain required construction schedule as outlined within the Lease agreements.  Should revisions require updates to OfficeMax TI drawings, Landlord / Landlord's Shell Architect shall be required to coordinate such changes with the OfficeMax TI Architect for revisions to the OfficeMax TI drawings.

1.2.7.2.  OfficeMax TI drawings are to be submitted for any necessary national, state and local permits as required.  Should drawings be submitted by Landlord / Landlord's Shell Architect either simultaneously with building shell drawings or thereafter, Landlord / Landlord's Shell Architect shall notify OfficeMax TI Architect of any revisions as required from jurisdictions having authority and shall coordinate the changes with the shell drawings as well.

1.3.  Construction Management

1.3.1.  This section is provided for all new OfficeMax projects with the following construction specifics: (Landlord Build to Suit / OfficeMax Self Develop / Landlord Provided Warm Shell / Landlord Provided Cold Shell).  All non-OfficeMax construction responsibilities are to be coordinated with the Construction Responsibility Chart above.  Therefore, due to the varying delineations / transition of responsibility between projects, some statements below may not be applicable.

1.3.2.    OfficeMax Construction Manager is to provide Landlord, Landlord's Construction Manager and Landlord's Shell Architect a copy of the OfficeMax *Store Construction Coordination Guide* for use during construction of the OfficeMax project. This guide is to be utilized before and throughout construction by all contactors and vendors associated with the construction of the OfficeMax store and is to be used in conjunction with these Outline Specifications.   The *Store Construction Coordination Guide* can be found in Section 19 of these Outline Specifications.   Due to the varying delineations / transition of responsibility between projects, some statements within this Guide may not be applicable.

1.3.3.    In order to provide for timely execution of all construction requirements and turnover to OfficeMax, the Landlord shall assign a construction management team who will be required to comply with the following minimum requirements:

1.3.3.1.    A written Notice of Commencement of Construction shall be submitted to OfficeMax Construction Manager along with a list of proposed contractors, subcontractors, and prime material suppliers (for all non OfficeMax construction responsibility items) ten (10) days prior to start of construction.

1.3.3.2.    The Landlord's Construction Manager shall be responsible to schedule and conduct a pre-construction meeting to address all "Notice of Commencement of Construction" items as related here-in with all applicable contractors, subcontractors, prime material suppliers and the OfficeMax Construction Manager.

1.3.3.3.    OfficeMax shall have ten (10) days to advise of any unacceptable contractor, subcontractor, or material supplier, in which case compliance of such rejections and seeking alternates shall be conducted / submitted.  Failure of OfficeMax to reply within ten (10) days shall constitute acceptance of such list provided.

1.3.3.4.    OfficeMax shall reserve the right to reject any and all work, supplies, and materials of any contractor, subcontractor, or supplier if previously disapproved by OfficeMax.   Upon rejection, OfficeMax shall retain the right, should it deem necessary, to provide/secure remedies to make corrections or changes on its own behalf at no cost to OfficeMax.

1.3.4.    Landlord's Construction Manager is to designate a Site Superintendent who shall be responsible for communicating all project scheduling and status updates to OfficeMax.  The Site Superintendent shall be responsible to provide the OfficeMax Construction Manager with all required information as detailed in the *Store Construction Coordination Guide.*

1.3.4.1.    The Site Superintendent is to be on site at all times and ensure that all work is being performed to meet the scheduled OfficeMax delivery date.  The Site Superintendent shall be assigned to the OfficeMax construction project exclusively and shall remain on-site until all non OfficeMax construction responsibility items have been satisfied, found to be acceptable by local building officials, and found to be acceptable by OfficeMax Construction Manager.

1.3.4.2.    The Site Superintendent shall be equipped throughout the project duration with telephone, fax, temporary power, heat (if required), waste container service, portable restrooms, drinking water and portable hand washing stations, and shall maintain such for OfficeMax use until all permanent services are secured for OfficeMax.

1.3.4.3.    The Site Superintendent shall provide direct communication with the OfficeMax Construction Manager as deemed necessary by OfficeMax and as defined in the *Store Construction Coordination Guide.*

1.3.4.4.    After turnover to OfficeMax, Site Superintendent shall insure that all on-site construction personnel adhere to OfficeMax guidelines of conduct as stated herein while working within the store.

1.3.5.    Construction status reports and progress photographs

1.3.5.1.    Written construction status reports shall be provided to the OfficeMax Construction Manager as outlined within the *Store Construction Coordination Guide.*

1.3.5.2.    Construction progress photos shall be provided to the OfficeMax Construction Manager as outlined within the *Store Construction Coordination Guide.*

1.3.5.3.    Status report information and photos are to be current within the last 48 hours.

1.3.5.4. Should written construction status reports and photos on a weekly basis as described above not be provided, OfficeMax shall reserve the right to contract the services of a professional Architect and/or professional photographer on it's own behalf for the entire project duration, and shall deduct all costs and charges for such services from the first rent's payment.

1.3.6. Written construction status reports shall adhere to all requirements as defined in *Store Construction Coordination Guide*. In general, these reports shall include, but not be limited to, the following;

  1.3.6.1. Original schedule (first report) and any revisions thereafter

    1.3.6.1.1. OfficeMax shall provide Landlord's Construction Manager with a 'Microsoft Project' template for use in preparing the project's schedules.

    1.3.6.1.2. Project schedules shall be prepared in 'Microsoft Project' (Gant Chart) format and be provided to the OfficeMax Construction Manager in electronic format.

  1.3.6.2. Project directory and subcontractor list (first report) and any revisions

  1.3.6.3. Status report information including work completed since the last report and work in progress including percentage completed on the form provided in the OfficeMax Project Coordination Guide

  1.3.6.4. Verbal communication with the OfficeMax Construction Manager as needed

1.3.7. In order for OfficeMax to provide for accurate and timely scheduling of fixture installation, stocking/merchandising of the store, and soft/grand opening, the OfficeMax Construction Manager shall be provided with the following written notices, including back-up documentation, to validate the accuracy of the turnover date. Turnover will occur on a Saturday unless OfficeMax is required to utilize union labor for fixture installation, in which case turnover will occur on a Monday. Clarification of this requirement is further defined in the OfficeMax Project Coordination Guide.

  1.3.7.1. Seventy-five (75) days prior to turnover, "Notice of Intent to Turnover" with the following documentation shall be issued to the OfficeMax Construction Manager:

    1.3.7.1.1. Information requested in Sections 1 and 2 of the OfficeMax Project Coordination Guide

    1.3.7.1.2. OfficeMax plan review letter stating that plans are Approved or Approved As Noted

    1.3.7.1.3. Copy of Building Permit for construction of tenant's space

    1.3.7.1.4. Current construction schedule

    1.3.7.1.5. General Contractor's bid summary

    1.3.7.1.6. General Contractor's insurance certificate meeting requirements of OfficeMax (see section on Liability Insurance)

  1.3.7.2. Sixty (60) days prior to turnover, "Notice of Turnover" with the following documentation shall be issued to the OfficeMax Construction Manager:

    1.3.7.2.1. Confirmation of Lease Agreement execution by Landlord and OfficeMax

    1.3.7.2.2. Insurance underwriter approval for fire protection system (VENDOR 17)

    1.3.7.2.3. Confirmation of purchase of OfficeMax vendor items (see REQUIRED VENDOR LIST)

    1.3.7.2.4. Current construction status report and progress photos (current within 72 hours)

    1.3.7.2.5. Summary of Change Orders to date for modifications requested by OfficeMax

  1.3.7.3. In any case, the "Notice of Turnover" will not be considered valid unless accompanied by all of the back-up documentation listed above.

1.3.8. If, after issuance of written notice of turnover, OfficeMax deems that the required construction schedule has not been met, OfficeMax reserves the right to travel (all expenses paid) to the job site to conduct site inspections and job site meetings.

1.3.9.    Punch-lists

     1.3.9.1.    Prior to store turnover to OfficeMax, a punch-list / walk-thru shall be conducted between the OfficeMax Construction Manager, the Landlord / Landlord's Site Superintendent, and the General Contractor.

     1.3.9.2.    All items tagged as "Non-Compliant" in the OfficeMax punch-list are to be completed prior to the OfficeMax Store Turnover Date as detailed within the lease agreement, or as otherwise stated.

     1.3.9.3.    The Landlord / Landlord's Site Superintendent shall provide its own analysis of construction completion / punch-list and copy OfficeMax of such prior to the turnover date.

1.3.10.    All requirements herein and as detailed in the *Store Construction Coordination Guide*, and the implementation of such shall provide for a thorough, open line of communication between the Landlord, contractor, and OfficeMax and therefore are to be complied with.

1.3.11.    Changes/modification to specification at the request of OfficeMax and change order process.

     1.3.11.1.    OfficeMax retains the right to modify and change these specifications to meet new design criteria as it may see fit. If plans have previously been approved by OfficeMax, such changes / modifications will be submitted by OfficeMax. All such requests for changes or modifications shall be reviewed and either a "cost estimate/not to exceed" or an "actual cost" notice will be submitted to the OfficeMax Construction Manager for review and approval. All costs for changes or modifications must be approved by the OfficeMax Construction Manager or OfficeMax Director of Construction prior to execution of the work. OfficeMax will deem change orders as approved only under these terms.

     1.3.11.2.    An invoice for all approved change orders is to be submitted to OfficeMax after the turnover date and no later than sixty (60) days after the turnover date. Invoices submitted after sixty (60) days from turnover will not be valid or accepted for payment. The following items are to be submitted along with the invoice to the attention of the OfficeMax Store Development Financial Accounting Group.

         1.3.11.2.1.    Copy of signed change order with OfficeMax Construction Purchase Order

         1.3.11.2.2.    Copy of original request for change

         1.3.11.2.3.    Copy of general contractor change order and invoice

         1.3.11.2.4.    Copy of subcontractor invoice

1.3.12.    Store Development Bulletins

     1.3.12.1.    All Store Development Bulletins are located on the OfficeMax Store Planning FTP web site. This allows the General Contractor, all sub contractors and the OfficeMax required vendors to access, at any time, all applicable Store Development Bulletins issued since time of bid. All Store Development Bulletins distributed since time of issuance of these New Store Outline Specifications are to supersede any information contained either on the Approved as Noted Construction Documents, or within these Outline Specifications.

     1.3.12.2.    Starting at construction commencement, the General Contractor, sub contractors and OfficeMax required vendors shall be required to access the OfficeMax FTP web site weekly for updates and download all issued Store Development Bulletins.

     1.3.12.3.    The OfficeMax Construction Manager will provide information on how to access the FTP web site and download all issued Store Development Bulletins either during the pre-construction meeting or sometime prior to construction commencement.

1.4.    **General Requirements**

     1.4.1.    The contractor shall, during the continuance of work under the contract, including any extra work in connection therewith, maintain with companies acceptable to OfficeMax the following insurance coverage.

     1.4.2.    All insurance companies used are required to have an A.M. Best & Co. rating of "A VII" or better. Self insured retention or other fronted programs not supported "first dollar" by insurance company paper are not acceptable unless the insured has a net worth of at least $100 million.

     1.4.3.    Worker's compensation as required by all applicable federal, state, or other laws, including employers'

liability with a limit of at least:

1.4.3.1.    $1,000,000 each accident

1.4.3.2.    $1,000,000 policy limit

1.4.3.3.    $1,000,000 each employee

1.4.4.    Commercial general liability (insurance services office or equivalent form):   Completed operations liability shall be kept in force for at least two (2) years after the date of final completion.  The policy must be endorsed as primary and non-contributory to any insurance of the additional insureds referenced below.  The policy must also be endorsed cover "stop-gap" liability for all monopolistic state fund states (Ohio, Nevada, North Dakota, West Virginia, Washington, Wyoming, and Puerto Rico) if operations are to be conducted in any of those states. Limits shall be at least the following:

1.4.4.1.    Bodily injury/property damage (CSL)

1.4.4.1.1.    $1,000,000 each occurrence

1.4.4.1.2.    $2,000,000 general aggregate

1.4.4.1.3.    $2,000,000 products/completed operations aggregate

1.4.4.2.    Business automobile policy: (insurance services office or equivalent form):

1.4.4.2.1.    $1,000,000 bodily injury/property damage (CSL)

1.4.4.3.    Umbrella excess liability limits shall be at least the following

1.4.4.3.1.    $10,000,000 each occurrence

1.4.4.3.2.    $10,000,000 general aggregate (where applicable)

1.4.4.3.3.    $10,000,000 products/completed operations aggregate (where applicable)

1.4.5.    The contractor shall have the policy endorsed to include OfficeMax (including any subsidiary, affiliated or financially controlled companies as now or hereafter exist), and the Landlord as additional insured. Contractor shall provide OfficeMax with original "Accord" certificates of insurance evidencing all required coverage, endorsed as required.   The certificates of insurance submitted to OfficeMax hereunder must provide that no material change or cancellation in insurance shall be made without forty-five (45) days prior written notice to the owner, Landlord, and OfficeMax  The contractor shall not make any change or cancellation in insurance without the prior written consent of OfficeMax Further, at the request of OfficeMax, contractor shall provide complete certified copies of the policies of insurance and related documents for review by OfficeMax

1.4.6.    Subcontractors shall be required to carry insurance limits in the amount and the form required of contractor.   Any shortfall in limits or scope of coverage of subcontractors' insurance is the responsibility of the contractor.

1.4.7.    Warranties

1.4.7.1.    Construction shall be warranted and guaranteed against any defects in workmanship or materials for a period of not less than one (1) year after the turnover date except where specifically otherwise stated herein.  A "Warranty Repair Notification" form for use by the OfficeMax Facilities Department as shown in the OfficeMax Project Coordination Guide shall be provided.

1.4.7.2.    All warranties and guarantees in connection with construction shall be assigned.   Such warranties and guarantees (from the general contractor and subcontractors) shall be provided on the forms provided in the OfficeMax Project Coordination Guide.

1.4.7.3.    Copies of all General Contractor and Subcontractor warranties and guarantees shall be provided to OfficeMax (see section on Closeout Documents).

1.4.7.4.    If originally warranties are to be provided from the Landlord (Landlord Build to Suit projects only) warranties shall be transferred to the new property owner should the Landlord sell the property.   New property owner(s) shall be responsible for any and all warranties and warranty recalls.

1.4.8.    Closeout Documents, Materials and Procedures

1.4.8.1.    All Closeout Documents and Materials shall be provided as outlined within the *Store*

**OfficeMax**  New Store Outline Specifications

*Construction Coordination Guide* (attached), and are to be provided prior to store turnover as detailed within the lease agreement, or as otherwise stated.

1.4.8.2.  All Closeout Procedures are to be complied with as outlined within the *Store Construction Coordination Guide* (attached).

1.5.  OfficeMax Required Vendor List / Purchase Requirements

All OfficeMax vendor services, products, and designated equipment are to be purchased exclusively from the Required Vendor List below.

No substitutions in materials or suppliers will be accepted.  Deposits will be required by the following vendors to secure the purchase of the required services, products or equipment.

| NO. | VENDOR | RESPONSIBILITY | DRAWING DISTRIB. (*) |
|---|---|---|---|
| 1. | **MADIX STORE FIXTURES** <br> 38750 Santa Barbara, Clinton Township, MI 48036 <br> Jim Bogusz  (586/469-3213)  (586/469-3417 fax) <br> Email:  jbogusz@madixinc.com | Metal display fixtures (provided and installed by OfficeMax) | F1 |
| 2. | **GLENCO, INC.** <br> 4600 Mabry Drive, Clovis, NM 88102 <br> Randy Kelley  (505/763-4414)  (505/762-2944 fax) <br> Email:  bigdog@yucca.net | Structural Steel and Steel Joist and Deck System (optional) | A1, A2, A6, A7, A8, A9, A10, A11, all S |
| 3. | **NOVAR CONTROLS CORPORATION** <br> 6060 Rockside Woods Blvd., Suite 400, Cleveland, OH 44131 <br> Rhonda Athey  (216/682-1337)  (330/409-9002 fax) <br> Email:  rhonda.athey@novar.com | Energy Management System | Mechanical & Electrical, Disk of A1, M1 |
| 4a. | **CUSTOM ARCHITECTURAL DESIGN** <br> 4021 Fambrough Drive, Powder Springs, GA 30127 <br> Kelli McCall  (800/683-3805)  (770/439-0306 fax) <br> Email:  kelli@cadconcepts.net | Stainless steel accessories | A1, A3, F1 |
| 4b. | **COMPLETE DISPLAY SYSTEMS, INC.** <br> 707 Whitlock Ave., SW, Suite E-20, Marietta, GA 30064 <br> Tonya McNabb  (770/419-1765)  (770/419-1898 fax) <br> Email:  tmcnabb@completedisplay.com | Stainless steel accessories | A1, A3, F1 |
| 5. | **LOEB ELECTRIC** <br> 915 Williams Avenue, Columbus, OH 43212 <br> Doug Hamrick  (614/421-3369)  (614/299-6268 fax) <br> Email:  dhamri@loeb-electric.com | Light fixtures and wiring system (8 week lead time); power pole raceways; plugmold | A1, A2, all Electrical |
| 6. | **STANLEY ACCESS TECHNOLOGIES** <br> 65 Scott Swamp Road, Farmington, CT 06032 <br> Christopher Lombardo  (860/679-6406)  (860/679-6436 fax) <br> Email:  clombardo@stanleyworks.com | Automatic doors (exterior) | A1, A5 |
| 7a. | **CREATIVE CABINETS** <br> 1 Pop Rite Drive, Arcanum, OH 45304 <br> Dennis Koons  (614/878-2708)  (937/692-6409 fax) <br> Email:  dkoons@columbus.rr.com | Millwork | A1, A3, A4 |
| 7b. | **IDL MERCHANDISING SOLUTIONS** <br> 600 West Chicago, Suite 615, Chicago, IL 60610 <br> Cheryl Parsons  (312/624-7873)  (773/612-3718 cell) <br> Email:  cparsons@idlpop.com | Millwork | A1, A3, A4 |
| 8. | **ALVARADO MANUFACTURING CO.** <br> 12660 Colony Street, Chino, CA 91710 <br> Gary Struc  (800/423-4143)  (909/628-1403 fax) <br> Email:  gstruc@alvaradomfg.com | Chrome Cart Railing | A1, A3, F1 |

**OfficeMax** New Store Outline Specifications

| 9. | **CHASE DOORS**<br>10021 Commerce Park Drive, Cincinnati, OH 45246<br>Felix Fuentes  (800/543-4455 x2905)  (800/626-5684 fax)<br>Email:  ffuentes@chasedoors.com | Warehouse impact doors | A1, A3, F1 |
|---|---|---|---|
| 10. | **THE MATWORKS**<br>11900 Old Baltimore Pike, Beltsville, MD 20705<br>Susan Sprague  (800/523-5179)  (301/931-8536)<br>Email:  ssprague@thematworks.com | Vestibule floor system | A1, A3, F1 |
| 11. | **COMMERCIAL DOCK & DOOR**<br>7653 St. Clair Avenue, Mentor, OH 44060-5235<br>Ray Strumbly  (440/951-4541)  (440/951-4910 fax)<br>Email:  rstrumbly@commercialdockanddoor.com | Loading dock equipment | A1, A9, A10, S2 |
| 12. | **NORTH AMERICAN SIGN**<br>3601 West Lathrop, South Bend, IN 46628<br>Laurie Lloyd  (800/348-5000 x211)  (219/289-8118 fax)<br>Email:  lll@northamericansigns.com | Exterior signage (by OfficeMax), OfficeMax construction banner | F1, A7 |
| 13. | **DIGITAL RELIANCE**<br>386 Charmel Place, Columbus, OH 43235<br>Jerry Galbreath  (614/430-5950)<br>Email:  jg@digital-reliance.com | Electronic Closeout Documents | |
| 14. | **CORNELL STOREFRONT SYSTEMS**<br>190 Welles Street #201, Forty Fort, PA 18704<br>Bill Ackerman  (800/882-6773 x560)  (800/882-6772 fax)<br>Email:  backerman@cornellstorefronts.com | Rolling grilles and overhead doors | A1, A5, A8, A9 |
| 15. | **LENNOX INDUSTRIES**<br>2100 Lake Park Boulevard, Richardson, TX 75080<br>Jerry Lee  (800/367-6285)  (972/497-5112 fax)<br>Email:  jerry.lee@lennoxintl.com | HVAC equipment | A2, F1, all mechanical and electrical |
| 16. | **CROSSCOM NATIONAL, INC.**<br>1001 Asbury Drive, Buffalo Grove, IL 60089<br>Heather Glasnovich  (800/933-9203 x373)  (847/353-1481 fax)<br>Email:  hglasnovich@crosscomnational.com | Telephone system | F1, E1, E2 |
| 17. | **FACTORY MUTUAL INSURANCE CO.**<br>300 South Northwest Highway<br>Tim Kelly  (847/430-7141)<br>Email:  Timothykelly@fmglobal.com | Insurance underwriter (sprinkler system) | F1, sprinkler shop drawings |
| 18. | **PCX CORPORATION**<br>33 Pony Farm Road, Clayton, NC 27520<br>Rod Clark  (866/564-6454 x3911)  (919/550-2900 fax)<br>Email:  clark@pcxcorp.com | Power conditioner | |
| 19. | **NATIONAL SYSTEM INSTALLERS (NSI)**<br>3155 Dallavo Court, Walled Lake, MI 48390<br>Chuck Whitener  (248/624-8301)  (248/624-5667 fax)<br>Email:  cwhitener@nsidata.com | Network system cabling | |
| 20. | **BASS SECURITY SERVICES, INC.**<br>26701 Richmond Road, Cleveland, OH 44146<br>Mike Girolamo  (800/523-1422 x102)  (888/774-8900 fax)<br>Email:  mgirolamo@locksmithusa.com | Door hardware, restroom accessories | A1, A5 |
| 21. | **MILLIKEN CARPET CONSUMER ENVIRONMENTS**<br>2969 North Limestone Street, Springfield, OH 45503<br>Jeff Butterfield  (937/657-2755)  (866/503-6811 fax)<br>Email:  jeff.butterfield@milliken.com | Carpet | A1, disk of A1 |
| 22. | **NATIONAL GUARDIAN**<br>155 E. Wildmere Avenue, Suite 1021, Longwood, FL 32750<br>Matt Krebs  (800/338-9021 x108)  (407/682-7987 fax)<br>Email:mkrebs@nationalguardiansecurity.com | Security alarm and fire alarm | Full set, disk of F1 |

**OfficeMax** New Store Outline Specifications

| 23. | **MIDWEST FACTORY**<br>804 East Monument Avenue, Dayton, OH  45402<br>Les Stein  (800/777-3211)  (937/228-0225 fax)<br>Email:  jlstein@midwestfactory.com | Employee lockers | F1 |
|---|---|---|---|
| 24. | **HJA INTERNATIONAL**<br>88 Beacon Street, Buffalo, NY 14220<br>Peter Hurd  (800/836-2253)  (716/332-6059 fax)<br>Email:  phurd@hotmail.com | Baler | |
| 25. | **GIRTMAN & ASSOCIATES, INC.**<br>7115 Cockrill Bend Blvd., Nashville, TN 37209<br>Donna Howard  (615/350-6000)  (615/350-6686 fax)<br>Email:  OfficeMax@girtman.com | Doors & Door Frames (interior) | |
| 26. | **SHERWIN WILLIAMS NATIONAL ACCOUNTS**<br>11410 Alameda Drive, Strongsville, OH 44149<br>Pete Cobb  (440/846-4305)  (440/846-4349 fax)<br>Email:  pete.t.cobb@sherwin.com | Paint manufacturer | |
| 27. | **PCX CORPORATION**<br>33 Pony Farm Road, Clayton, NC 27520<br>Andy Hudson  (866/564-6454 x3911)  (919/550-2900 fax)<br>Email:  hudson@pcxcorp.com | PDO, EDC, panels, fuses, disconnects, lighting contactors/panel, generator (where required) | All  Electrical |
| 28. | (intentionally left blank) | | |
| 29. | (intentionally left blank) | | |
| 30. | **ARMSTRONG WORLD INDUSTRIES, INC.**<br>1204 Grenham Place, Rockford, IL 61107<br>Lisa Cavataio  (815/484-9377)  (815/484-9148 fax)<br>Email:  lycavataio@armstrong.com | Vinyl tile flooring, vinyl cove base, acoustical ceiling tile | |
| 31. | **FIRE MATERIALS GROUP LLC**<br>127 South Weber Drive, Chandler, AZ 85226<br>Glenn Matthews  (480/753-5444)  (480/753-5450 fax)<br>Email:  gmatthews@1fmg.com | Fire extinguishers | F1 |
| 32. | (intentionally left blank) | | |
| 33. | **JOHNS MANVILLE**<br>2516 Glen Echo, Hudson, OH 44236<br>Steve Crone  (330/653-8909)  (330/653-3577 fax)<br>Email:  crones@jm.com | Roofing and insulation | A6 – A11 |
| 34. | **McCUE CORPORATION**<br>35 Congress Street, Salem, MA 01970<br>Bill Bell  (800/800-8503 x277)  (978/741-2542 fax)<br>Email:  bbell@mccuecorp.com | Floor mounted bumper system | |

**(\*) Note:** The "Drawing Distribution" column references OfficeMax Prototype template sheet numbers only.  Specific page references shall be modified accordingly based on actual composition of project specific construction documents / drawings.  These specific construction documents are to contain all applicable information for the respective vendors listed above and are to be provided as such.

**OfficeMax** New Store Outline Specifications

1.6    OfficeMax General Contractor Referral List

The following general contractors are actively involved in numerous OfficeMax construction projects. This list is intended to present the Landlord with a list of contractors who are extremely knowledgeable of the OfficeMax prototype store design, along with OfficeMax punchlist expectations as gained from extensive involvement in multiple OfficeMax construction projects throughout the years. Their knowledge of plan details, accelerated project schedules, performance and price competitiveness has allowed their being listed below.

| (All United States and Puerto Rico) |
|---|
| **FAST-TRAK CONSTRUCTION**<br>1150 Empire Central Place #124, Dallas, TX 75247<br>Evan Stamenov  (214/638-0525)  (214/638-0528 fax)<br>Email:  estamenov@fasttrakconstruction.com<br>Website:  www.fasttrakconstruction.com |

| (All United States) |
|---|
| **HANLIN RAINALDI CONSTRUCTION CORP.**<br>6610 Singletree Dr., Columbus, Ohio  43229<br>Mike Hanlin  (614/436-4204)  (614/436-4244 fax)<br>Email:  mike.hanlin@hanlinrainaldi.com<br>Website:  www.hanlinrainaldi.com |

| (Eastern, Central, and Mountain areas) |
|---|
| **INNOVATIVE CONSTRUCTION SOLUTIONS, INC.**<br>12660 West Capitol Drive, Suite 200, Brookfield, WI 53005<br>David Schwartz  (262/790-1911)  (262/790-1964 fax)<br>Email:  daves@buildics.com<br>Website:  www.buildics.com |

| (Mountain and Pacific areas) |
|---|
| **S.D. DEACON GENERAL CONTRACTORS**<br>0720 SW Bancroft Street, Portland, OR 97239<br>Steve Deacon  (503/297-8791)  (503/297-8997 fax)<br>Email:  deacon@deacon.com<br>Website:  www.deacon.com |

**OfficeMax** New Store Outline Specifications

1.7   OfficeMax Required Interior Tenant Improvement Design Team List

The following Architectural / Engineering design teams are actively involved in every OfficeMax project currently in plan development. Furthermore, as described above these design teams are to be contracted with either the Landlord or the Landlord's Shell Architect directly for the development of its TI plans. Lastly, these teams may also be utilized as the Landlord's building shell architectural consultant for the production of the building shell plans.

These design teams have in depth knowledge of all OfficeMax store designs gained through their experience and involvement with OfficeMax projects, which gives them the ability to produce plans accurately and quickly with a reduction in time required for review by OfficeMax.

| **OfficeMax TI Architect** |
|---|
| **HERSCHMAN ARCHITECTS, INC.**<br>25001 Emery Road #400, Cleveland, OH 44128<br>John Quinn  (216/223-3250)  (216/223-3210 fax)<br>Email:  jquinn@herschmanArchitects.com<br>Website:  www.herschmanArchitects.com |

| **OfficeMax TI (M/E/P) Engineer**<br>(to be subcontracted by OfficeMax TI Architect) |
|---|
| **MCHENRY & ASSOCIATES, INC.**<br>25001 Emery Road, #200, Cleveland, OH 44128<br>Dennis Daly  (216/292-4696)  (216/292-5874 fax)<br>Email:  daly@mchenryassociates.com |

2.   **SITE**

2.1.   Site shall be per Lease Agreement and approved plans.  In general, site shall include a minimum of 100 parking spaces within a 200'-0" radius of the OfficeMax front entry doors for use by OfficeMax customers and associates.  All parking lot spaces and traffic flow lanes shall be adequately striped to allow ease of access and convenience for the OfficeMax customers.  There shall be no standing water, surface drainage, or parking spaces along or adjacent to the OfficeMax storefront.

2.2.   Provide handicap accessible parking as required by local codes and the Americans with Disabilities Act (ADA), including all required signage, with a minimum of two (2) handicap parking spaces being located within a 40'-0" radius of the OfficeMax front entry doors.

2.3.   The storefront sidewalk shall have one (1) curb cut/ramp, a minimum of 10'-0" in width, with detectable warnings, meeting handicap accessibility and A.D.A. code compliance, centered with OfficeMax front entry door.  In locations where two (2) separate entry/exit doors are required, the ramp shall always be centered with the door designated as "EXIT" by OfficeMax

2.4.   Provide clear access at all times to OfficeMax loading area (see section on LOADING DOCK).  Turning radii and maneuverability to be designed to accommodate trucks up to 75'-0" in length.

2.5.   Final Site Plan is subject to OfficeMax approval (see section on Plan Review and Approval).

2.6.   Landscaping Plan is subject to OfficeMax approval (see section on Plan Review and Approval).  All trees, shrubs, landscaping, etc., whether new or existing, shall be placed or modified to allow clear visibility to all OfficeMax signage from all roadway / pedestrian views.  Should visibility of OfficeMax signage become blocked, any trees, shrubs, or landscaping, etc. shall be trimmed, replaced, relocated or removed and returned to original / correct condition.  Provide a programmable, underground irrigation system for all landscaping and lawn areas.

2.7.   Site Lighting

2.7.1.   Provide a minimum lighting level of 5.0 foot-candles for parking lot with an average to minimum ratio of 4:1.  Lighting fixtures to include manufacturer's glare shields and optics per the Prototype plans. All state, local, and city code requirements are to be maintained and incorporated into the site lighting design.

**OfficeMax** New Store Outline Specifications

2.7.2.  Provide illumination for the storefront elevation and sign fascia in cases where this is included in the overall design of the shopping center.

2.8.  Bollards and/or guardrails shall be installed, as required, to protect the building, retaining walls, utility connections and meters, and egress doors from car and truck traffic.  Bollards to be 6" diameter steel pipe with concrete fill, 10'-0" long (5'-0" below grade, 5'-0" above grade), painted Safety Yellow.  On each bollard, install a Bumper Post Sleeve, color to be OSHA yellow. Purchase Bumper Post Sleeve from Ideal Shield (888/308-7290). (This bollard type is not to be used in storefront area.)

2.9.  All egress doors must exit to a 4'-0" wide concrete walkway which leads to a paved surface at either the front or rear of the store.

2.10.  Provide a 5" thick, reinforced concrete dumpster pad.  Provide a dumpster enclosure when required by local codes, when dumpster is in clear view to the public, or when requested by OfficeMax

2.11.  If the store is located in a shopping center where construction activities are ongoing after turnover to OfficeMax, fencing and barricades to block the view of such activity from the OfficeMax store and restrict unauthorized access by customers of any areas where construction is in progress is to be provided.  Any undeveloped areas of the site shall be planted with grass and other landscaping materials.

## 3.  **BUILDING SHELL**

3.1.  Exterior wall construction shall be concrete masonry unit walls at all visible exterior elevations, sealed and stained per plans.  Inside of walls to be finished with 5/8" drywall on 3 5/8" metal studs with batt insulation and vapor barrier.  Tilt wall or E.I.F.S. finish shall be acceptable only after review and written approval by OfficeMax

3.2.  Minimum R-values shall be R-20 for the roof, R-10 for exterior walls.  Local codes that require higher R-values shall be maintained.

3.3.  Roofing system shall consist of a mechanically fastened PVC membrane over a rigid polyisocyanurate insulation system over a corrugated metal deck.  An alternate roofing system over a rigid polyisocyanurate insulation system upon written approval from OfficeMax may be provided.  No insulation shall be visible from store interior.  Roof drains to be adjacent to perimeter walls.  Rooftop surface to have treadway walk paths from roof hatch to and around all roof top equipment.  A ten (10) year "no dollar limit" (NDL) warranty only in cases where OfficeMax is responsible for roof maintenance is to be provided.

3.4.  Structure shall be steel tube columns with steel joist girder construction supporting a steel bar joist and deck system.

3.4.1.  A minimum clear height of 16'-0" AFF to the bottom of steel joist girder/bar joists system shall be maintained in the sales area.

3.4.2.  All HVAC rooftop units shall be supported as required.  All penetrations through roof deck shall be supported as designed by a licensed structural engineer.

3.5.  Each egress door (non-vestibule) shall be an insulated, hollow metal door in a hollow metal frame with 1½ pair tamperproof butt hinges.  Doors are to be solid with no see-through windows.  Hollow metal door frames to be grouted solid and anchored into the masonry wall.  Each door shall receive the following hardware, to be purchased from VENDOR 20.

3.5.1.  Door closer

3.5.2.  Detex egress panic hardware

3.5.3.  Dynalock Model 3101 delay egress hardware including an integral local enunciator, key switch (all units keyed alike), external transformer (mounted in a junction box in the joist space, installed and wired by the electrical contractor), and signage adjacent to the release device stating "PUSH UNTIL ALARM SOUNDS.  DOOR CAN BE OPENED IN 15 SECONDS."  If local authorities having jurisdiction will not permit delayed egress, purchase a software upgrade from VENDOR 20 which maintains the function of the Dynalock, but eliminates the 15 second delay.

3.5.4.  Anti-jimmy plates (2" x 1/8" steel, full height of door, welded to door edge)

3.6.  Concrete Floor Slabs

3.6.1.  Slabs-on-grade are to be designed for a minimum design load capacity of 125 pounds per square foot, 2,000 pound capacity pallet mover or a rack column load of 5,000 pound capacity at 4'-0" x 8'-

0" centers (verify spacing with store fixture layout). Floor slabs are to be constructed of a minimum 4" thick reinforced concrete on a minimum 4" thick compacted granular base with vapor barrier. Thicken slab to 5" at warehouse. Existing slabs shall meet or exceed these requirements.

3.6.2.   Structural floor slabs (basement or pile supported) to be designed to support the following live loads.

    3.6.2.1.   Slab below warehouse area to be 400 PSF.

    3.6.2.2.   Remaining slab to be 125 PSF.

    3.6.2.3.   All existing structural slabs to be reinforced to meet these design live loads.

3.6.3.   Floor slab shall be level, smooth, and properly cured and prepared to receive finish flooring in accordance with manufacturer's recommendations. Floor slabs not conforming to these requirements shall be repaired or replaced.

# 4.   UTILITIES

4.1.   Provide OfficeMax with the following minimum utility requirements. Actual requirements shall be based on actual calculated loads.

4.1.1.   Domestic Water to be, at minimum, a 1½" line located at rear of the building.

4.1.2.   Sprinkler/Fire Protection Water Line to be sized to meet all code requirements to provide adequate water flow for sprinkler coverage to allow OfficeMax rack storage to 14'-0" AFF (see section on FIRE PROTECTION/SPRINKLER SYSTEM). OfficeMax lease space to have a dedicated sprinkler riser/system located at the rear of the building.

4.1.3.   Natural Gas Line to be 3" (based on 7 oz. pressure) at rear of the building.

4.1.4.   Sanitary Sewer to be a minimum of one (1) - 4" line at the rear of the building. Line shall be sized to meet designed demand requirements.

4.1.5.   Storm Drainage System to be sized based on average local rainfall. Roof drains to be adjacent to perimeter walls, and shall be connected to the store drainage system.

4.1.6.   Electric Service to be 480/277 volt/3 phase/4 wire, minimum 400 amp service.

    4.1.6.1.   If natural gas is not available, a letter stating such from the utility shall be obtained and shall provide additional service capacity as needed based on electric heat load.

    4.1.6.2.   All electrical service to and from the building to be run below grade.

    4.1.6.3.   Additional service capacity is to be provided if required voltage is not available or if required by site/building specific conditions (i.e. site lighting, fire pump).

    4.1.6.4.   If electrical service is not available to OfficeMax at turnover, temporary electrical service until the store is switched over to permanent power is to be provided (see section on ELECTRICAL SYSTEM).

4.1.7.   Telephone Service

    4.1.7.1.   Underground conduit per the specifications of the utility provider prior to installation of the service cable (at minimum, a 4" conduit, with pull line, into the building to the telephone utility backboard) is to be provided. Telephone utility equipment shall be located in the Electrical Distribution Center or in an area within 15'-0" of the telephone system backboard.

    4.1.7.2.   The telephone company is to be contacted to initiate the engineering and installation of telephone facilities into the building. An order must be placed for the order for telephone facilities from the utility upon issuance of the building permit. OfficeMax requires, at minimum, one (1) - fifty (50) pair cable service. If telephone service is not available to OfficeMax at turnover, temporary service is to be provided (see section on TELECOMMUNICATIONS SYSTEM).

4.2.   All utilities shall be metered separately from Landlord and/or other tenant utilities. All utility meters are to be installed and accounts opened a minimum of ten (10) days prior to turnover/fixture date. Accounts shall be transferred into OfficeMax name at turnover.

**OfficeMax** New Store Outline Specifications

5. **SIGNAGE / SIGNAGE REQUIREMENTS**

5.1. Sign fascia shall be per Lease Agreement and approved plans, and shall consist of a "File Folder" shaped primary background for storefront signage. Sign fascia to include E.I.F.S. or other finish which shall be approved in writing by OfficeMax Sign fascia is to be free of any other signage or devices.

5.2. Storefront sign, supplied and installed by OfficeMax, shall be per Lease Agreement and approved plans. Sign shall be internally illuminated letters in OfficeMax logo style. Letters to have gloss black channel returns with plexiglass faces, illuminated with LED illumination. Electrical feed (two (3) 20 amp/120 volt circuits) and connection is to be made. Sign fascia projection framing to include 5/8" plywood support sheathing behind signage.

5.3. Secondary sign(s), supplied and installed by OfficeMax, shall be per Lease Agreement and approved plans. Electrical feed(s) (two (3) 20 amp/120 volt circuits per sign) and connection(s) are to be made. Provide 5/8" plywood support sheathing behind signage under E.I.F.S. finish.

5.4. OfficeMax to have prominent signage on any new and/or existing pylon or monument signs per the Lease Agreement and approved plans. Signage to consist of OfficeMax logo.

5.5. Sign approvals by providing the following to the OfficeMax Development Manager prior to execution of Lease Agreement and prior to submitting for Architectural review board and/or zoning board approvals are to be coordinated.

5.5.1. Building elevations, site plan, and pylon/monument sign drawings.

5.5.2. All sign criteria for site.

5.5.3. Local sign ordinance criteria and appeals process (if required).

5.5.4. Representation at any city or municipality meetings is required to obtain permits and/or variances.

5.6. OfficeMax required signage area when submitting any site signage allowances to local authorities for approval is to be included.

5.7. Temporary / Construction Banner Sign

5.7.1. Construction banner sign shall be for new store identification only and is to be temporary.

5.7.2. Sign faces shall be 8' wide x 4' tall exterior grade plywood (plywood good on both sides). Mounting of faces shall be at a height of 7'-0" to top of sign, secured on two (2) 4" x 4" wood posts with non-corrosive bolts as required by VENDOR 12, and located in front of project site visible to major street.

5.7.3. Front side of the sign face shall read: "Coming Soon / Now Hiring" artwork and face outwards toward major street traffic throughout construction. Back side of the sign face shall read: "OfficeMax Now Open" artwork. Artwork is to be coordinated with VENDOR 12. At Store Opening, sign faces shall be reversed with "OfficeMax Now Open" artwork facing outwards toward street.

5.7.4. Construction banner signage and attachment kits are to be purchased from VENDOR 12 and are to be installed within one (1) week of commencement of construction.

5.7.5. A photo of the completed sign shall be submitted to the OfficeMax Construction Manager. If sign is relocated, provide photo of relocated sign to OfficeMax Construction Manager.

5.8. Eye-Bolts / Storefront Elevation Banner Sign

5.8.1. Six (6) non-corrosive eye-bolts shall be provided in the sign fascia, or in the location as shown on the approved drawings.

5.8.2. Eye-bolts shall be installed three (3) weeks prior to OfficeMax turnover and prior to banner sign installation.

5.8.3. "Now Hiring" / "Grand Opening" banner signage is to be attached to the building using the six (6) eye-bolts. Artwork, cost and installation of banner sign is to be coordinated with VENDOR 12 and the OfficeMax Construction Manager.

5.9. Storefront fascia, secondary sign fascia work, and pylon/monument structure and cabinet (including power feeds) to be complete and available to OfficeMax sign contractor for sign installation two (2) weeks prior to OfficeMax turnover date.

5.9.1. Upon purchase of the sign panels for the pylon/monument sign, said panels are to be installed two (2) weeks prior to OfficeMax turnover date.

6.  **STOREFRONT**

6.1.   Storefront to be per Lease Agreement and approved plans. Storefront shall have at minimum 42'-0" wide x 10'-0" high storefront glass including automatic door. Exterior door system to be one (1) 14'-0" bi-parting automatic door with transom. Purchase door system from VENDOR 6. Storefront system to be 1¾" x 4½" clear anodized aluminum framing with 1" insulated glass. Glass areas to have a 32" high masonry sill wall with drywall finish and plastic laminate sill at interior. Storefront glass area not meeting this criteria must be submitted to OfficeMax for written approval.

6.1.1.   In order to maintain continuity with the Architectural design of a shopping center, another color for the exterior surface of the exterior automatic door(s) and exterior storefront glass framing only after obtaining written approval from OfficeMax may be utilized.

6.1.2.   If structural layout will not allow for exterior door to be one (1) 14'-0" bi-parting automatic door, utilize two (2) 9'-0" bi-parting automatic doors.

6.1.3.   Storefront glass and automatic doors to be protected with exterior mounted hurricane shutters in stores within 25 miles of the Gulf of Mexico coast, in stores within 25 miles of the Atlantic Ocean coast south of Raleigh, NC, and in all island stores.

6.2.   Storefront canopy with soffit above sidewalk/entry door with a height of 10'-0" AFF to underside of soffit. Soffit to be gloss white aluminum panel system with down lighting at a maximum spacing of 10'-0" O.C. Purchase lighting from VENDOR 5.

6.3.   Glazing in elevations facing south or west to be shielded from direct summer sun by building overhang or canopy (5'-0" projection minimum).

6.4.   Storefront areas must have 6" diameter stainless steel pipe bollards (concrete filled, with cap) installed in front of storefront doors and at all glazed areas where 32" high masonry sill walls are not present. Bollards to be 42" high, 5'-0" O.C., and 6'-4" to center from face of building. Purchase bollards from VENDOR 4.

6.5.   All exterior glazing (including storefront and entry door(s)) to be protected by interior roll-up security grilles. Grilles to be supplied with Schlage single cylinder locks with Primus interchangeable cores. Provide thumbturn on interior side of grille covering the automatic door(s). Contractor to include drywall soffit to conceal coil/support assembly with access panels for maintenance and adjustment. Purchase grilles from VENDOR 14. Grilles to be either manual type or motorized where required by the size of the grille. For any required motorized grilles, electric power, exterior key switch, and interior key switch inside vestibule is to be provided.

6.6.   Face of exterior wall on each side of the storefront to receive decorative lighting fixture. Purchase fixture from VENDOR 5.

6.7.   If required by code, provide exterior flush mounted key lock box ("Knox" Box). Key lock box door to be monitored by the security system.

7.  **VESTIBULE**

7.1.   Vestibule doors to be automatic sliding doors with transoms. Interior door to be one (1) 14'-0" bi-parting automatic doors. Exterior door to be as defined in the section on **STOREFRONT**. Purchase doors from VENDOR 6.

7.1.1.   All doors to have aluminum thresholds and be properly weatherstripped.

7.1.2.   All interior automatic doors and glass framing will be clear anodized finish notwithstanding the exterior color of the exterior automatic door(s) and glass framing (see section on **STOREFRONT**).

7.1.3.   All doors to be supplied with Schlage mortise cylinder locks with Primus interchangeable cores on exterior side, ILCO thumbturn on interior side. (NOTE: These are the only exterior doors to be keyed for access).

7.2.   All interior glass framing shall be 1¾" x 4" clear anodized aluminum with ¼" clear glass (tempered glass where required by code). Vestibule wall to include 42" high laminated knee wall with surface mounted bumper guard at 2'-0" AFF. Purchase knee wall and bumper from VENDOR 7.

7.3.   Ceiling shall be 5/8" drywall at a height of 10'-0". Exposed wall areas to be drywall. Ceiling and walls to be painted per plans. Install bumper guard on walls at 2'-0" AFF. Purchase paint from VENDOR 26. Purchase bumper from VENDOR 7.

7.4.  Lighting to be recessed lighting fixtures with compact fluorescent lamps.  Provide emergency exit light.  Purchase lighting from VENDOR 5.

7.5.  Provide electrical service for Electronic Article Surveillance (EAS) system which shall include a dedicated 20 amp/120 volt quadplex outlet above the vestibule ceiling, and a double gang junction box mounted above the vestibule ceiling with ¾" conduit feeds with pull strings to two (2) recessed single gang junction boxes, mounted at 8" AFF to center, installed per plans.

7.6.  Floor covering to be entry mat system.  Install per plans and manufacturer's recommendations.  Purchase from VENDOR 10.

7.7.  Provide conditioned air with one (1) ceiling mounted supply air diffuser (color to match ceiling) complete with opposed blade damper and manual volume damper in associated duct run out and one (1) recessed, ceiling mounted electric cabinet heater controlled by the Energy Management System.  See section on HVAC SYSTEM.

# 8.  **SALES AREA**

8.1.  Floor covering

    8.1.1.  General Sales Area flooring shall have 12" x 12" x 1/8" Vinyl Composition Tile (VCT) with 4" vinyl base, color and style per plans.  Install per plans and manufacturer's recommendations.  Purchase VCT flooring and vinyl base from VENDOR 30.  Clean VCT and apply protective acrylic floor finish prior to OfficeMax fixture setup.

    8.1.2.  Furniture Sales Area flooring shall have modular carpet with perimeter transition strip and 4" vinyl base, color and style per plans.  Install per plans and manufacturer's recommendations.  Purchase carpet and transition strip from VENDOR 21.  Immediately following installation, carpet shall be covered with heavy duty visquene and tape all seams and edges.

    8.1.3.  Technology Sales Area flooring shall have modular carpet with perimeter transition strip, color and style per plans.  Center "Hub" area shall have 12" x 12" x 1/8" Vinyl Composition Tile (VCT), color and style per plans.  Install per plans and manufacturer's recommendations.  Purchase carpet from VENDOR 21.  Immediately following installation, carpet shall be covered with heavy duty visquene and tape all seams and edges.  Purchase VCT flooring from VENDOR 30.  Clean VCT and apply protective acrylic floor finish prior to OfficeMax fixture setup.

8.2.  All wall construction to be 5/8" drywall on metal studs, sealed to deck and/or ceiling above.  Exposed CMU walls or tilt wall construction to be furred out, insulated, and covered with drywall.  Provide wood anchor strips for tenant's display fixtures per plans.  Paint per plans.  Purchase paint from VENDOR 26.

8.3.  All columns shall be exposed steel (as allowed by code), prepared for paint finish, painted per plans, with 48" high stainless steel wrap.  If columns are wide flange type, fill column bases with limestone/gravel to 42" AFF, top off with concrete from 42" to 48" AFF (finish top).  Purchase stainless steel wraps from VENDOR 4 (order must be placed six (6) weeks prior to turnover date).  Purchase paint from VENDOR 26.

    8.3.1.  If columns must be wrapped in drywall to meet local code requirements, apply drywall directly to the column to maintain a minimum column dimension.

8.4.  Ceiling shall be exposed roof deck, joist girders and joists, prepared for paint finish and painted per plans.  Paint all exposed ductwork, sprinkler system, conduit and support structures per plans.  Bottom of steel to be at 16'-0" AFF (minimum), no exposed insulation.  No roof supported systems shall be any lower than 15'-0" AFF (ductwork, conduits, etc.).  Purchase paint from VENDOR 26.  Sprinkler heads to be free from paint.

8.5.  Lighting shall be per plans with the lighting fixture types listed below.  Mounting system to be Unistrut or equal metal framing channel system, hung per plans and painted to match the ceiling.  Fixtures to be wired using a premanufactured wiring system.  Purchase fixtures, lamps, emergency/exit lighting, and wiring system from VENDOR 5.

    8.5.1.  HID lighting fixtures, suspended per plans.

    8.5.2.  T8 fluorescent lighting fixtures with GE Ultramax "L" high efficiency ballasts, suspended per plans.

    8.5.3.  Ceramic Metal Halide spot lights, track mounted, suspended from Unistrut per plans.

    8.5.4.  Ceramic Metal Halide wall washer lights, track mounted, suspended from Unistrut per plans.

    8.5.5.  Provide exit lighting to meet all local requirements.  Exit units shall be universal L.E.D. unit with white housing.  Install per plans.  Do not install units on perimeter walls or over areas where top stock of

**OfficeMax** New Store Outline Specifications

merchandise or wall graphics will occur.

8.6. Plugmold to be provided as described below. Plugmold to be powered through an in-slab power-feed system (Walker Duct). This work must be completed five (5) days after turnover date. Wiring of all gondolas and endcaps must be in concealed conduit. Locations and quantities to be determined by OfficeMax Purchase plugmold, Walker Duct, and pre-painted conduit from VENDOR 5.

8.6.1. Plugmold at low electronics to be 6'-0" long units, single circuit with duplex receptacles at 12" O.C. Plugmold to have a maximum of 24 feet on a 20 amp/120 volt circuit. Power to low electronics fixtures to be in Walker Duct raceway.

8.6.2. Plugmold at low gondola endcaps to be 3'-0" long units wired to 20 amp/120 volt circuits per plan.

8.6.3. Equip lamp display plugmold as called for on the Architectural plans and switched through Novar contactor control.

8.7. Power to cash register counters to be through an in-slab electrical feed. Each cash register unit, whether single unit or double unit, to be provided in-slab electric feed (one (1) for power and (1) for data/telecommunications). Each cash register unit to have one (1) dedicated 20 amp/120 volt quadplex outlet, one (1) telephone cable with jack, one (1) network cable with jack, and one (1) dedicated 20 amp/120 volt duplex outlet on an isolated ground circuit. All outlets and jacks must be installed within the cabinet.

8.8. All walls, ceilings, columns, trim, ductwork, droplines, conduit, pipes and unistrut to be painted per plans. Painting to include differing paint colors on some walls. Color schedule and specifications per Prototype plans. All drywall, doors and frames, and ceilings are to be sealed and primed prior to painting. All drywall throughout the store to be smooth finish. Purchase paint from VENDOR 26.

8.9. All exposed drywall outside corners to have 2" x 2" x 44" high stainless steel corner guards from 4" AFF to 48" AFF. Purchase corner guards from VENDOR 4.

8.10. Vinyl base to be installed on all millwork base cabinets and at all drywall partitions. Vinyl base to be 4" with preformed corners, color per plans. Purchase from VENDOR 30.

8.11. All sales area interior doors to be hollow metal doors in hollow metal frames.

8.11.1. All door hardware to be Schlage heavy duty lever type locksets, USD26 finish, with Primus interchangeable cores (where applicable). Refer to Prototype plans door/hardware schedule for complete hardware list. Other door hardware, including kick plates, deadbolts, and door closers, shall be provided per plans. Purchase all door hardware, locksets, and keys from VENDOR 20.

8.11.2. All locksets shall be sent to job site with construction cores. Permanent replacement cores and keys will be sent directly to OfficeMax personnel.

8.12. Warehouse service door shall be one (1) pair of 3' x 8' impact doors (gray) with reinforced hollow metal frame and four (4) 48" high stainless steel traffic control pipe bollards. Purchase doors from VENDOR 9. Purchase bollards from VENDOR 4.

8.13. Checkouts

8.13.1. Checkout cabinets to be four (4) cabinets of plastic laminate/particle board construction consisting of the elements listed below. All cabinet doors shall have locks (all locks to be keyed alike) and all cabinetry shall be protected with vinyl base and bumper guard per plans, furnished and installed by the contractor. Quantity and style changes may be required for non-prototypical store layouts as approved by OfficeMax Purchase cabinetry and bumper from VENDOR 7.

8.14. Copy Center

8.14.1. Copy center cabinetry to be plastic laminate/particle board construction consisting of the elements listed below. All cabinetry at copy center to be protected with vinyl base and bumper guard, furnished and installed by the contractor. Quantity and style changes may be required for non-prototypical store layouts as approved by OfficeMax Purchase cabinetry and bumper from VENDOR 7.

8.14.1.1. Front service counter with bumper

8.14.1.2. Register cabinet with locking, hinged door, and bumper

8.14.1.3. Desktop publishing counter

8.14.1.4. Publishing station with computer cabinet

**OfficeMax** New Store Outline Specifications

8.14.1.5.   Rear service counters with locking, hinged door access and drawers

8.14.1.6.   Paper display cabinet

8.14.1.7.   Cabinets for Self Serve Copier area with drawers, doors and integral paper display

8.14.2.   Copy center power requirements shall be as follows.  Purchase plugmold, in-slab floor boxes, and mounting hardware from VENDOR 5.

8.14.2.1.   Publishing station shall receive one (1) dedicated 20 amp/120 volt quadplex outlet, telephone cable with jack, and network cable with jack, all located under publishing counter.

8.14.2.2.   Rear counter shall receive two circuit plugmold above counter with outlets at 12" O.C., two (2) 20 amp/120 volt duplex outlets on a single dedicated circuit, and two (2) telephone cables with jacks (one for telephone, one for fax).

8.14.2.3.   Register cabinet shall receive one (1) dedicated 20 amp/120 volt duplex outlet on an isolated ground circuit, and one (1) network cable with jack for cash register.

8.14.2.4.   Self serve copy area to receive four (4) dedicated 20 amp/120 volt single receptacle (NEMA 5-20R) outlets within Self Serve Copier Cabinets for self serve copiers.

8.14.2.5.   Copy center production equipment shall be provided power via recessed in-slab floor outlets.

8.14.2.5.1.   Provide two (2) dedicated 20 amp/208-220 volt single receptacle (NEMA 14-20R) outlets and network cable and jack for high speed copiers.

8.14.2.5.2.   Provide one (1) dedicated 20 amp/120 volt duplex outlet for roll laminator.

8.14.2.5.3.   Provide one (1) dedicated 20 amp/120 volt duplex outlet and network cable and jack for color copier and controller.

8.14.2.5.4.   Provide one (1) dedicated 20 amp/120 volt quadplex outlet and one (1) network cable with jack above the ceiling, behind copy center graphic.

8.14.2.6.   Provide two (2) 3' plug-mold power-strips in storefront's window headers and two (2) 20 amp / 120 volt duplex outlets in the vestibule ceiling.

8.15.  A maximum rack storage height of less than 12'-0" must be maintained.  Provide building access, smoke and heat removal, smoke curtains and small hose connections if required by local fire code for rack storage over 12'-0". Verify requirements prior to building permit submission.  See section on <u>FIRE PROTECTION/SPRINKLER SYSTEM</u>.

8.15.1.   All roof openings, including roof and smoke evacuation hatch(es), to be contacted to the security system.  Install security bars on all openings not intended for roof access.

8.16.  Provide power and lighting in OfficeMax provided "Focal Displays" as detailed below.  All lighting and power to be controlled through the Energy Management System.  Purchase lighting and plugmold from VENDOR 5.

8.16.1.   In "Ink Focal", provide three (3) 3'-0" T8 fluorescent light fixtures.

8.16.2.   In "Lamp Focal", provide three (3) 3'-0" T8 fluorescent light fixtures and 36'-0" lineal feet of plugmold.

8.16.3.   In "Book Shelf Focal", provide three (3) 3'-0" T8 fluorescent light fixtures.

8.16.4.   In "Furniture Focals", provide nine (9) 3'-0" T8 fluorescent light fixtures in each of two (2).

8.16.5.   In "Check Out Focal", provide three (3) 3'-0" T8 fluorescent light fixtures.

8.17.  Each exit door (non-vestibule) is to have delay egress panic hardware and local enunciator with key switch. See section on <u>BUILDING SHELL</u>.

8.18.  Furniture Sales Area

8.18.1.   Provide partition walls per plans.  Walls to be 5/8" drywall on 6" metal studs.  Paint per plans. Purchase paint from VENDOR 26.

8.18.2.   Install two (2) duplex outlets on rear side of partition walls (four (4) total).

8.18.3.   Rear wall to receive seven (7) duplex outlets.

**OfficeMax** New Store Outline Specifications

9. **CASH OFFICE/MANAGER'S OFFICE**

   9.1.   Cash Office

       9.1.1.   Room to be painted 5/8" drywall on metal stud partitions (all partitions with drywall sealed to deck), 8'-0" high drywall ceiling painted per plans, vinyl tile floor covering and 4" black vinyl cove base. Provide 4' x 8' x ¾" plywood in wall (under drywall) for network system cabinet. Purchase vinyl tile and cove base from VENDOR 30.

       9.1.2.   Door to be 3'-0" x 7'-0" x 1¾" hollow metal door in hollow metal frame with 1½ pair tamperproof hinges, closer, peephole at 60" AFF, door stop, Schlage single cylinder deadbolt with thumbturn on inside and Primus interchangeable core outside, and storeroom function Schlage lever type lockset with Primus interchangeable core. Purchase door hardware from VENDOR 20.

       9.1.3.   Lighting to be 2' x 4' fluorescent lay-in light (1) with acrylic lens and with motion sensor switch. Purchase lighting from VENDOR 5.

       9.1.4.   Millwork to include one (1) 30" wide plastic laminate over plywood countertop (mounted at 30" AFF) with 4" backsplash and four (4) - 3" diameter access holes with grommets. Install three (3) 12" deep prefinished white shelves on adjustable standards/brackets. Purchase millwork from VENDOR 7. OfficeMax supplied safe is to be bolted to the floor.

       9.1.5.   Electrical requirements to include:   Network cabling including required conduit feeds, three (3) telephone/computer outlets, two (2) isolated ground quadplex outlets each on its own dedicated 20 amp circuit through the power conditioner, four (4) general use duplex outlets and one (1) white ceiling mounted paging speaker to be installed by VENDOR 16.

   9.2.   Manager Office

       9.2.1.   Room to be painted 5/8" drywall on metal stud partitions (all partitions with drywall sealed to deck), 8'-0" high 2' x 4' acoustical tile ceiling, vinyl tile floor covering and 4" vinyl cove base.  Purchase vinyl tile and cove base from VENDOR 30.

       9.2.2.   Door to be 3'-0" x 7'-0" x 1¾" hollow metal door in hollow metal frame with 1½ pair tamperproof hinges, closer, door stop, and storeroom function Schlage lever type lockset with Primus interchangeable core.  Purchase door hardware from VENDOR 20.  Room to have 3'-6" high by 4'-0" wide fixed view window in a painted hollow metal frame mounted at 3'-6" AFF with ¼" clear tempered glass.  Paint per plans.  Purchase paint from VENDOR 26.

       9.2.3.   Lighting to be 2' x 4' fluorescent lay-in light (1) with acrylic lens and with motion sensor switch. Purchase lighting from VENDOR 5.

       9.2.4.   Millwork to include one (1) 30" wide plastic laminate over plywood countertop with a 4" backsplash and 3" diameter access holes with grommets, and three (3) 12" deep prefinished white shelves on adjustable standards/brackets.  Purchase millwork from VENDOR 7.

       9.2.5.   Electrical requirements to include one (1) network cable with jack, one (1) telephone cable with jack, three (3) convenience 120 volt duplex outlets, one (1) convenience 120 volt quadplex outlet, and one (1) white ceiling mounted paging speaker to be installed by VENDOR 16.

10. **WAREHOUSE**

   10.1.   Seal concrete floor with clear bond sealant.  Install two (2) coats at 400 square feet/gallon at pour prior to turnover to OfficeMax  Existing concrete floors to be cleaned and repaired to a smooth finish and receive one coat of sealant.  Purchase sealant from VENDOR 26.

   10.2.   Drywall over metal studs and/or concrete block partitions per plans.  All exposed drywall to be covered with ¾" fire retardant plywood to 48" AFF.

   10.3.   Ceiling to be exposed roof construction.

   10.4.   Lighting shall be HID low bay lighting fixtures with 175 watt pulse start metal halide lamps.  Light fixtures designated as "night lights" shall be low bay lighting fixtures with 175 watt pulse start metal halide lamps, and quartz restrike system with 250 watt quartz lamp.  Mounting system to be Unistrut or equal metal framing channel system, hung per plans. Fixtures to be wired using a premanufactured wiring system.  Purchase fixtures, lamps, and wiring system from VENDOR 5.

10.5. Provide one (1) 20 amp/120 volt dedicated outlet for "Walkie Stacker" battery charger.

10.6. Furnish and install cardboard baler. Baler requires 30 amp/480 volt/3 phase disconnect or, if 480/277 volt power is not available, 60 amp/208 volt/3 phase fused disconnect. Coordinate voltage with vendor prior to placing order. Provide a 12'-0" long, 6" diameter PVC tube mounted horizontally at 4'-0" AFF for the storage of the baling wire. Purchase baler from VENDOR 24. Purchase disconnect and fuses from VENDOR 27. If baler is not installed prior to OfficeMax fixture date, the removal of all waste until baler is installed and operational will be required.

10.7. Unit heater, with "Lightstat" thermostat, suspended from structure at loading dock door.

10.8. Roof ladder and hatch.

10.8.1. Roof ladder and hatch to be accessible from the interior of the store.

10.8.2. Roof ladder protective cage is mandatory if ladder is 20'-0" or higher.

10.8.3. Hatch to be equipped with padlock hasp and Schlage padlock with Primus interchangeable core. Purchase padlock from VENDOR 20.

10.8.4. All roof openings, including roof hatch and smoke evacuation hatch(es), to be contacted to the security system. Install security bars on all openings not intended for roof access.

10.9. Storage racks are limited to a maximum height of 14'-0". Provide building access, smoke and heat removal, smoke curtains and small hose connections if required by local fire code for rack storage over 12'-0". Verify requirements prior to building permit submission. See section on FIRE PROTECTION/SPRINKLER SYSTEM.

10.10. Provide three (3) Schlage padlocks with Primus interchangeable core for in-rack lock-up fixture to be supplied and installed by OfficeMax

10.11. A wire grid extension from top of warehouse racking to warehouse walls is to be installed per plans. Wire grid furnished by OfficeMax.

## 11. **LOADING DOCK**

11.1. Provide exterior depressed driveway type loading dock (46" below finish floor, 6" reinforced concrete slab) with safety rails and drain (provide pump if required). Maximum slope to be 5%. Provide bollard protection at end of retaining wall (see section on SITE).

11.1.1. For store locations in the contiguous 48 states that are serviced by an OfficeMax catalog fulfillment (delivery) center, one (1) loading dock will be required.

11.2. For each dock, provide an 8'-0" x 8'-0" high roll up, thermally insulated, overhead door with steel track, mounted steel jambs, bottom bumper and weatherstripping. Dock seals at exterior to be Kelley Tufseal black foam pads with full pleats. Locks to be Schlage padlock with Primus interchangeable core. Purchase padlock(s) from VENDOR 20. Purchase overhead door(s) from VENDOR 14. Purchase dock seals from VENDOR 11.

11.3. For each dock, provide a Kelley 'edge of dock' leveler with perimeter weatherseal and dock bumpers. Leveler to have the ability to lock in place for security. Purchase dock leveler and bumpers from VENDOR 11. Provide concrete pit projection as required by slope of truck approach. Slopes of 0-2% require no cantilever, slopes of 2-5% shall require 1" of cantilever for each 1% of slope. For any incline or split approach, contact VENDOR 11.

11.4. Receiving door shall be one (1) pair 3'-0" x 7'-0" x 1¾" insulated, hollow metal doors in a hollow metal frame with 1½ pair tamperproof butt hinges per door. Doors are to be solid with no see-through windows. Hollow metal door frames to be grouted solid and anchored into the masonry wall. At door provide push button door chimes (chimes to be located at receiving deck and manager office). Door shall exit directly to the loading area without any vertical steps. Door assembly shall receive the following hardware, to be purchased from VENDOR 20.

11.4.1. Door closers with "hold open" arm

11.4.2. Detex egress panic hardware

11.4.3. Delay egress hardware (see section on BUILDING SHELL)

11.4.4. Astragal

**OfficeMax** New Store Outline Specifications

11.4.5. Anti-jimmy plates (2" x 1/8" steel, full height of door, welded to door edge)

11.4.6. Peep hole installed at 60" AFF

11.5. Exterior lighting in loading dock area and at receiving door shall be wall mounted fluorescent over man doors and halide wall pack fixtures controlled by an integral photocell. Purchase lighting from VENDOR 5.

11.6. For each dock, provide an interior dock loading light mounted to wall at 6'-6" AFF adjacent to the overhead door. Purchase lighting from VENDOR 5.

11.7. Receiving counter area

11.7.1. Area to be under Electrical Distribution Center (EDC) (see section on ELECTRICAL SYSTEM).

11.7.2. Counter to be 3'-0" wide plastic laminate over particle board counter top, mounted at 36" AFF, with 4" backsplash and four (4) - 3" access holes with grommets. Install three (3) 12" deep prefinished white shelves on adjustable standards/brackets. Purchase counter and shelving from VENDOR 7.

11.7.3. Lighting to be three (3) 4'-0" fluorescent light fixtures factory installed on the underside of the electrical distribution center (EDC). Purchase EDC from VENDOR 27.

11.7.4. Electrical requirements are two (2) dedicated 20 amp/120 volt quadplex outlets, network cable with jacks, and telephone cable with jack, all mounted at 18" AFF.

11.8. Sprinkler riser to be protected from material handling equipment with steel bollards.

## 12. **EMPLOYEE LOUNGE**

12.1. Room size to be minimum 13'-7" x 20'-0" with painted 5/8" drywall on metal stud partitions (seal to deck on warehouse side), 8'-0" high 2' x 4' acoustical tile ceiling, vinyl tile flooring, and 4" vinyl cove base.

12.2. Lighting to be 2' x 4' fluorescent lay-in lights (deep cell parabolic lens) with motion control switch. Purchase lighting from VENDOR 5.

12.3. Millwork to include six (6) lineal feet of base cabinet and four (4) lineal feet of wall cabinet. Base cabinet to include two (2) concealed top drawers and one (1) stainless steel sink. Wall cabinet to include adjustable shelves. Countertop to be plastic laminate over particle board with 4" backsplash. Purchase cabinets and countertop from VENDOR 7.

12.4. Provide and install seven (7) locker units. Size to be 12" x 15" x 12" x six (6) high box locker unit with visual doors, combination padlocks with masterkeying, with base and sloped top. Color to be beige. Bolt lockers to floor if required by local code. Purchase lockers from VENDOR 23.

12.5. Provide 72" long vinyl coated metal rod and shelf mounted at 60" AFF. Purchase from VENDOR 7.

12.6. Electrical requirements to include two (2) 120 volt GFI protected duplex outlets mounted at 44" AFF (above counter), three (3) dedicated 20 amp/120 volt duplex outlets (vending/refrigerator), and one (1) 120 volt duplex outlet with network cable and jack mounted 54" AFF outside lounge on lockset side of door frame for time clock keypad. Provide one (1) white ceiling mounted paging speaker installed by VENDOR 16. Install thermostat with ventilated locking case mounted at 54" AFF.

## 13. **RESTROOMS/CORRIDOR**

13.1. Restrooms

13.1.1. Room size to be minimum 9'-0" x 17'-10" (1'-4" common chase wall) with painted 5/8" drywall on metal stud partitions, 8'-0" high drywall ceiling painted per plans, ceramic tile flooring, base, and wainscot to 48" AFF. Rooms to be sized as required to meet all locally required fixture quantities and handicap access requirements including A.D.A.

13.1.2. Doors to be 3'-0" x 7'-0" x 1¾" hollow metal door in hollow metal frame with 1½ pair hinges, closer, door stop, push plate and pull, kickplates, and signage per A.D.A. Doors to have flush marble ("White Carrara") thresholds. Purchase door hardware from VENDOR 20.

13.1.3. Lighting to be 2' x 4' fluorescent recessed lights (deep cell parabolic lens) with switch. Purchase lighting from VENDOR 5.

13.1.4. Plumbing fixtures (American Standard) to include wall-hung water closets, wall-hung urinals with elongated rim, wall-hung lavatories; barrier free bi-level electric water coolers, floor drains, and trap

**OfficeMax** New Store Outline Specifications

primer valve. Fixture quantities to be calculated to meet governing plumbing codes. Mounting heights for fixtures and accessories to comply with A.D.A. and/or local requirements.

13.1.4.1. Water Closet valve shall be "Sloan" model, Optima Plus – G2 8111. Purchase valve equipment from VENDOR 20.

13.1.4.2. Urinal valve shall be "Sloan" model, Optima Plus – G2 8180-1. Purchase valve equipment from VENDOR 20.

13.1.5. Toilet partitions to be Bobrick. Purchase from VENDOR 20.

13.1.6. Bobrick restroom accessories to include 18" x 30" mirrors and grab bars (mount per plans or as local code requires). Purchase from VENDOR 20. OfficeMax to provide paper towel dispensers, toilet paper dispensers, and soap dispensers through VENDOR 20.

13.1.7. Electrical requirements to include one (1) GFI protected duplex outlet in each restroom mounted above the sink.

13.2. Corridor

13.2.1. Minimum width of 5'-0" wide with painted 5/8" drywall on metal stud partitions (to deck if used as egress corridor), 8'-0" high 2' x 4' acoustical tile ceiling, vinyl tile flooring and 4' vinyl cove base.

13.2.2. Lighting to be 2' x 4' fluorescent lay-in lights (deep cell parabolic lens) with switch. Purchase lighting from VENDOR 5.

13.2.3. Minimum 4'-0" wide alcove for bi-level barrier-free electric water coolers with a drywall soffit at 7'-0" AFF. Paint per plans. Install stainless steel corner guards at drywall corners. Purchase corner guards from VENDOR 4.

13.2.4. Provide service sink (Fiat MSB(2424)) with hose, hose holder, mop holder, two (2) 24" wide x 12" deep prefinished white shelves, and FRP panels to 48" AFF to protect walls. Drywall soffit at 7'-0" AFF, paint per plans. Install fifteen (15) gallon water heater above soffit. Purchase shelves from VENDOR 7.

13.2.5. Electrical requirements to include one (1) dedicated 20 amp/120 volt duplex outlet for electric water coolers.

## 14. PLUMBING

14.1. Plans and specifications shall be prepared and certified (stamped and/or sealed) by the Interior Tenant Improvement M/E/P Engineer (see Required Interior Tenant Improvement Design Team List). Plumbing plans shall be submitted to OfficeMax for review as a part of the Interior Tenant Improvement Plans as prepared by the Required Interior Tenant Improvement Design Team (see section on Plan Review and Approval).

14.2. Furnish all plumbing systems complete and in accordance with all state and local codes.

14.3. In general, plumbing system consists of, but is not limited to, the following: roof drains, downspouts, storm sewers, sanitary sewers and vents, domestic hot and cold water systems, gas piping, condensate drains, trench drains, floor drains, supports and insulation.

14.4. The OfficeMax Prototype plans are part of this Outline Specification and all plumbing systems and equipment indicated and/or described in the Prototype plans shall be provided.

14.5. The Prototype plans are based on new stores and providing new equipment. Buildings remodeled to accommodate OfficeMax shall, in general, provide the same systems and equipment required for new stores. Reuse of existing systems and equipment shall only be as authorized, in writing, by OfficeMax.

## 15. HVAC SYSTEM

15.1. Plans, specifications, and energy code calculations (where required) shall be prepared and certified (stamped and/or sealed) by the OfficeMax TI (M/E/P) Engineer (see Required Interior Tenant Improvement Design Team List). Mechanical plans shall be submitted to OfficeMax for review as a part of the Interior Tenant Improvement Plans as prepared by the OfficeMax TI Architect (see section on Plan Review and Approval).

15.2. All work to meet local, state and national code requirements. All mechanical equipment and supplies shall be U.L. Listed or Factory Mutual Approved for their intended purposes.

15.3. Actual tonnage shall be determined by calculation. Calculations shall be by zone, specific for each air conditioning unit. Calculations shall also be provided for each room, and shall be based on the following information unless local codes are more stringent.

15.3.1. Cooling - ASHRAE 2001 Fundamentals 1% column and 75° F inside air temperature with a 10% safety factor.

15.3.2. Heating - ASHRAE 2001 Fundamentals 99.6% column and 72° F inside air temperature with a 20% safety factor.

15.3.3. Gross store area miscellaneous power load of 0.25 watts per square foot.

15.3.4. Summer and winter outside air quantity shall be determined by local code and shall not be less than 0.10 CFM per square foot of gross store area.

15.3.5. Fifty-five (55) person occupancy load at 245 BTU sensible and 205 BTU latent heat per person or as otherwise dictated by local code.

15.3.6. U value minimum of 0.06 for new roof construction and a U value of 0.1 for new wall construction. Existing construction to be calculated.

15.3.7. Lights shall be by actual count.

15.3.8. Cash room - miscellaneous sensible load of 1000 watts and one (1) person.

15.3.9. Manager's office - miscellaneous sensible load of 350 watts and one (1) person.

15.3.10. Lounge - miscellaneous sensible load of 1000 watts and eight (8) people.

15.3.11. Copy area - miscellaneous sensible load of 7 KW.

15.4. This Outline Specification is based on the installation of new HVAC equipment only.

15.4.1. Any equipment being reused as existing must be submitted to OfficeMax for review and approval prior to final Lease Agreement. Submittals must include equipment models, capacities, ages, sheet metal layout and clearances from floor to bottom of ductwork.

15.4.2. Submittal requirements governed under this section must also be complied with after final Lease Agreement. In cases where existing units are accepted by OfficeMax, units are to be refurbished to a "like new" condition and modified as needed to accept the specified Energy Management System.

15.4.3. A warranty as if units were new is to be provided (see section on HVAC UNITS). Reuse of existing equipment will require written acceptance from OfficeMax Director of Construction.

15.4.4. Where units are to be reused shall include official certification stating all items as listed within section HVAC UNITS have been met.

15.5. HVAC units

15.5.1. Gas/electric rooftop heating/cooling units with the following factory installed options: Economizer cycle, barometric relief dampers (sales area units to include power exhaust), electric disconnect, and 120 volt GFI duplex outlet. In each unit provide smoke detectors prewired for individual unit shutdown, to be factory install in units larger than 2 tons. Detectors shall be installed in the supply and/or return air openings of unit as mandated by local fire marshal and building code requirements. In the units servicing the sales area, provide carbon dioxide sensors for demand control ventilation system. Units also to include anti-cycle control, burglar bars, and matching roof curbs. Units to include a five (5) year compressor and ten (10) year heat exchanger extended warranty to include all parts and labor. Air conditioning units to be high efficiency with sizes to be used limited to a combination of 2, 7½, 10, 13 , 15, 17½ and 20 ton units. Purchase HVAC units and equipment from VENDOR 15.

15.5.1.1. Electrical contractor to install and wire smoke detectors in HVAC units not equipped with factory installed smoke detectors.

15.5.1.2. Electrical contractor to wire smoke detectors to fire alarm control panel. Final connection to fire alarm control panel will be made by VENDOR 22.

15.5.1.3. Electrical contractor to install remote indicator light and test key switch for each smoke detector as purchased from VENDOR 15. At each remote indicator provide a plastic laminated sign stating "A/C unit smoke detector trouble indicator light. Notify Store Manager when lighted".

15.5.1.4. For store locations where natural gas is not available, utilize the rooftop units specified above with the factory installed electric heat option.

15.5.1.5. Mechanical contractor to provide conduit and junction box for carbon dioxide sensors for demand control ventilation system. Carbon dioxide sensors to be installed, wired, and connected by the mechanical contractor.

15.5.2. An Equipment Operation Check (EOC) report to be completed and provided at job completion. Report to be submitted to OfficeMax with Close-out documents. Purchase EOC from VENDOR 15.

15.5.3. For store locations either on an island or within 2 miles of an ocean coastline, provide Corrosion Protection Package as a factory-installed option. Purchase from VENDOR 15.

15.6. The following minimum requirements are to be provided on plans and submitted for review by the Landlord's engineer. Review will not commence unless the information is complete, including calculations. If information is incomplete, the following requirements will be used as a check list and will be returned identifying missing information. The requirements listed below are not intended to be all inclusive but as minimum standards for construction. Varying sites and existing conditions will be taken into consideration during plan review. The contractor shall submit, in writing, along with the construction documents, any requested variances to the following requirements due to local conditions.

15.7. HVAC distribution system shall meet the following criteria.

15.7.1. Flexible connections at supply and return air ducts at each air conditioning unit.

15.7.2. Factory installed smoke and/or heat detectors at each air conditioning unit per local Fire Marshal and building code requirements.

15.7.3. All ductwork shall be sheet metal and constructed per ASHRAE standards for 2" low pressure duct with seal class B. Supply ductwork shall be sized for a maximum pressure drop of 0.10" per 100 feet. Return ductwork shall be sized for a maximum pressure drop of 0.05" per 100 feet. Fiberglass ductwork is not acceptable.

15.7.4. Provide 1" acoustic lined return air duct at each air conditioning unit. Expand return air duct drop size to one and a half times duct drop size and terminate with 1" x 1" galvanized steel mesh. Extend to 18" below bottom of roof deck.

15.7.5. First 10'-0" of supply air duct shall be 1" acoustic lined.

15.7.6. All ductwork shall be installed tight to underside of structure (above lights) and coordinated with lights and sprinkler system. No ductwork shall be installed below 15'-0" AFF in the sales area or warehouse. Verify all ductwork clearances with Architectural and structural plans.

15.7.7. All supply ductwork located in concealed spaces shall be insulated.

15.7.8. Four-way sidewall supply air registers shall be provided at sides of supply air ducts at sales area and warehouse (areas without ceilings) in order to minimize conflict between air distribution and rack storage. Four-way side wall registers shall be complete with opposed blade dampers.

15.7.9. A sufficient quantity of air conditioning units shall be provided to maintain an even temperature throughout the store regardless of exposure or usage. Air conditioning must be provided at sales and stock areas (all rooms). Typically, a new store utilizes six (6) roof top units - four (4) in the sales area, one (1) in the stockroom, and one (1) at cash office/manager's office. Quantities and sizes may vary based on individual store design.

15.7.10. Provide a single 400 CFM supply diffuser in vestibule complete with opposed blade dampers. Coordinate location with lights and cabinet heater. Return air from the vestibule is not required.

15.7.11. Exposed ductwork to be rectangular. Supply runouts extending to vestibule, office area, and lounge area may be round providing size does not exceed 14" diameter. Ductwork shall enter through sidewall of vestibule above 16'-0" AFF in order not to interfere with signage.

15.7.12. Provide manual volume dampers at all supply air runouts and opposed blade dampers at all diffusers and supply air grilles. Wherever a supply air branch duct connects to an air conditioning unit supply air plenum, provide an opposed blade air volume damper in the supply air plenum downstream of the branch duct to force air through the branch duct. Provide turning vanes at all elbows. Diffusers/registers shall not exceed a NC of 25. Balance system at completion of job.

15.7.13. Provide a certified air balance report to be submitted to OfficeMax and approved no later than forty-

five (45) days following completion. Report shall be distributed as defined in the section on CLOSEOUT DOCUMENTS.

15.7.14. Provide a single, roof mounted exhaust fan to exhaust air from restrooms. Air quantity shall be per local code requirements. All exhaust ductwork shall be ½" acoustic lined and the fan shall be interlocked with the restroom lights. Provide make-up air from the sales area via air transfer ducts with ½" acoustic lining.

15.7.15. Provide 16 KW recessed ceiling mounted cabinet heater at vestibule controlled by the Energy Management System. Reduce cabinet heater capacity to 10KW at store locations where 1997 ASHRAE winter design dry bulb (99.6%) is above 20°F, increase capacity to 24 KW where below -5°F, and eliminate where above 35°F. Purchase from VENDOR 15.

15.7.16. Provide a unit heater at each loading dock overhead door. Each unit heater to be mounted at 10'-0" AFF to bottom and discharge directly toward the overhead door, and shall be equipped with double deflection louvers and wall mounted "Lightstat" thermostat. Purchase unit heater and thermostat from VENDOR 15. Unit heater(s) shall be sized to maintain 70° F at dock area, but not smaller than the following, based on 1997 ASHRAE 99.6% winter design dry bulb temperatures (°F):

15.7.16.1. Below 10°F - 300 MBH input

15.7.16.2. Between 11°F and 20°F - 200 MBH input

15.7.16.3. Between 21°F and 30°F - 100 MBH input

15.7.16.4. Above 31°F – none required

15.7.17. Show locations for all unit heater "Lightstat" thermostats and cabinet heater and air conditioning unit temperature sensors. Indicate mounting height of 96" AFF for unit heater "Lightstat" thermostats and sales area and warehouse air conditioning unit temperature sensors. Temperature sensors in sales area shall be located on columns, facing the rear of the sales area, and coordinated not to interfere with display fixtures or merchandise.

15.7.18. At lounge, provide volume control terminal with matching wall mounted thermostat with ventilated, locking cover and 24 volt transformer. Purchase from VENDOR 15.

15.7.19. At the Cash Room provide a ventilation fan to run continuously controlled through the Novar lighting controls.

15.7.20. Provide electric wall heaters with integral thermostat at restrooms and lounge. Heater shall be surface mounted with surface mount frame. Heater control must be tamperproof. Supplemental heat is not required in restrooms or lounge not having an exterior wall or at store locations where ASHRAE winter design dry bulb (99.6%) is above 35°F.

15.7.21. Schedule all mechanical equipment, including grilles and diffusers, on plan. Schedules to include electrical characteristics, capacities and all accessories.

15.7.22. All roof openings, including roof and smoke evacuation hatch(es), to be contacted to the security system. Install security bars on all openings not intended for roof access.

# 16. <u>FIRE PROTECTION/SPRINKLER SYSTEM</u>

16.1. Sprinkler system to meet criteria of all governmental agencies having jurisdiction. System to be designed for the densities listed below in full compliance with NFPA and/or local fire marshal requirements, and shall include water flow and tamper switches. OfficeMax lease space to have dedicated sprinkler riser/system. All fire protection equipment and supplies, including sprinkler heads and valves, to be U.L. Listed and Factory Mutual Approved. Sprinkler heads in drop ceilings to be two (2) piece semi-recessed chrome. All sprinkler heads to be high temperature (286° F rated). Storage racks are limited to a maximum height of 14'-0" in the warehouse and 8'-0" in the sales area. Provide building access, smoke and heat removal, smoke curtains and small hose connections if required by local fire code for rack storage over 12'-0". Verify requirements prior to building permit submission.

16.1.1. OfficeMax Warehouse shall have a minimum sprinkler density of 0.32 GPM/square foot over the most remote 2,000 square feet. (This meets the requirements of NFPA based on minimum 6'-0" wide aisles and a rack storage height of 14'-0" for type IV commodity.) Storage commodity type and classification to be determined by local fire codes. Should the local jurisdiction determine the commodity class to be higher than type IV or require a higher density for any reason, sprinkler

coverage shall be provided as needed to meet those requirements to allow OfficeMax rack storage to 14'-0" AFF.

16.1.2.  Office and lounge shall have a minimum sprinkler density of 0.15 GPM/square foot over the most remote 1,500 square feet.

16.1.3.  OfficeMax Sales area shall have a minimum sprinkler density 0.20 GPM/square foot over the most remote 2000 square feet. The maximum height of the sales racks is limited to 8"-0". Provide a 100 GPM inside hose allowance of the total 500 GPM hose allowance as specified in NFPA 13 Chapters 11 and 12.

16.1.4.  Maximum head spacing allowed is 100 square feet.

16.1.5.  Provide a minimum of 10 PSI difference between the required design and the available water supply.

16.1.6.  The installing contractor shall identify the hydraulically designed sprinkler system with a permanently marked weatherproof metal or rigid plastic sign secured with corrosion-resistant wire, chain, or other approved means.  Such signs shall be placed at the alarm valve, dry pipe valve, preaction valve, or deluge valve supplying the corresponding hydraulically designed area.  The sign shall include the following information.

16.1.6.1.  Location of the design area or areas.

16.1.6.2.  Discharge densities over the design area or areas.

16.1.6.3.  Required flow and residual pressure demand at the base of riser.

16.1.6.4.  Occupancy classification or commodity classification and maximum permitted storage height and configuration.

16.1.6.5.  Hose stream demand included in addition to the sprinkler demand.

16.1.6.6.  Identifying signage for all drains and valves.

16.2.  Sprinkler system drawings shall be submitted to VENDOR 17 for review and approval.  Any modification to the sprinkler design must be approved by OfficeMax Director of Store Development & Construction prior to plan submittal.  One (1) copy shall be retained by VENDOR 17.  Sprinkler system shall conform to these specifications and all requirements of the authorities having jurisdiction.

16.3.  Fire protection/sprinkler system to meet all federal, state and local codes.

16.4.  Fire extinguishers shall be furnished and installed as per local code, with a minimum of five (5) being provided. Fire extinguishers shall be ten (10) pound, ABC type, inspected and ready for use.  Purchase fire extinguishers from VENDOR 31.

## 17.  ELECTRICAL SYSTEM

17.1.  Plans and specification shall be prepared and certified (stamped and/or sealed) by the Interior Tenant Improvement M/E/P Engineer (see Required Interior Tenant Improvement Design Team List).  Electrical plans shall be submitted to OfficeMax for review as a part of the Interior Tenant Improvement Plans as prepared by the Required Interior Tenant Improvement Design Team (see section on Plan Review and Approval).

17.2.  Electrical system to meet all applicable codes and requirements, including the National Electrical Code, and all state and local codes. All life safety oriented equipment and supplies shall be U.L. Listed or Factory Mutual Approved for their intended purposes.  All equipment to be heavy duty type, wired in accordance with N.E.C.

17.3.  The main electrical service will be, at minimum, 400 amp / 480/277 volt / 3 phase / 4 wire, run underground to the building.  Service requirements may vary due to site conditions (see section on UTILITIES).  Service voltage is to be determined by availability.  Service ampacity is to be determined by calculation complying with N.E.C. Article 230.

17.4.  Furnish and install premanufactured electrical distribution center (EDC).  EDC to contain electrical power panel and panelboards with flush locks (all keyed alike).  Branch circuit breakers to be U.L. Listed bolt-on type, minimum 20 amp/1 pole capacity, rated for 75° Celsius wire.  Breakers used as switches to be U.L. switch rated.  Power panels and all panelboards to have maximum mounting hardware for a minimum of 20% spare capacity.  All panelboards to be supplied with spare 20 amp/1 pole circuit breakers in place.  Coordination of installation of the utility transformer with the delivery and installation of the EDC is paramount.  This discipline will provide permanent power for the duration of the construction schedule eliminating the cost and need for

temporary power services. EDC to be mounted above receiving counter. Furnish and install structure to support EDC (may be a part of the building structure or may be purchased from VENDOR 27), paint exterior of EDC and support structure to match ceiling. Purchase EDC from VENDOR 27.

17.4.1. The following equipment will be factory installed and prewired in the EDC: electrical power panel, panelboards, 480 volt-120/208 volt transformer (prewired to 120/208 volt panelboards), lighting contactors installed in contractor cabinet (prewired to lighting panel), convenience lighting with way switch, emergency light, and convenience outlets.Backboards, electrical service, and equipment location stenciling will be factory installed for the following systems to be furnished and field installed by others: security/fire alarm system and telecommunications system.

17.5. Emergency and night lighting circuits to have lock-on circuit breakers, emergency inverter system backup, and shall meet all applicable codes and local authorities approval. Coordinate locations with OfficeMax fixture plan and floor plan to ensure that OfficeMax fixtures, merchandise, and interior signage will not obstruct the view or illumination of any emergency lighting devices.

17.6. Lighting shall be 277 volt, wired with a premanufactured wiring system. Purchase light fixtures, lamps, and wiring system from VENDOR 5. To obtain your cost information, fax a copy of the lighting legend and quantities to VENDOR 5.

17.7. Electrical requirements for energy management system.

17.7.1. Provide dedicated 20 amp/120 volt circuit factory installed in the EDC to the energy management system control unit.

17.7.2. Provide 20 amp/3 phase/4 wire circuit factory installed in the EDC to phase loss transducer from main distribution panel.

17.7.3. Main distribution panels shall have sufficient space in panel tub for the energy management system vendor to install current transformers for kilowatt hour measurement.

17.7.4. Provide contactor panel and lighting contactors for the control of OfficeMax interior lights, exterior signage/canopy lights, all in rack lights, vestibule heater and other exterior lighting, if applicable, factory installed in the EDC.

17.7.5. Sales area lighting control shall be accomplished by the use of multiple pole contactors factory installed in the EDC, with one (1) 20 amp contact for each 20 amp lighting circuit. Use 20 amp/12 pole contactors as needed for the required number of circuits.

17.7.6. Group lighting circuits as follows for control by the energy management system. See Prototype plans for light fixture staging cycles.

17.7.6.1. All sales area overhead lighting.

17.7.6.2. Warehouse lighting, restroom, lunchroom, and employee/stocking lighting in the sales area.

17.7.6.3. Exterior building signs and canopy lights (unless tied into Landlord's house panel).

17.7.6.4. Other exterior and parking lot lighting (unless tied into Landlord's house panel).

17.7.6.5. Vestibule recessed unit heater.

17.8. Unless otherwise noted, all outlets are to be NEMA 5-20R heavy duty, specification grade, duplex receptacles.

17.9. Provide sufficient night lighting for security purposes and stage travel to egress doors and electrical panels.

17.10. Electric panels must be clearly marked with typewritten log of controls. Provide engraved nameplate for each panelboard indicating voltage, phase, panel name, and feeder origin.

17.11. All computer network cabling shall be installed by VENDOR 19.

17.12. For stores outside of the contiguous 48 states, emergency backup power shall be provided by means of an on-site, diesel powered generator. Generator shall be sized to accommodate the designed load. Purchase generator and accessories from VENDOR 27.

17.13. Permanent power shall be available to OfficeMax at turnover. If utility power is not available or sufficient to fully power the store, an on-site prime power generation system capable of powering the entire store until switched over to permanent utility power shall be provided. Construction will not be considered substantially complete until the store is connected to permanent power.

18. **SPECIALTY SYSTEMS**

18.1. The following vendor products/services shall be provided:

18.1.1. All contacting, designing, purchasing, scheduling, and coordinating of all vendor activities and installation requirements to satisfy the requirements of the project schedule in order to achieve and maintain the turnover date.

18.1.2. Any additional charges required by local conditions including, but not limited to, union labor, additional conduit, special cable requirements, permits/fees, lift rental and expediting charges.

18.1.3. Any additional charges which apply to stores constructed outside of the contiguous United States.

18.2. Energy Management System

18.2.1. Furnish and install energy management system (EMS). EMS shall include a network manager, lighting controller, rooftop unit controller, interface panel, interior temperature sensors, exterior temperature sensor, and exterior light sensor. This system shall control the heating/cooling system as well as the lighting system. A modem and a wide area network connection shall be provided as part of the system for remote access. EMS to be installed in the EDC. Provide an "Extended Hours" override button system at the receiving counter. EMS equipment to be purchased from and installed by VENDOR 3. Coordinate all work between VENDOR 15 and VENDOR 3.

18.2.2. Energy management system is to be connected to the security system to activate full building lighting in the event that the security system goes into alarm during unoccupied hours. Building lighting to remain "ON" until 60 seconds after the alarm condition is cleared. Auxiliary contact to be provided by VENDOR 22.

18.3. Telecommunication System

18.3.1. Furnish and install telecommunications system. All interior telecommunication/telephone equipment to be purchased from and installed by VENDOR 16. Telecommunication system is to be installed in the EDC.

18.3.1.1. All required main telephone service requirements to allow VENDOR 16 to perform its installation within the scheduled time frame are to be provided (see section on <u>UTILITIES</u>). OfficeMax will place orders with the local telephone service provider for telephone numbers and dial tone approximately ten (10) weeks prior to the turnover date.

18.3.1.2. The designated telecommunication equipment package shall be as manufactured by Toshiba. System to include, but not be limited to, the following: base cabinet, expansion cabinet, loop start CO line interface unit, twelve (12) ten-button telephones, CO line/digital telephone interface, remote maintenance unit (IMDU card), single zone paging card (PIOUS), amplifier, dual control and power supply, twelve (12) paging speakers, three (3) ceiling mounted speakers with hangers and baffles, FM tuner, and CD player.

18.3.1.3. Included within the telecommunication vendor package is the coordination and installation of special line/jack configurations to provide communications for the EMS, security/fire alarm, and three (3) cables with jacks (RJ11) for modem connections.

18.3.1.4. OfficeMax will retain the right to provide for minor alterations to the location of telephone equipment in the design phase without any added costs.

18.3.2. Dedicated telephone lines, if required by the local Authority Having Jurisdiction, for the direct monitoring of the fire alarm system shall be provided and installed.

18.3.3. The entire telephone system is to be operational at the turnover date to OfficeMax If system is not fully functional at turnover, two (2) telephone lines within the store (either land-based or wireless service) and use of the general contractor's on site fax machine until the telecommunications system is operational is to be provided. Construction will not be considered substantially complete until the telecommunications system is fully operational.

18.4. Security/Fire Alarm System

18.4.1. Furnish and install security/fire alarm system. System to be Radionics 7412 Control Communicator using one (1) Radionics 1255 Command Center, and a TTLE network board. All movable doors to receive magnetic contact switches. All glass to be protected with dual-tech motion detectors. Cash

office to be equipped with motion detector and silent alarm button. Security/fire alarm vendor to wire from the sprinkler system's water flow and tamper switches, which are dedicated for the OfficeMax lease space, to the Radionics control panel for central station monitoring. All alarm signals to be monitored at security/fire alarm vendor's central station. Fire alarm system requirements as mandated by local fire codes are the responsibility of the building designer, who shall provide all requirements to security fire alarm vendor during the design process. Security system device plan, provided by VENDOR 22, must be approved by OfficeMax prior to the installation of the security/fire alarm system. It shall be verified that the security/fire alarm system vendor is in direct contract with the general contractor and not part of any subcontractor's scope of work. System to be purchased from, installed and serviced by VENDOR 22.

18.4.1.1.  The Control Communicator and TTLE network board is to be mounted in the EDC.

18.4.1.2.  The Radionics 1255 Command Center is to be mounted inside the manager's office by the doorway.

18.4.1.3.  The security/fire alarm system shall be fully operational at turnover. If not, any services required to provide OfficeMax with a secure space and the ability to fixture and merchandise the store including, but not limited to, guard service for security and/or fire watch until the security/fire alarm system is operational shall be provided. Construction will not be considered substantially complete until the building is secure and the security/fire alarm system is fully operational.

18.4.2.  Contractor to provide and install delay egress lock on all exterior egress (non-vestibule) doors (see section on BUILDING SHELL).

18.4.2.1.  Enunciator (speaker on Dynalock unit and remote siren if door is not directly off the sales area) to ring if door is opened 24 hours a day, continue to ring even if door is then closed, and can only be shut off by the keyswitch on the Dynalock unit by the management staff.

18.4.2.2.  At each egress (non-vestibule) door, electrical contractor shall provide the following items for use in installing the Dynalocks.

18.4.2.2.1.  Provide one (1) two-gang junction box located immediately above the door, on the strike side of the door immediately above the Dynalock unit, with a conduit stubbed into the joist space. Provide a blank, stainless steel cover plate on the junction box. At walls finished with drywall, junction box and conduit to be recessed.

18.4.2.2.2.  Provide one (1) two-gang junction box in the joist space with a single 120 volt circuit dedicated to all of the Dynalock units, circuit to be locked "on". Electrical contractor shall install Dynalock power transformer in junction box and wire transformer to 120 volt circuit.

18.4.2.3.  Security vendor to utilize terminal points on the Dynalock unit for monitoring of perimeter security, activation of the ceiling mounted siren when an unauthorized opening of the door occurs, and provide signaling from the fire alarm panel for the release of the Dynalock in the event of a fire emergency. Security vendor to feed low voltage power cables from Dynalock power transformer and security system cables from the junction box above the door to the Dynalock in stainless steel armor flexible conduit.

18.4.3.  The TTLE network board shall provide back-up the analog phone line for system monitoring.

18.4.4.  Motion detectors and door alarm contacts will be individually zoned at the control center and all points of protection, security or fire, shall be individually enunciated, regardless of type. There should be no less than twenty (20) zones.

18.4.5.  Door contacts will be installed as follows:

18.4.5.1.  Factory installed magnetic door contacts on all vestibule automatic doors.

18.4.5.2.  Heavy duty magnetic door contact sets on all overhead doors.

18.4.5.3.  Heavy duty or recessed magnetic door contact on the cash office door.

18.4.5.4.  Heavy duty magnetic door contact sets on sales area storage room door.

18.4.5.5.  Door contact on exterior key lock box ("Knox" box) if such is required by code.

18.4.5.6. All roof openings and hatches will be contacted.

18.4.5.7. Wiring to all exposed door contacts must be protected by stainless steel armored cable.

18.4.5.8. Door contacts to be installed with one way screws.

18.4.6. Motion detectors are to be dual technology, both heat and motion sensitive, and to be installed no lower than 10'-0" AFF in the following areas. Motion detectors shall not be installed on any wall area containing accent painting or in or behind any display fixtures.

18.4.6.1. Short range motion detector to cover the overhead door and man door at the loading dock.

18.4.6.2. Long range motion detectors in the warehouse to cover the clear aisle and access door to the sales area.

18.4.6.3. Long range motion detectors covering the common demising walls shared with co-tenants (where applicable).

18.4.6.4. Long range motion detector bisecting store from rear of main aisle to front of the store.

18.4.6.5. Long range motion detector bisecting store from side to side in the main aisle.

18.4.6.6. Two mid range motion detectors in the front of the store on opposite ends of the building. These detectors will be placed to cover access gained through the vestibule and front window area.

18.4.6.7. Short range motion detector inside cash office mounted above the door.

18.4.7. A holdup button will be wired in the cash office and mounted underneath the cash office counter. The holdup button is silent, no alarm should be sounded in the store.

18.4.8. Siren to be installed on the interior of the sales area (ceiling mounted at center) and on the exterior front of the building.

18.4.9. System should have the capability to shunt the interior protection while keeping the perimeter alarmed.

18.4.10. All water flow and tamper alarms should be connected to the panel where code allows.

18.4.11. One RJ31X telephone jack shall be installed by telephone company on an existing telephone line in the EDC. A second RJ31X telephone jack shall be installed at the same location if a dedicated telephone line for fire monitoring is required by the Authority Having Jurisdiction.

18.4.12. System to provide a "ring back" to alert the management that alarm is properly set.

18.4.13. Provide keypad at door to the sales area storage room to control access.

18.4.14. Security system is to be connected to the Energy Management System to activate full store lighting in the event that the security system goes into alarm. Store lighting to remain "on" until 60 seconds after the alarm condition is cleared. Auxiliary contact to be provided by VENDOR 22.

18.4.15. OfficeMax reserves the right to make modifications to security system equipment placement depending on site specific conditions as it may see fit at no expense to OfficeMax

18.5. Power Conditioner

18.5.1. The power conditioner shall be factory installed in the EDC. Power conditioner shall provide three level conditioning/protection with a low impedance isolation transformer, a surge diverter, and a bi-directional power line filter. Power conditioner shall be rated at 6.0 KVA (208/240 volt input, 12/240 volt output). The power conditioner unit will supply a subpanel which shall contain a minimum of eighteen (18) 20 amp circuit breakers (including spares) to provide dedicated, conditioned power through isolated ground circuits to the areas listed below. All power conditioner protected outlets must be NEMA 5-20R heavy duty receptacles (isolated ground orange) with an engraved cover plate stating "Computer Only". Purchase cover plates from VENDOR 5.

18.5.1.1. Cash office - two (2) dedicated quadplex outlets for ISP and network system cabinet.

18.5.1.2. Cash registers - four (4) dedicated duplex outlets for each of four (4) cash registers.

18.5.1.3. Copy Center front counter - one (1) dedicated duplex outlet for cash register.

18.5.1.4. Telephone backboard - one (1) dedicated quadplex outlet for telephone system (factory installed in EDC).

18.6.  Electrical requirements for Electronic Article Surveillance (EAS) system.

    18.6.1.  Provide one (1) dedicated 20 amp/120 volt quadplex outlet above the vestibule ceiling, and a double gang work box mounted above the vestibule ceiling with ¾" conduit feeds with pull strings to two (2) recessed single gang work boxes mounted at 0'-8" AFF to center, located per plans.

18.7.  Network Cable System

    18.7.1.  Network cable system shall be furnished and installed by OfficeMax  Network cable system shall be a multi-drop 10base-T cabling and network system interlinking all computer components and systems within store.  System to be installed by VENDOR 19.  Junction boxes and conduit per plan are to be provided.  Installation shall be coordinated by General Contractor.

19. **STORE CONSTRUCTION COORDINATION GUIDE**

# STORE CONSTRUCTION COORDINATION GUIDE

This Store Construction Coordination Guide is dated: **September 15, 2006**

## Table of Contents

| Section | | Section | |
|---|---|---|---|
| A. | Project Information | Appx. A. | New Store Opening Calendar |
| B. | Turn Over/Occupancy Information | Appx. B. | Status Report Form |
| C. | Required Vendors | Appx. C. | Change Order Request Form |
| D. | Construction Status Reports and Photographs | Appx. D. | General Contractor's Warranty Form |
| E. | Project Milestones | Appx. E. | Subcontractor's Warranty Form |
| F. | Criteria for Substantial Completion at Turnover | Appx. F. | Work Request Form for Warranty Repairs |
| G. | In-rack Electrical Requirements | Appx. G. | OfficeMax Construction Vendor Survey |
| H. | Changes Made at OfficeMax, Inc.'s Request | | |
| I. | Project Closeout | | |

The purpose of this guide is to clearly identify specific OfficeMax requirements during the construction of this new OfficeMax store. These items are referred to in the OfficeMax Outline Specifications which are a part of the Lease Agreement. It is our intention to create an open line of communication in order to provide all parties with the most accurate information.

A. **Project Information to be provided to the OfficeMax Construction Manager a minimum of ten (10) days prior to the commencement of construction**

A.1. Name, address, telephone number, fax number, and contact person for the following:

A.1.1. Landlord

A.1.2. Developer

A.1.3. General Contractor

A.1.4. Site Contractor(s)

A.1.5. Landlord's Architect

A.1.6. Building Department having jurisdiction with names and telephone numbers of all officials and inspectors

A.1.7. Local Post Office (telephone number only)

A.1.8. Local weather information (telephone number only)

A.1.9. All utility companies servicing the store (provide meter numbers if facilities are existing)

A.2.    Site supervisor and job site telephone number, fax number, pager and cellular number.

A.3.    Permanent mailing address of the new store including shopping center name (if applicable), unit number (if applicable), Zip Code + 4, and county.

A.4.    Two (2) complete sets of full size building plans and one (1) complete set of 11" x 17" original plot plans.

A.5.    Construction schedule.

A.6.    Notice of Commencement of Construction.

A.7.    Certificate of Insurance indicating the OfficeMax store number, location, and indicating OfficeMax, Inc. as additionally insured.

A.8.    Subcontractor and prime material supplier list (including address, telephone number, and contact name).

A.9.    Building information:

    A.9.1.    Type of wall construction

    A.9.2.    Type of roof structure construction

    A.9.3.    Clear height to bottom of structure and/or suspended building systems

    A.9.4.    Age of building, if existing

    A.9.5.    Is the building in a Zone "A" floodplain?

    A.9.6.    If building is existing, name of previous tenant

A.10.    Major co-tenants and inducement tenants and their opening dates

A.11.    Confirmation of drawing approval by OfficeMax, Inc.

A.12.    Copy of the building permit.

B.    **Turn Over Information is to be provided to the OfficeMax Construction Manager to determine if we are able to fixture and merchandise the store according to our standard schedule (see Appendix A).**

B.1.    Will the job require the use of union fixture installers or may non-union fixture installers be utilized? If the job is "open shop", which trades are union.

B.2.    Is a fixture permit required? If so, what procedures are to be followed?

B.3.    Is this store in a designated seismic zone requiring special installation requirements? If so, define the seismic zone, installation requirements, and the inspections required either during or after installation.

B.4.    What are the inspection requirements for fixturing the store, if any (Certificate of Occupancy, Temporary C. of O., etc.)?

B.5.    What are the inspection requirements for merchandising the store, if any (Certificate of Occupancy, Temporary C. of O., etc.)?

B.6.    Do the incidental powerpoles and plugmold which is placed in our display fixtures need to be installed and inspected prior to merchandising?

B.7.    Are there any restrictions to our use of particle board decking on the pallet racking or for the top level only of our 96" high multifunctional display fixtures? In all cases, the width of the particle board decking does not exceed 48".

B.8.    What is the maximum allowable stock height on the sales floor? OfficeMax requires 14'-0".

**OfficeMax** New Store Outline Specifications

B.9.  Is the final Certificate of Occupancy for OfficeMax connected in any way to other work being performed at this location?  If so, please specify.

B.10.  What is the maximum allowable fixture height?

B.11.  Does local code and all authorities have jurisdiction allow the use of delay egress devices on egress (non-vestibule) doors?

## C.  Required Vendors

C.1.  Landlord/Contractor is required to purchase all vendor designated equipment, products, and services from OfficeMax, Inc. vendors (see OfficeMax Required Vendor List / Purchasing Requirements of the OfficeMax New Store Outline Specification).  No substitutions in materials or suppliers will be accepted.  Landlord/Contractor shall be responsible for any deposits required by OfficeMax, Inc. vendors to secure the purchase of the required equipment, product or service.  The architect is to send plans to each vendor as early as possible so that accurate quotes can be issued by each of the vendors for their service or supply of products.  Provide written confirmation of vendor orders to the OfficeMax Construction Manager eight (8) weeks prior to turnover.

## D.  Construction Status Reports and Photographs

D.1.  Provide weekly written construction status reports and progress photos.  Photos, at minimum 24 in quantity, shall be 35MM (Polaroids are not acceptable) color/gloss finish, 4" x 6" in size, dated on each photo, or digital photos forwarded via e-mail (640 x 480 resolution).  Photos shall be provided beginning with commencement of construction through grand opening, shall provide detailed views of all construction progress, and shall be sent to the designated OfficeMax, Inc. Construction Manager to arrive regularly on Wednesday of each week (express mail if required).  Photos are to be current within the last 48 hours.

D.2.  Provide weekly written construction status reports using the attached form (see Appendix "B").  Written construction status reports shall be provided beginning with commencement of construction through grand opening and shall be sent weekly to the designated OfficeMax, Inc. Construction Manager to arrive on Wednesday of each week (via fax to 630/864-4422 or email).  Status report information is to be current within the last 48 hours.

D.3.  Any revision in the construction schedule or drawings must be forwarded to our office immediately.

## E.  Project Milestones

E.1.  Provide the OfficeMax Construction Manager written notification 10 days prior to the commencement of construction.  Provide all project information required in Sections 1 of this document at or prior to that time.

E.2.  Seventy-five (75) days prior to turnover, Landlord shall issue "Notice of Intent to Turnover" with the following documentation.  Turnover will occur on a Saturday unless OfficeMax is required to utilize union labor for display fixture installation in which case turnover will occur on a Monday.

E.2.1.  Information requested in Sections 1 and 2 of this Guide.

E.2.2.  OfficeMax, Inc. plan review letter stating that plans are "Approved" or "Approved As Noted".

E.2.3.  Copy of Building Permit for tenant improvements.

E.2.4.  Construction schedule.

E.2.5.  General Contractor's bid summary.

E.2.6.  General Contractor's insurance certificate meeting requirements of OfficeMax, Inc.

E.3.  Once the "Notice of Intent to Turnover" has been receive and validated by the OfficeMax Construction Manager, OfficeMax corporate departments and field managers will be notified of the anticipated opening dates and relevant turnover information as provided above.

**OfficeMax** New Store Outline Specifications

E.4.   Sixty-three (63) days prior to turnover, landlord shall issue "Notice of Turnover" to the OfficeMax Construction Manager with the following back-up documentation.

E.4.1.   Confirmation of Lease Agreement execution by landlord and OfficeMax, Inc.

E.4.2.   Insurance underwriter approval for fire protection system.

E.4.3.   Confirmation of purchase of OfficeMax, Inc. vendor items.

E.4.4.   Current construction status report and progress photos (current within 72 hours).

E.4.5.   Summary of Change Orders to date.

E.5.   Once the "Notice of Turnover" and all of the above back-up documentation has been received and validated by the OfficeMax Construction Manager, the store will be placed on the OfficeMax "Hot List" eight (8) weeks prior to the turnover date.  This confirms the opening date to all OfficeMax corporate departments, the field managers, and our Required vendors.  Based on this date, OfficeMax releases merchandise purchase orders, advertising, and fixture orders per the landlord's commitment.  Once a store is placed on the "Hot List", it is the landlord's responsibility to ensure that the store is turned over to OfficeMax on the date declared in the "Notice of Turnover" with Substantial Completion criteria met (see Section 6).

F.   **Criteria for Substantial Completion at Turnover**

F.1.   Sign fascia and pylon or monument signs are to be complete two (2) weeks prior to turnover to allow the installation of OfficeMax logo signs and "Coming Soon" banner prior to turnover.

F.2.   Site work to be complete including paving of the parking lot and access roads, curbing including curb cuts, site lighting, striping, sidewalks, loading docks and landscaping.

F.3.   Sales area must be complete, including all painting (walls, conduit and roof deck), lighting, VCT flooring (installed, cleaned and waxed), carpet (covered with plastic), and wall mounted fixture anchors.  Storage room is to be complete and secure including all door hardware.

F.4.   Cash office must be complete.  (Computer equipment installed in this area is not to be disturbed once OfficeMax has occupied the building.)

F.5.   Loading dock, overhead door, seals, and dock leveler to be installed, operational and accessible.

F.6.   Receiving counter in warehouse must be complete and accessible. (Computer equipment installed in this area is not to be disturbed once OfficeMax has occupied the building.)

F.7.   Telephone system must be installed and operational.

F.8.   Phase 1 network cabling must be completed.

F.9.   Store must be a secured space.  This includes the installation of all doors, door hardware and glazing, and the installation and activation of the entire security system.

F.10.   All mechanical equipment, including the Energy Management System (EMS) and the power conditioner, must be installed and operational.

F.11.   All utilities must be complete - permanent electrical service, telephone, water, natural gas, sanitary sewer, storm sewer, etc.

F.12.   General contractor to obtain all inspections necessary to fixture and merchandise the store.  All life/safety issues to be resolved prior to fixturing.

F.13.   Contractor materials must be stored outside of the OfficeMax lease space.

F.14.   Baler is to be installed and operational.

F.15.   Restrooms must be operational with partitions installed.

F.16.   Copy Center must be complete, including all electrical work.  A representative of Xerox will visit the site the first Monday of merchandising to review the site for completion.

## G. In-rack Electrical Requirements

G.1.   Install power poles, and plugmold in display fixtures. All electrical work must be completed five (5) days after the turnover date.

G.2.   Install conduit, junction boxes, and plugmold in the multifunctional display fixtures. Make sure that the conduit and junction boxes do not interfere with the interior signage on the end caps and that the conduit runs down the end caps are concealed. This work must be completed five (5) days after the turnover date.

## H. Changes made at OfficeMax, Inc.'s Request

H.1.   OfficeMax, Inc. retains the right to make modifications and changes to meet new design criteria as it may see fit. Such modification will be submitted to the landlord by the OfficeMax, Inc. Construction Manager   All such requests for changes or modifications shall be reviewed by the landlord/contractor/architect and a "cost estimate/not to exceed" or an "actual cost" notice will be submitted on the attached Change Order Request Form (see Appendix "D") to the OfficeMax, Inc. Construction Manager for review and approval. All costs for changes or modifications must be approved by the OfficeMax, Inc. Construction Manager or OfficeMax, Inc. Director of Construction prior to execution of the work. OfficeMax, Inc. will deem change orders as approved only under these terms. Upon approval, OfficeMax, Inc. will issue a "CONSTRUCTION PURCHASE ORDER" document to the landlord.

H.2.   An invoice for all approved change orders is to be submitted by the landlord to OfficeMax, Inc. after the turnover date and no later than sixty (60) days after the turnover date. Invoices submitted after sixty (60) days from turnover will not be valid or accepted for payment. The landlord will be responsible to submit the following with the invoice to be sent to the attention of the OfficeMax, Inc. Store Development Financial Accounting Group: Copy of signed change order with OfficeMax, Inc. approval ("CONSTRUCTION PURCHASE ORDER" document), copy of original request for change, copy of general contractor change order and invoice, and copy of subcontractor invoice.

## I. Project Closeout

I.1.   All closeout responsibilities listed below shall be completed prior to store turnover as detailed within the lease agreement, or as otherwise stated.

I.2.   The responsible party shall provide one (1) set of the information listed below for the production of the MAINTENANCE/WARRANTY/OPERATIONS MANUAL shall be provided. VENDOR 13 shall be responsible for creating one (1) hardcopy manual, which shall be forwarded to the OfficeMax Store Manager and two (2) CD-ROMs of the manual to be forwarded to the OfficeMax Construction Manager shall be purchased. Manuals are to be delivered within forty-five (45) days of turnover to OfficeMax, Inc and shall consist of the following items.

I.2.1.   Architect's certification of completion in accordance with plans and specifications (use AIA Document G704) and Certification of Square Footage.

I.2.2.   General Contractor's certification of completion in accordance with plans and specifications (use AIA Document G704)

I.2.3.   Certificate of Occupancy

I.2.4.   General Contractor and Subcontractor warranties and guarantees (forms included in the OfficeMax Inc. Project Coordination Guide)

I.2.5.   General Contractor/Subcontractor/Prime Material Supplier listing including address, telephone number, fax number, and contact

I.2.6.   Photo of completed storefront after opening (8" x 10" glossy)

I.2.7.   Set of photos (36 minimum) of the completed store after opening, interior and exterior

I.2.8.   Certified HVAC air balance report

I.2.9.   Equipment Operation Check (EOC) purchased from VENDOR 15

I.2.10.   Vendor Survey (form included in the OfficeMax Project Coordination Guide)

I.3.    At completion of construction, the following Closeout Materials are to be provided and left on site in the location as directed by the OfficeMax Construction Manager.

    I.3.1.    Two (2) full, one-gallon containers of paint (P-1) only. Refer to TI drawings for specification.

    I.3.2.    Two (2) unopened cartons of vinyl composite tile (VCT-1) only. Refer to TI drawing for specification.

    I.3.3.    One (1) unopened cartons of carpet tiles used.

    I.3.4.    Thirty (30) linear feet of VCT to carpet tile transition strips used.

    I.3.5.    Two (2) unopened cartons of acoustical ceiling tile as follows:

        I.3.5.1.    One (1) unopened carton of 2' x 2' acoustical ceiling tile

        I.3.5.2.    One (1) unopened carton of 2' x 4' acoustical ceiling tile

I.4.    At completion of construction, two (2) sets of accurate, as built, record drawings and two (2) sets of sprinkler shop drawings are to be provided and distributed as follows. Drawings to be delivered within forty-five (45) days of turnover to OfficeMax

    I.4.1.    One (1) set of each to VENDOR 13 for the production of the MAINTENANCE/ WARRANTY/OPERATIONS MANUAL (see section on Closeout Documents).

    I.4.2.    One (1) set of each shall remain on site in a 4" diameter, 36" long PVC tube to be located in the Electrical Distribution Center (EDC). Tube to be labeled "RECORD DRAWINGS - RETAIN - DO NOT DESTROY".

I.5.    Closeout Procedures

    I.5.1.    The Landlord's Construction Manager shall be responsible to schedule and conduct a meeting to address all "Closeout Procedures" as related here-in.

    I.5.2.    Arrange for each installer of products/services requiring continuing maintenance or operation to meet with OfficeMax personnel at the project site to provide basic instructions needed for proper operation and maintenance of entire work. Include instruction by manufacturer's representatives where installer is not expert in required procedures. Demonstrate start up, shut down, emergency operations, noise and vibration adjustments, safety, economy and efficiency adjustments, and similar operations.

    I.5.3.    Review Maintenance Manual, record documents, tools, spare parts and materials, lubricants, fuels, identification system, control sequences, hazards, cleaning and similar procedures and facilities. Review maintenance and operations in relation with applicable guarantees, warranties, maintenance agreements and similar continuing commitments.

    I.5.4.    Provide instructions to OfficeMax personnel on categories of work including, but not limited to, mechanical/electrical systems; lawn and live plant materials; roofing, flashing, joint sealers and similar elements of work; and finish flooring.

I.6.    Landlord shall warrant and guarantee its construction against any defects in workmanship or materials for a period of one (1) year after the completion date. Landlord shall provide "Warranty Repair Request" forms for use by the OfficeMax, Inc. Facilities Department (see Appendix "F"). Landlord shall assign to tenant all warranties and guarantees in connection with its construction, and landlord shall obtain such warranties and guarantees from its general contractor and subcontractors on the forms provided (see Appendix "D" and "E"). Landlord shall provide OfficeMax, Inc. with copies of all General Contractor and Subcontractor warranties and guarantees. All warranties shall be transferred should the landlord sell the property. New property owner(s) shall be responsible for any and all warranty recalls.

**OfficeMax** New Store Outline Specifications

## Appendix "A" – New Store Opening Calendar

| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
|---|---|---|---|---|---|---|
| | Store system installation | Store system installation | Store system installation | Store system installation | Punchlist walk with Landlord. Forklift delivery. | SOS delivery at 6:00am. Fixture trucks arrive at 8:00am 5:30am to midnight |
| Fixture and signage installation<br><br>7:00am to midnight | Fixture and signage installation<br><br>7:00am to midnight | Fixture and signage installation<br><br>7:00am to midnight | Inspections<br><br>Store prints planograms<br><br>8:00am to 5:00pm | Inspections<br><br>Store prints planograms<br><br>8:00am to 5:00pm | Inspections<br><br>Store prints planograms<br><br>8:00am to 5:00pm | Day Off |
| Merchandise trucks arrive at 8:00am<br><br>7:00am to midnight | Merchandise trucks arrive at 8:00am<br><br>7:00am to midnight | Merchandise trucks arrive at 8:00am<br><br>7:00am to midnight | Merchandising<br><br>Build Furniture<br><br>7:00am to midnight | Merchandising<br><br>Build Furniture<br><br>7:00am to midnight | Merchandising<br><br>Build Furniture<br><br>7:00am to midnight | Merchandising<br><br>MSP set by store team<br><br>7:00am to midnight |
| Merchandising<br><br>MSP set by store team<br><br>7:00am to midnight | Merchandising firm punchlist walk and signoff<br><br>MSP set by store team | Strip & Wax<br><br>MSP set by store team | Strip & Wax | **Soft Opening** | | |
| | | | | | | |
| | | | | | | |

**OfficeMax** New Store Outline Specifications

# Appendix "B" – Status Report Form

Store No.: _____

Location: _____

Fax to:

OfficeMax PM:    630/864-4422

Reported by: _____

| DESCRIPTION | % | | DESCRIPTION | % | | DESCRIPTION | % |
|---|---|---|---|---|---|---|---|
| **1    SITEWORK** | | | **4    BLDG. DRIED IN** | | | **8    LOADING DOCK** | |
| 1.01 Grading | | | **5    SALES AREA** | | | 8.01 Dock Doors, Overhead | |
| 1.02 Sidewalks/curbs | | | 5.01 Framing/rough carpentry | | | 8.02 Dock Ramp | |
| 1.03 Access roads | | | 5.02 Drywall system | | | 8.03 Dock Retaining Wall | |
| 1.04 Parking lot | | | 5.03 Overhead electric rough | | | 8.04 Dock Seals | |
| 1.05 Site lighting | | | 5.04 HVAC ductwork | | | 8.05 Dock Leveler/Electric | |
| 1.06 Landscaping | | | 5.05 Painting of roof deck | | | **9    INSPECTIONS** | |
| 1.07 Pylon sign | | | 5.06 Light fixtures installed | | | 9.01 Electrical rough | |
| **2    UTILITIES** | | | 5.07 Painting | | | 9.02 Mech/plumb rough | |
| 2.01 Gas rough in | | | 5.08 Vestibule knee wall | | | 9.03 Fire rough | |
| 2.02 Gas meter | | | 5.09 Vestibule glazing/glass | | | 9.04 Building rough | |
| 2.03 Electric rough in | | | 5.10 Vestibule doors | | | 9.05 Site final | |
| 2.04 Electric meter | | | 5.11 Electric in CopyMax | | | 9.06 Electrical final | |
| 2.05 Water rough in | | | 5.12 Millwork | | | 9.07 Mech/plumb final | |
| 2.06 Water meter | | | 5.13 VCT flooring | | | 9.08 Fire final | |
| 2.07 Telephone rough in | | | 5.14 Carpet (FurnitureMax) | | | 9.09 Building final | |
| 2.08 Telephone dial tone | | | 5.15 Seismic upgrades | | | **10    CERTIFICATE OF** | |
| 2.09 Sewer rough in | | | 5.16 Security system | | | **OCCUPANCY** | |
| 2.10 Sewer connection | | | 5.17 Fire sprinkler system | | | 10.0 TCO to fixture (date) | |
| **3    BUILDING SHELL** | | | 5.18 Telephone system | | | 10.0 TCO to merchandise | |
| 3.01 Footings & foundations | | | 5.19 Energy Management Sys. | | | 10.0 CO to open (date) | |
| 3.02 Floor slab | | | 5.20 Unisys data cabling | | | **11    OVERALL PROJECT** | |
| 3.03 Masonry walls | | | **6    INTERIOR ROOMS** | | | **STATUS** | |
| 3.04 Masonry door openings | | | 6.01 Manager office | | | 11.0 On schedule | |
| 3.05 Structural steel | | | 6.02 Cash office | | | 11.0 Days behind schedule | |
| 3.06 Roof decking | | | 6.03 Storage room 1 (sales | | | 11.0 Days ahead of schedule | |
| 3.07 Roofing system/flashing | | | 6.04 Storage room 2 (sales | | | **12    WEATHER CONDITIONS** | |
| 3.08 Canopy | | | 6.05 Restrooms | | | | |
| 3.09 Storefront framing | | | 6.06 Lounge | | | | |
| 3.10 Sign fascia (EIFS) | | | 6.07 Corridor | | | **13    PROBLEMS/COMMENTS** | |
| 3.11 Electric for sign(s) | | | **7    WAREHOUSE** | | | | |
| 3.12 Storefront sign | | | 7.01 Receiving Counter | | | | |
| 3.13 Automatic doors | | | 7.02 Electric in receiving | | | | |
| 3.14 Storefront glazing/glass | | | 7.03 Switch gear/panel boards | | | | |
| 3.15 Exterior H.M. doors | | | 7.04 Telephone board (in | | | *Vendor Item Notes:* | |
| 3.16 Security grilles | | | 7.05 Power conditioner (EDC) | | | *Indicate "ORD" for Vendor Items* | |
| 3.17 HVAC gas piping | | | 7.06 Baler disconnect | | | *Indicate "On Site" if items are* | |
| 3.18 HVAC rooftop units | | | 7.07 Baler | | | *Indicate Scheduled install date* | |

**OfficeMax** New Store Outline Specifications

## Appendix "C" – Change Order Request Form
### (fax to SP Financial at 630/864-4422)

OfficeMax Store Number: _____    OfficeMax Construction Manager: _____

City/State of Store/Project: _____    Change Request Number: _____

**Change Requested By:**

Company: _____        Contact Name: _____
Address: _____        Phone: _____
City: _____        Fax: _____
State/Zip: _____        Mobile: _____

|  | **Labor** | **Materials** |  |  |
|---|---|---|---|---|
| **Breakdown of Change Request (Dollars):** |  |  | **Date:** |  |
| **Total:** |  |  |  |  |

*Attach all necessary backup information required to document this Change Request (i.e. photos, permits, etc.)*

**Reason for Change:**

☐ Architectural Error          ☐ Merchandise Plan          ☐ OfficeMax DM Request
☐ Code Requirement          ☐ Facilities Repair          ☐ Field Conditions
☐ General Conditions          ☐ OfficeMax Vendor Item          ☐ Site Enhancement
☐ Loss Prevention Request          ☐ OfficeMax Store Request          ☐ Bid Alternate
                                                                                       Implementation
☐ Permit Fee          ☐ OfficeMax Bulletin # _____          ☐ Credit to OfficeMax

**Description of reason for Change Request:**

_____
_____
_____
_____

*This Change Request is not approved until the OfficeMax Construction Manager has issued a CONSTRUCTION PURCHASE ORDER document approving the change requested herein.*

The original contract/change order total was: _____
Net change by previously authorized change orders: _____
The contract/change order total prior to this Change Order Request: _____
If this request is approved, the new contract sum/change order total will be: _____
Pending change orders/not yet approved by OfficeMax: _____

*For OfficeMax Use Only:*

**CONSTRUCTION PURCHASE ORDER #** [_____]

**OfficeMax** New Store Outline Specifications

# Appendix "D" – General Contractors Warranty
## of Workmanship and Materials

Project:    OfficeMax Store No. _____

General
Contractor: _____
_____

Address: _____
_____
_____

_____
_____
_____

Warranty Period: _____ to _____ (One Calendar Year)

Having completed all work as per the contract agreement in a first class manner in strict accordance with the drawings and specification, the undersigned Contractor hereby warrants that all workmanship and materials shall remain in a first class condition for a period of one year from the date of substantial completion as shown above.

The Contractor shall be responsible for performing all warranty repairs (including labor and material) and securing replacements related to failures of equipment or materials that it has furnished and/or installed free of cost to OfficeMax, Inc. and the Landlord during the warranty period.

The Contractor shall perform all inspections and reviews related to any breakdowns or failures in performance related to workmanship and materials free of cost to OfficeMax, Inc. and the Landlord during the warranty period.

For work which may be required but is not covered by the warranty, the Contractor shall perform such work under direct contract with OfficeMax, Inc. maintaining the following cost schedule during the warranty period:

| Sub-trade / Subcontractor | Hourly Rate (x) # Hours | | (=) subtotal | (+) % Material Markup (+) % O & P | | (=) Total |
|---|---|---|---|---|---|---|
| | Rate | Hours | | Markup | O & P | |
| Plumbing: | $ | # | | % | % | |
| Electrical: | $ | # | | % | % | |
| HVAC: | $ | # | | % | % | |
| Carpentry: | $ | # | | % | % | |
| Sprinkler: | $ | # | | % | % | |
| Other: | $ | # | | % | % | |

The undersigned hereby agrees to all terms of this written warranty and shall maintain its content to the fullest in good faith.

_____          _____
General Contractor                  Date

_____
Notary Public                       Notary Seal

# Appendix "E" – Subcontractors Warranty
## of Workmanship and Materials

Project:    OfficeMax Store No. _____          Subtrade: _____

Address: _____          Subcontractor: _____

         _____          _____

         _____          _____

                              _____

Warranty Period: _____ to _____ (One Calendar Year)

Having completed all work as per the contract agreement in a first class manner in strict accordance with the drawings and specification, the undersigned Subcontractor hereby warrants that all workmanship and materials shall remain in a first class condition for a period of one year from the date of substantial completion as shown above.

The Subcontractor shall be responsible for performing all warranty repairs (including labor and material) and securing replacements related to failures of equipment or materials that it has furnished and/or installed free of cost to OfficeMax, Inc., the General Contractor and the Landlord during the warranty period.

The Subcontractor shall perform all inspections and reviews related to any breakdowns or failures in performance related to workmanship and materials free of cost to OfficeMax, Inc., the General Contractor and the Landlord during the warranty period.

If the Subcontractor shall fail to commence to comply with the above within 48 hours of verbal notification for emergency calls or within 30 days of written notification for non-emergency calls, or fail to pursue such compliance with diligence, the Subcontractor does hereby authorize OfficeMax, Inc., the General Contractor or the Landlord to proceed to have the defects repaired and made good at the Subcontractor's sole expense.

For work which may be required but is not covered by the warranty, the Subcontractor shall perform such work under direct contract with OfficeMax, Inc. maintaining the following cost schedule during the warranty period:

Hourly rate: _____
Material Mark-up: _____

The undersigned hereby agrees to all terms of this written warranty and shall maintain its content to the fullest in good faith.

_____          _____
Subcontractor                                              Date

_____
Notary Public                                              Notary Seal

# Appendix "F" — Work Request Form
# for Warranty Repairs

**Forward Warranty repair requests to:**

(This section to be filled in by the landlord providing the contact information for landlord's property manager)

| | |
|---|---|
| Company: | |
| Attention: | |
| Address: | |
| | |
| Telephone: | Fax: |
| E-mail: | |

**Description of requested repair:**

_____

_____

_____

_____

_____

<u>Type of repair</u>:   ☐  Emergency repair (same day service required)
                      ☐  Standard repair (3 – 5 business days)

<u>Scheduling of repair</u>:  Contractor is to contact the Store Associate listed below or the Manager on Duty to schedule the repair work.  Repairs which will affect the store's ability to conduct business or pose a potential hazard to store associates or customers must be performed before or after hours during which the store is open to the public.

<u>Repairs not covered by the Warranty</u>:  If it is determined that the requested repair is not covered by the terms of the Warranty, the contractor shall notify the Facilities Coordinator listed below while at the store and prior to any work being performed.  At that time, the contractor shall provide an estimate for the requested repair. Facilities will either immediately approve the repair work or direct the repair to an OfficeMax approved National Facilities Vendor.

Store Contact: _____     Telephone: _____

Facilities Coordinator: _____     Telephone: _____

### Store Manager's Confirmation

I acknowledge that the above work has been completed to my satisfaction.

Store Manager: _____

Date: _____

### Store Stamp

## Appendix "G" — OfficeMax Construction Vendor Survey

OfficeMax Store Number: _____

OfficeMax Manager: _____

Constr _____

City/State of Store/Projec _____

General Contractor: _____

Please circle the rating for each of the categories below from "1" = Excellent to "5" = Unacceptable.

- **Receiving** rating is based on quality of materials received, completeness of the order, and packaging of the materials.
- **Installation** rating is based on quality of service provided, professionalism of the installer, and ability to meet the construction schedule.
- **Customer Service** rating is based on the vendor's responsiveness to communications and follow-through on issues.

| Vendor Item | Receiving | Installation | Customer Service |
|---|---|---|---|
| | Excellent----Unacceptable | Excellent----Unacceptable | Excellent----Unacceptable |
| Electrical Distribution Center (EDC) | 1  2  3  4  5 | ██████████ | 1  2  3  4  5 |
| Automatic Doors | 1  2  3  4  5 | 1  2  3  4  5 | 1  2  3  4  5 |
| Door Hardware | 1  2  3  4  5 | ██████████ | 1  2  3  4  5 |
| Millwork | 1  2  3  4  5 | ██████████ | 1  2  3  4  5 |
| Stainless Steel Accessories | 1  2  3  4  5 | ██████████ | 1  2  3  4  5 |
| Carpet | 1  2  3  4  5 | ██████████ | 1  2  3  4  5 |
| Lighting Fixtures and Electrical Accessories | 1  2  3  4  5 | ██████████ | 1  2  3  4  5 |
| HVAC Equipment | 1  2  3  4  5 | ██████████ | 1  2  3  4  5 |
| Bailer | 1  2  3  4  5 | 1  2  3  4  5 | 1  2  3  4  5 |
| Dock Equipment | 1  2  3  4  5 | 1  2  3  4  5 | 1  2  3  4  5 |
| Roll-up Security Grilles | 1  2  3  4  5 | 1  2  3  4  5 | 1  2  3  4  5 |
| Lockers | 1  2  3  4  5 | ██████████ | 1  2  3  4  5 |
| Telecommunications System | 1  2  3  4  5 | 1  2  3  4  5 | 1  2  3  4  5 |
| Energy Management System | 1  2  3  4  5 | 1  2  3  4  5 | 1  2  3  4  5 |
| Data Cabling | 1  2  3  4  5 | 1  2  3  4  5 | 1  2  3  4  5 |

**OfficeMax** New Store Outline Specifications

Additional
Comments:

**EXHIBIT C-1**

**Landlord's Construction Schedule**

**EXHIBIT C-2**

**Building Elevation(s)**

Case 3:08-cv-03647-MHP     Document 1-5     Filed 07/30/2008     Page 17 of 43
Exhibit C2 (part 1 of 3)
(OfficeMax Prototype Plan for
Building Elevation Signage)



STOREFRONT DESIGN TO BE COORDINATED WITH RON KOSS @ OFFICEMAX (216) 471-6403 PRIOR TO INITIAL DESIGN PHASE.

FRONT ELEVATION
N.T.S.




# OfficeMax 8.0.C

JOB NAME
CITY, STATE, ZIP
STORE #

HERSCHMAN
ARCHITECTS
INCORPORATED

2 5 0 0 1
EMERY ROAD, SUITE 400
CLEVELAND, OHIO
4 4 1 2 8
PHONE 216-223-3200
FAX
216-223-3210
E-MAIL
herschmanarchitects.com

ELEV-1

Date: 05-02-05
Drawn By: HA
Proj. No. T.B.A.

# OfficeMax

## LETTER DETAIL
SCALE 3/32" = 1'-0"

**OfficeMax**
- INDIVIDUAL CHANNEL LETTERS
- MOUNTED FLUSH TO BUILDING
- INTERNALLY ILLUMINATED w/ YELLOW LED LIGHTS
- 8 ½" DEEP .050" THICK, BLACK ALUMINUM RETURNS
- WHITE ALUMALITE BACKS
- CAULKED INSIDE & OUT

- 2" BLACK TRIM CAP
- WHITE PLEX FACES w/ 3M DOU FILM APPLIED TO FIRST SURFACE- BLACK DURING THE DAY, WHITE AT NIGHT
- MOUNTED TO WALL w/ 3/8" x 12" STUDS
- EXTERIOR SET / WEEP HOLES
- UL LISTED

**72"**
**49'-5/8"**

## STOREFRONT ELEVATION
SCALE 1/16" = 1'-0"





## CHANNEL LETTERS
SCALE: 3/16" = 1'-0"

**Print & Document Services**

SQUARE FEET: 21.21

**ONE (1) SET NON-ILLUMINATED LETTERS**
- PIN-MOUNTED TO BUILDING w/ NON-CORROSIVE ALUMINUM HARDWARE
- 12" LETTERS ARE PAINTED BLACK
- BLACK, CYAN, MAGENTA & YELLOW
- PAINTED SQUARES ON 24" LOGO BOX
- EXTERIOR SET

**2'-35/8"**
**24"**
**15'-0"**
**12"**

---

**north american signs**

| SALES: LAURIE LLOYD | DWG # OM Pt-02.cdr | PM FILE: | LOCATION: |
|---|---|---|---|
| ACC. M: LAURIE LLOYD | REVISION: | | **OfficeMax** |
| ART: RLP 5.03.06 | | | |

NOTE: IF ANY FIELD MEASUREMENTS DIFFER FROM THOSE ON THIS PRINT PLEASE NOTIFY NORTH AMERICAN SIGNS @ (800) 348-5000

EXHIBIT C-2 (part 3 pt 9)
(OfficeMax Prototype Plan for
Building Elevation Signage)

**north american signs**

NOTE: IF ANY FIELD MEASUREMENTS DIFFER FROM THOSE ON THIS PRINT PLEASE NOTIFY NORTH AMERICAN SIGNS @ (800) 348-5000

| SALES: | LAURIE LLOYD | DWG #: Prototype Pkg.cdr | |
| ACC.M.: | LAURIE LLOYD | REVISION: | |
| ART: | RLP   12.23.04 | PM FILE: | |

**OfficeMax**

LOCATION:

---

**BANNER DETAIL**
SCALE ½" = 1'-0"

4'-0"
7'   4½"   11½"

Call Toll Free
1-888-OMAX-JOB

**OfficeMax**

8'-0"

**NOW HIRING**

6 7/8"   6 7/8"

SIDE 2

---

POSTS 18" FROM
TOP OF SIGN

9'-0"
5'-0"   4'-0"

**COMING SOON**
**OfficeMax**

8'-0"

11½"   9 3/8"

(3) - 3/8" WOOD
LAGS PER POST

TWO (2) 4" x 4" x 10' WOOD
POSTS (UNPAINTED)

POSTS TO BE 30"
BELOW GROUND LEVEL

SIDE 1

---

**BANNER MOUNTING DETAIL**
N.T.S.

(10) - ½" FENDER
WASHERS

(10) - #8-1" WOOD
SCREWS

PLYWOOD

BANNER

---

## CONSTRUCTION SITE 'COMING SOON'
## DOUBLE FACE BANNER DETAIL

**'COMING SOON' BANNER**
• BANNER BACKGROUND TO BE YELLOW #3630-015
• 'COMING SOON' TO BE RED #3630-73
• OFFICEMAX TO BE BLACK

**'NOW HIRING' BANNER**
• BANNER BACKGROUND TO BE YELLOW #3630-015
• 'COMING SOON' TO BE BLACK w/ 7/64" BLACK OUTLINE
& BLACK TRADEMARK
• '1-800-OMAX-JOB' TO BE RED #3630-73
• 'NOW HIRING' TO WHITE ON RED #3630-73 BKGRD
• CALL TOLL FREE TO BE RED #3630-73

**CONSTRUCTION**
• GENERAL CONTRACTOR TO SUPPLY TWO (2)
4' x 4' x 10' WOOD POSTS
PLUS ONE SHEET OF 4' x 8' x ½" CONSTRUCTION
GRADE EXTERIOR PLYWOOD
• G.C. TO PURCHASE 'OFFICEMAX' BANNER &
ATTACHMENT KIT FROM 'OFFICEMAX APPROVED
SIGN VENDOR
• G.C. TO INSTALL IN GROUND & ATTACH BANNER
w/ TEN (10) #8 - 1" WOOD SCREWS & TEN (10) -
½" FENDER WASHERS

NOTE: BACK BRACING TO SUPPORT POST MAY BE
REQUIRED DUE TO LOCAL CONDITIONS

**EXHIBIT C-3**

**Pylon Sign(s)**

**EXHIBIT C-3 (part 1 of 2)**
(OfficeMax Prototype Pylon)

**north american signs**

NOTE: IF ANY FIELD MEASUREMENTS DIFFER FROM THOSE ON THIS PRINT PLEASE NOTIFY NORTH AMERICAN SIGNS @ (800) 348-8020

| SALES: LAURIE LLOYD | DWG #: Prototype Pkg.cdr | PM FILE: | LOCATION: |
| ACC. M.: LAURIE LLOYD | REVISION: HBY 02.01.05 | | |
| ART: RLP 12.23.04 | | | **OfficeMax** |

**PYLON PANEL DETAIL**
NOT TO SCALE

- 3M 3630-015 YELLOW BACKGROUND
- 3M BLACK VINYL 'OFFICEMAX'

- PANEL SIZE TO BE COORDINATED
  w/ GROUND SIGN DESIGN



**EXHIBIT C-3** (part 2 of 2)
(OfficeMax Prototype Pylon)



**BANNER DETAIL**
SCALE ½" = 1'-0"

**BUILDING DOUBLE FACE**
**BANNER DETAIL**

SIDE 1

- BANNER BACKGROUND TO BE YELLOW #3630-015
- 'OFFICEMAX' TO BE BLACK w/ 7/64" BLACK OUTLINE & BLACK TRADEMARK
- '1-800-OMAXJOB' TO BE RED #3630-73
- 'NOW HIRING' TO WHITE ON RED #3630-73 BACKGROUND
- 'CALL TOLL FREE' TO BE RED #3630-73

SIDE 2

- BANNER BACKGROUND TO BE YELLOW #3630-015
- 'OPEN' TO BE RED #3630-73
- 'LOW PRICES GUARANTEED' TO BE BLACK

SALES: LAURIE LLOYD
ACC. M: LAURIE LLOYD
ART: RLP    12.23.04

DWG # Prototype Pkg.cdr
REVISION:
PM FILE:

LOCATION:

NOTE: IF ANY FIELD MEASUREMENTS DIFFER FROM THOSE ON THIS PRINT PLEASE NOTIFY NORTH AMERICAN SIGNS @ (920) 348-5000

**OfficeMax**

north american signs

## EXHIBIT D

### Permitted Title Exceptions

1.  Oil, gas, hydrocarbon substances and mineral rights as recorded in the deed from Zita Corporation, a California corporation, to Fred Ferrando and Florence Ferrando, his wife, as to an undivided ½ interest, in joint tenancy, and Arthur "Buzz" Haskins and Bonnie M. Haskins, his wife, as to an undivided ½ interest in joint tenancy dated November 29, 1965 and recorded December 29, 1965 in Book 5086 Official Records of San Mateo County, Page 741.

2.  Right of Way as granted in Deed from Cabot, Cabot & Forbes, San Mateo Properties, Inc., a California corporation to Pacific Gas and Electric Company, a California corporation, dated July 18, 1968 and recorded August 29, 1968 in Book 5519 Official Records of San Mateo County, Page 117.

3.  Covenants, Conditions and Restrictions executed by Cabot, Cabot & Forbes, San Mateo Properties, Inc., a California corporation, dated March 5, 1970 and recorded March 19, 1970 in Book 5760 Official Records of San Mateo County, Page 232.

4.  Certificate of Approval executed by Serra Center Associates, a limited partnership, dated October 31, 1974 and recorded December 5, 1974 in Book 6747 Official Records of San Mateo County, Page 261.

5.  Second Certificate of Approval executed by Serra Center Associates, a limited partnership, dated June 2, 1975 and recorded June 3, 1975 in Book 6857 Official Records of San Mateo County, Page 715.

6.  Covenants, Conditions and Restrictions in Deed from Cabot, Cabot & Forbes, San Mateo Properties, Inc., a California corporation, to Lucky Stores, Inc., a California corporation, dated March 24, 1970 and recorded March 31, 1970 in Book 5764 Official Records of San Mateo County, Page 311.

7.  Consent executed by Reeve Investment Co., a California corporation, dated August 22, 1974 and recorded December 5, 1974 in Book 6747 Official Records of San Mateo County, Page 266.

8.  Agreement Concerning Rights to Water by and between Cabot, Cabot & Forbes, San Mateo Properties, Inc., a California corporation and Lucky Stores, Inc. dated March 24, 1970 and recorded March 31, 1970 in Book 5764 Official Records of San Mateo County, Page 328.

9.  Right of Way granted in Deed from Serra Center Associates, a limited partnership, to The Pacific Telephone and Telegraph Company, dated July 5, 1973 and recorded July 11, 1973 in Book 6428 Official Records of San Mateo County, Page 45.

10. Right of Way granted in Deed from Louis A. Petri and Flori C. Petri, husband and wife to The Pacific Telephone and Telegraph Company, dated January 19, 1976 and recorded March 15, 1976 in Book 7071 Official Records of San Mateo County, Page 716.

11. Right of Way granted in Deed from Louis A. Petri and Flori C. Petri, husband and wife to The Pacific Telephone and Telegraph Company, dated January 25, 1977 and recorded March 10, 1977 in Book 7405 Official Records of San Mateo County, Page 262.

12. Assignment of Lease from International Settlement Holding Corporation, a California corporation, as to an undivided 50% interest and Elmer P. Gavello and Betty A. Gavello, husband and wife, as to an undivided 50% interest, all as tenants in common, to Massachusetts Casualty Insurance Company, a Massachusetts corporation, dated September 28, 1988 and recorded September 30, 1988 as document number 88131385, Official Records of San Mateo County.

13. Lease by and between Serra Center Associates, a California limited partnership and Cost-Plus, Inc., a California corporation, dated August 28, 1974 and recorded June 3, 1975 in Book 6857 Official Records of San Mateo County, Page 720.

14. Assignment of Lease from Serra Center Associates, a California limited partnership to Louis A. Petri and Flori C. Petri, husband and wife, as to an undivided ¾ interest, and Patricia Petri Spengler, as to an undivided ¼ interest, recorded June 11, 1975 in Book 6864, Official Records of San Mateo County, Page 720.

15. Assignment of Lease executed by Petri Estate Company and Patricia Petri Hudson, recorded September 30, 1988 as instrument number 88131383 Official Records of San Mateo County.

16. Subordination Agreement by International Settlement Holding Corporation, a California corporation, and Elmer P. Gavello, as tenants in common and Cost Plus, Inc., a California corporation and Massachusetts Casualty Insurance Company, a Massachusetts corporation, dated August 31, 1988, recorded September 30, 1988 as instrument number 881313863 Official Records of San Mateo County.

17. Deed of Trust to Secure Indebtedness by and between International Settlement Holding Corporation, a California corporation, as to an undivided 50% interest and Elmer P. Gavello and Betty A. Gavello, husband and wife, as community property, to an undivided 50% interest, to First Interstate Mortgage Company, a California corporation, to benefit Massachusetts Casualty Insurance Company, a Massachusetts corporation, dated September 28, 1988, recorded September 30, 1988 as instrument number 88131384 Official Records of San Mateo County.

**EXHIBIT E**

**SNDA**

## SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

This **SUBORDINATION, NONDISTURBANCE, AND ATTORNMENT AGREEMENT** (this "Agreement") is entered into as of _____, 200__ (the "Effective Date"), between, _____ whose address is _____ ("Lender"), and OfficeMax North America, Inc., an Ohio corporation, whose address is 263 Shuman Blvd., Naperville, Illinois 60563 ("Tenant"), with reference to the following facts:

A. _____, whose address is _____ ("Landlord"), owns the real property located at _____, such real property, including all buildings, improvements, structures and fixtures located thereon ("Landlord's Premises"), as more particularly described in Schedule A.

B. Lender has made a loan to Landlord in the original principal amount of $_____ (the "Loan").

C. To secure the Loan, Landlord has encumbered Landlord's Premises by entering into that certain Mortgage Deed and Security Agreement dated _____, in favor of Lender (as amended, increased, renewed, extended, spread, consolidated, severed, restated, or otherwise changed from time to time, the "Mortgage") recorded on _____, in Volume _____, Page _____, in the Official Records of the County of _____, State of _____ (the "Land Records").

D. Pursuant to a Lease dated as of _____, (the "Lease"), Landlord demised to Tenant a portion of Landlord's Premises ("Tenant's Premises"). Tenant's Premises are commonly known as OfficeMax #_____.

E. A Memorandum of the Lease is to be recorded in the Land Records prior to the recording of this Agreement.

F. Tenant and Lender desire to agree upon the relative priorities of their interests in Landlord's Premises and their rights and obligations if certain events occur.

**NOW, THEREFORE,** for good and sufficient consideration, Tenant and Lender agree:

1. **Definitions.**

The following terms shall have the following meanings for purposes of this Agreement.

Page 1 of 11

1.1    *Foreclosure Event*. A "*Foreclosure Event*" means:  (a) foreclosure under the Mortgage; (b) any other exercise by Lender of rights and remedies (whether under the Mortgage or under applicable law, including bankruptcy law) as holder of the Loan and/or the Mortgage, as a result of which Successor Landlord becomes owner of Landlord's Premises; or (c) delivery by Landlord to Lender (or its designee or nominee) of a deed or other conveyance of Landlord's interest in Landlord's Premises in lieu of any of the foregoing.

1.2    *Former Landlord*. A "*Former Landlord*" means Landlord and any other party that was landlord under the Lease at any time before the occurrence of any attornment under this Agreement.

1.3    *Offset Right*. An "*Offset Right*" means any right or alleged right of Tenant to any offset, defense (other than an affirmative defense or one arising from actual payment and performance, which payment and performance would bind a Successor Landlord pursuant to this Agreement), claim, counterclaim, reduction, deduction, or abatement against Tenant's payment of Rent or performance of Tenant's other obligations under the Lease, arising (whether under the Lease or other applicable law) from Landlord's breach or default under the Lease.

1.4    *Rent*. The "*Rent*" means any fixed rent, base rent or additional rent under the Lease.

1.5    *Successor Landlord*. A "*Successor Landlord*" means any party that becomes owner of Landlord's Premises as the result of a Foreclosure Event.

1.6    *Termination Right*. A "*Termination Right*" means any right of Tenant to cancel or terminate the Lease or to claim a partial or total eviction arising (whether under the Lease or under applicable law) from Landlord's breach or default under the Lease.

## 2.    Subordination.

The Lease shall be, and shall at all times remain, subject and subordinate to the Mortgage, the lien imposed by the Mortgage, and all advances made under the Mortgage.

## 3.    Nondisturbance, Recognition and Attornment.

3.1    *No Exercise of Mortgage Remedies Against Tenant*. So long as the Lease has not been terminated on account of Tenant's default that has continued beyond applicable cure periods (an "Event of Default"), Lender shall not name or join Tenant as a defendant in any exercise of Lender's rights and remedies arising upon a default under the Mortgage unless applicable law requires Tenant to be made a party thereto as a condition to proceeding against Landlord or prosecuting such rights and remedies. In the latter case, Lender may join Tenant as a defendant in such action only for such purpose and not to terminate the Lease or otherwise adversely affect Tenant's rights under the Lease or this Agreement in such action. If Lender joins Tenant in such

action, Landlord, by executing the Consent hereinafter set forth, agrees to indemnify, defend and hold Tenant harmless from and against any loss, cost or expense incurred or suffered by Tenant, including without limitation, legal fees, in being a party to or arising from such action.

3.2    *Nondisturbance and Attornment*.  If the Lease has not been terminated on account of an Event of Default by Tenant, then, when Successor Landlord takes title to Landlord's Premises:  (a) Successor Landlord shall not terminate or disturb Tenant's possession or quiet enjoyment of Tenant's Premises or rights under the Lease, except in accordance with the terms of the Lease and this Agreement; (b) Successor Landlord shall be bound to Tenant under all the terms and conditions of the Lease (except as provided in this Agreement); (c) Tenant shall recognize and attorn to Successor Landlord as Tenant's direct landlord under the Lease as affected by this Agreement; and (d) the Lease shall continue in full force and effect as a direct lease, in accordance with its terms (except as provided in this Agreement), between Successor Landlord and Tenant.

3.3    *Further Documentation*.  The provisions of this Article shall be effective and self-operative without any need for Successor Landlord or Tenant to execute any further documents. Tenant and Successor Landlord shall, however, confirm the provisions of this Article in writing upon request by either of them.

3.4    *Insurance and Condemnation Proceeds*.   Lender agrees that notwithstanding anything to the contrary in the Mortgage, and provided the Lease has not been terminated on account of an Event of Default by Tenant, all insurance proceeds and condemnation awards relating to the Tenant's Premises or the Landlord's Premises shall be applicable in accordance with and as otherwise provided in the Lease.

3.5 *Consent to Lease*.  Lender hereby consents to the Lease and all of the terms and conditions thereof.

## 4.    **Protection of Successor Landlord.**

Notwithstanding anything to the contrary in this Lease or the Mortgage, Successor Landlord shall not be liable for or bound by any of the following matters:

4.1    *Claims Against Former Landlord*.  Any Offset Right that Tenant may have against any Former Landlord relating to any event or occurrence before the date of attornment, including any claim for damages of any kind whatsoever as the result of any breach by Former Landlord that occurred before the date of attornment.  (The foregoing shall not limit either (a) Tenant's right to exercise against Successor Landlord any Offset Right otherwise available to Tenant because of events occurring after the date of attornment or (b) Successor Landlord's obligation to perform the obligations of Landlord under the Lease from and after the date of attornment or to correct any conditions that existed as of the date of attornment and violate Successor Landlord's obligation as landlord under the Lease.)

Page 3 of 11

4.2    *Prepayments.*   Any payment of Rent that Tenant may have made to Former Landlord more than thirty days before the date such Rent was first due and payable under the Lease with respect to any period after the date of attornment other than, and only to the extent that, the Lease expressly required such a prepayment.

4.3    *Payment; Security Deposit.*   Any obligation: (a) to pay Tenant any sum(s) that any Former Landlord owed to Tenant or (b) with respect to any security deposited with Former Landlord, unless such security was actually delivered to Lender.

4.4    *Modification, Amendment, or Waiver.*   Any modification or amendment of the Lease, or any waiver of any terms of the Lease, made without Lender's written consent which materially and adversely affects Lender's rights, duties or obligations under this Agreement.

4.5    *Surrender, Etc.*   Any consensual or negotiated surrender, cancellation, or termination of the Lease, in whole or in part, agreed upon between Landlord and Tenant, unless effected unilaterally by Tenant pursuant to the express terms of the Lease or which results because of a default by Landlord under the Lease.

5.    **Exculpation of Successor Landlord.**

Notwithstanding anything to the contrary in this Agreement or the Lease, upon any attornment pursuant to this Agreement the Lease shall be deemed to have been automatically amended to provide that Successor Landlord's obligations and liability under the Lease shall never extend beyond Successor Landlord's (or its successors' or assigns') interest, if any, in Landlord's Premises from time to time, including insurance and condemnation proceeds, Successor Landlord's interest in the Lease, the rents and other income received or receivable from the ownership or operation of Landlord's Premises, and the proceeds from any sale or other disposition of Landlord's Premises by Successor Landlord (collectively, *"Successor Landlord's Interest"*).   Tenant shall look exclusively to Successor Landlord's Interest (or that of its successors and assigns) for payment or discharge of any obligations of Successor Landlord under the Lease as affected by this Agreement.   If Tenant obtains any money judgment against Successor Landlord with respect to the Lease or the relationship between Successor Landlord and Tenant, then Tenant shall look solely to Successor Landlord's Interest (or that of its successors and assigns) to collect such judgment.   Tenant shall not collect or attempt to collect any such judgment out of any other assets of Successor Landlord.

6.    **Lender's Right to Cure.**

6.1    *Notice to Lender.*   Notwithstanding anything to the contrary in the Lease or this Agreement or the Lease, before exercising any Termination Right or Offset Right, **and provided Tenant received a fully executed counterpart of this Agreement containing Lender's correct notice address,** Tenant shall provide Lender with notice of the breach or default by

Page 4 of 11

Landlord giving rise to same (the "*Default Notice*") and, thereafter, the opportunity to cure such breach or default as provided for below.

6.2    *Lender's Cure Period*.  After Lender receives a Default Notice, Lender shall have a period of thirty days under the Lease in which to cure the breach or default by Landlord. Lender shall have no obligation to cure (and shall have no liability or obligation for not curing) any breach or default by Landlord, except to the extent that Lender agrees or undertakes otherwise in writing.  The foregoing shall not limit Tenant's right to exercise self help remedies to cure a default by Landlord under the Lease if permitted by the Lease or if necessary to prevent imminent danger of damage or injury to persons or property or if necessary to permit the full use and occupancy by Tenant of the Tenant's Premises.

6.3    *Extended Cure Period*.  In addition, as to any breach or default by Landlord the cure of which requires possession and control of Landlord's Premises, provided only that Lender undertakes to Tenant by written notice to Tenant within thirty days after receipt of the Default Notice to exercise reasonable efforts to cure or cause to be cured by a receiver such breach or default within the period permitted by this paragraph, Lender's cure period shall continue for such additional time not exceeding thirty (30) days (the "*Extended Cure Period*") as Lender may reasonably require to either (a) obtain possession and control of Landlord's Premises and thereafter cure the breach or default with reasonable diligence and continuity or (b) obtain the appointment of a receiver and give such receiver a reasonable period of time in which to cure the default.

7.    **Miscellaneous.**

7.1    *Notices*.  All notices or other communications required or permitted under this Agreement shall be in writing and given by certified mail (return receipt requested) or by nationally recognized overnight courier service that regularly maintains records of items delivered.  Notices shall be effective the next business day after being sent by overnight courier service, and three business days after being sent by certified mail (return receipt requested). Unless and until notice of a change of address is given under this Agreement, notices or other communications shall be given to Lender and Tenant, respectively, at the following address:

Lender:

with a copy to:

Page 5 of 11

| Tenant: | OfficeMax North America, Inc. |
|---|---|
| | 263 Shuman Blvd. |
| | Naperville, IL 60563 |
| | Attention: Vice President, Real Estate |

| with a copy to: | OfficeMax North America, Inc. |
|---|---|
| | 263 Shuman Blvd. |
| | Naperville, IL 60563 |
| | Attention: General Counsel |

7.2    *Successors and Assigns.*  This Agreement shall bind and benefit the parties their successors and assigns, any Successor Landlord, and its successors and assigns.  If Lender assigns the Mortgage, then upon delivery to Tenant of written notice thereof accompanied by the assignee's written assumption of all obligations under this Agreement, all liability of the assignor shall terminate for obligations thereafter accruing under this Agreement.

7.3    *Entire Agreement.*  This Agreement constitutes the entire agreement between Lender and Tenant regarding the subordination of the Lease to the Mortgage and the rights and obligations of Tenant and Lender as to the subject matter of this Agreement.

7.4    *Interaction with Lease and with Mortgage.*  If this Agreement conflicts with the Lease, then this Agreement shall govern as between the parties and any Successor Landlord, including upon any attornment pursuant to this Agreement.  This Agreement supersedes, and constitutes full compliance with, any provisions in the Lease that provide for subordination of the Lease to, or for delivery of nondisturbance agreements by the holder of this Mortgage.  Lender confirms that Lender has consented to Landlord's entering into the Lease.

7.5    *Lender's Rights and Obligations.*  Except as expressly provided for in this Agreement, Lender shall have no obligation to Tenant with respect to the Lease.

7.6    *Interpretation; Governing Law.*  The interpretation, validity and enforcement of this Agreement shall be governed by and construed under the internal laws of the State of _____, including its principles of conflict of laws.

7.7    *Amendments.*  This Agreement may be amended, discharged or terminated, or any of its provisions waived, only by a written instrument executed by the party to be charged.

7.8    *Execution.*  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

7.9    *Lender's Representation.*  Lender represents that Lender has full authority to enter into this Agreement, that the execution hereof has been duly authorized by its Board of Directors and Lender's entry into this Agreement has been duly authorized by all necessary actions.  Lender

Page 6 of 11

agrees to keep a copy of this Agreement in its permanent mortgage records with respect to the Loan.


THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK

**IN WITNESS WHEREOF,** this Agreement has been duly executed by Lender and Tenant as of the Effective Date.

WITNESS:                                          LENDER:


_____          By: _____

_____          Its: _____
Print Name


_____

_____
Print Name


WITNESS:                                          TENANT:

                                                  OfficeMax North America, Inc., an Ohio
                                                  Corporation

_____          By: _____

_____               Greg A. Darus
Print Name                                Its:   Vice President of Real Estate


_____

_____
Print Name


Attachments

    Acknowledgments
    Landlord's Consent
    Schedule A = Description of Landlord's Premises

OM #«Storenumber» «Location»
12/01/06 3:39 PM

ACKNOWLEDGMENTS

STATE OF _____ )
                                                                    )        ss
COUNTY OF _____ )

On the _____ day of _____, 200__, before me, the undersigned notary, personally came _____, to me known, who, being by me duly sworn, did depose and say that he/she is the _____, of the corporation described in and which executed the foregoing instrument; and that he/she signed his/her name thereto by authority of the board of directors and said corporation and that the execution thereof is his/her free act and deed individually and as officer of said corporation and the free act and deed of said corporation.

_____
Notary Public

STATE OF ILLNIOIS          )
                                            )        ss
COUNTY OF DUPAGE      )

On the _____ day of _____, 200__, before me, the undersigned notary, personally came Greg A. Darus, to me known, who, being by me duly sworn, did depose and say that he is the Vice President of Real Estate of OfficeMax North America, Inc., of the corporation described in and which executed the foregoing instrument; and that he signed his name thereto by authority of the board of directors and said corporation and that the execution thereof is his free act and deed individually and as officer of said corporation and the free act and deed of said corporation.

_____
Notary Public

Page 9 of 11

## LANDLORD'S CONSENT

Landlord consents and agrees to the foregoing Agreement (including, without limitation, the provisions of Section 3.1), which was entered into at Landlord's request. The foregoing Agreement shall not alter, waive or diminish any of Landlord's obligations under the Mortgage or the Lease. The above Agreement discharges any obligations of Lender under the Mortgage and related loan documents to enter into a nondisturbance agreement with Tenant and the obligations of Tenant to enter into a subordination agreement with Lender.

WITNESSES:                                LANDLORD:

_____          By: _____

_____          Its: _____
Print Name

_____          Date: _____

_____
Print Name

OM #«Storenumber» «Location»
12/01/06 3:39 PM

# SCHEDULE A

### Description of Landlord's Premises

### (To be attached by Landlord)

SOLICITORS, 34255, 91001, 3503.1, OfficeMax Form SNDA 7-19-03

Page 11 of 11

**EXHIBIT F**

**Commencement Date Letter**

RE:    Lease dated _____, 2006, by and between Gary Gavello and International Holding Settlement Corporation ("Landlord") and OfficeMax North America, Inc. ("Tenant") at 785 Serramonte Boulevard, Colma, California ("Property")

Landlord and Tenant confirm that the Commencement Date of the Lease is _____, 20__, and the expiration date of the Initial Term is _____, 2_____.

Landlord and Tenant have executed this Commencement Letter as of the dates set forth below.

**"LANDLORD"**

_____
Gary Gavello

Date:_____

INTERNATIONAL HOLDING SETTLEMENT
CORPORATION

By:_____

Title:_____

Date:_____

**"TENANT"**

OFFICEMAX NORTH AMERICA, INC.

By:_____

Title:_____
Date:_____

## EXHIBIT G

## PROHIBITED USES

1. <u>Prohibited Uses</u>. The sale of office, home office, school or business products, computers and computer products, office, home office, school or business supplies or equipment; office furniture; mobile or portable telephones or pagers; or electronics (including by way of example those businesses operated by Office Depot, Staples, Office Shop Warehouse, Mardel Christian Office and Education Supply Store, Mail Boxes etc., and Workplace); or for use as a business support center, copy center or "Kinko" type of operation.

## EXHIBIT H

### ELECTRICAL SERVICE TO DEMISED PREMISES

Project Location:    785 Serramonte Blvd., Colma, CA

Subject:    Existing electrical service observation.

Date:    Saturday, November 11, 2006.

A.    Transformer:    There is a pad mount transformer located at front of the building in the landscape area near the gas meter.

B.    Main Switch Board: The main switch board is located in the electrical room accessible from the inside of the loading dock area on east side of the building.

The Main service is rated at 800 amps, 120-208 volt, 3 phase, 4 wire. Single meter.

The main distribution board has fused disconnect switches as follows.

|  |  |  |  |
|---|---|---|---|
| 1. | 60A/3p --- | AC-3 |  |
| 2. | 60A/30 --- | AC-5 |  |
| 3. | 60A/3p --- | AC-2 | (no fuses) |
| 4. | 60A/3p --- | AC-4 |  |
| 5. | 100A/3p | --- | AC-1 |
| 6. | 100A/3p | --- | Panel "C" (90A fuses) |
| 7. | 100A/3p | --- | Panel "L" |
| 8. | 100A/3p | --- | AC |
| 9. | 200A/3p | --- | Panel "B" |
| 10. | 200A/3p | --- | Panel "A" |

C.    Distribution Panel Boards

1.    Panel "A" in electrical room rated at 225A, 120-208 volt, 3 phase, 4 wire, 42 spaces, feeding most sales area lighting.

2.    Panel "B" in electrical room rated at 225A, 120-208 volt, 3 phase, 4 wire, 42 spaces, feeding all receptacles, floor duct outlets and miscellaneous equipment.

3.    Panel "C" in electrical room rated at 100A, 120-208 volt, 3 phase, 4 wire, 24 spaces, feeding all registers and break room.

4.    Panel "L" in electrical room rated at 100A, 120-208 volt, 3 phase, 4 wire, 30 spaces, feeding all exterior signs and parking lot lighting through time clock and lighting contactor relay.

# **EXHIBIT I**

# **ESTOPPEL CERTIFICATE**

## TENANT ESTOPPEL CERTIFICATE

THIS TENANT ESTOPPEL CERTIFICATE ("Certificate") is given this _____ day of _____, 200_ by OfficeMax North America, Inc. ("Tenant") in favor of _____, with principal office and place of business at _____ ("Lender").

### RECITALS:

A.    Pursuant to the terms and conditions of that certain Lease Agreement dated _____ ("Lease"), whereby _____, ("Landlord") leased to Tenant certain real property in _____ ("Leased Premises"), which Leased Premises are more particularly described in the Lease.

B.    Pursuant to the terms and conditions of the Lease, the Lender has requested that the Tenant execute and deliver this Certificate with respect to the Lease.

NOW, THEREFORE, in consideration of the above premises, the Tenant hereby makes the following statements for the benefit of the Lender:

1.    The copy of the Lease attached hereto and made a part hereof as **Exhibit A** is a true, correct and complete copy of the Lease, which Lease is in full force and effect as of the date hereof, and has not been modified or amended, except as follows:

2.    The Lease sets forth the entire agreement between the Landlord and the Tenant relating to the leasing of the Leased Premises, and there are no other agreements, written or oral, relating to the leasing of the Leased Premises, except as follows:

3.    To Tenant's actual knowledge and subject to Tenant's right of audit and review as stated in the Lease, there exists no uncured or outstanding defaults or events of default under the Lease, or events which, with the passage of time, and the giving of notice, or both, would be a default or event of default under the Lease, except as follows:

4.    No notice of termination has been given by Landlord or Tenant with respect to the Lease.

5.    The Commencement Date (of the Initial Term) occurred on _____. The term shall expire on _____. There are _____/_____ options of _____ years each.

Page 1 of 3

6.     The Rent Commencement Date (as such term is defined in the lease) occurred on _____.

7.     All payments due the Landlord under the Lease through and including the date hereof have been made, including the monthly installment of Annual Minimum Rent for the month of _____ in the amount of $ _____.

8.     As of the date hereof, the Annual Minimum Rent under the Lease is $_____.

9.     Tenant understands and acknowledges that Lender is relying upon the representations set forth in this Certificate. Notwithstanding anything contained in this Certificate, nothing contained in this Certificate shall constitute or be deemed to constitute an amendment, modification, or waiver of any term or condition of the Lease or any right or remedy of Tenant thereunder. In the event of a conflict between the Lease and this Certificate, the Lease shall control.

IN TESTIMONY WHEREOF, witness the signature of the Tenant as of the day and year first set forth above.

OFFICEMAX NORTH AMERICA, INC., an Ohio corporation

By:     Greg A. Darus
Its:     Vice President, Real Estate

Page 2 of 3

## EXHIBIT A

A correct and complete copy of the Lease to be attached by Landlord

SOLICITORS, 34255, 91001, 3498.1, OMAX ESTOPPEL FORM - 7-19-03.doc

«STORENUMBER» «LOCATION»
12/01/2006 3:13 PM